**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DEMOCRACY FOR THE ARAB WORLD NOW, INC., d/b/a DAWN, TAXPAYER ALLIANCE AGAINST GENOCIDE, TARIK KANAANA, and WILLIAM DOARES, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; and BRADLEY T. SMITH, in his official capacity as Director of the Office of Foreign Assets Control, <br><br> *Defendants*. | **No. 26-cv-5957** <br><br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     Plaintiffs Democracy for the Arab World Now, Inc. ("DAWN") and Taxpayer Alliance Against Genocide ("TAAG") are U.S.-based advocacy organizations devoted to ending U.S. economic, diplomatic, and military support for states that commit grave human rights abuses. In pursuit of that mission, both groups have worked on submissions to the Office of the Prosecutor ("OTP") of the International Criminal Court ("ICC") compiling evidence that Israel has committed atrocity crimes[1] in the Occupied Palestinian Territory ("oPt"), often with U.S. backing. In addition

---

[1] "Atrocity crimes" encompass genocide, crimes against humanity, war crimes, and the crime of aggression. *See generally* Cong. Research Service, *International Atrocity Crimes and Their Domestic Counterparts*, LSB10747 (Apr. 3, 2024), https://perma.cc/FZX3-L9G2.

1

to its ICC-facing work, DAWN has published research, convened conferences, lobbied policymakers, and supported litigation in U.S. courts—all with the aim of shifting U.S. policy and promoting human rights in the oPt. To do that work effectively, DAWN has cultivated relationships with regional experts and Palestinian partners, including U.N. Special Rapporteur Francesca Albanese and three of the most prominent Palestinian human rights NGOs: Al-Haq, Al Mezan, and the Palestinian Centre for Human Rights ("PCHR") (collectively, "the NGOs"). DAWN has exchanged evidence, legal analysis, and strategic ideas with Albanese and the NGOs, coordinated its messaging and advocacy with them, and relied on them to supply the information that DAWN has used in its campaigns to move public opinion and shift U.S. policy.

2.      Each of these activities is protected speech and association, squarely within the First Amendment's heartland. As a result of Executive Order 14203 ("the Order"), however, Plaintiffs now face possible criminal prosecution and civil penalties if they engage in any of them. The Order regulates these activities, not because they further a crime or a criminal enterprise, but because they potentially promote a viewpoint that this Administration finds objectionable: that the ICC should investigate alleged atrocity crimes by the United States and Israel.

3.      On February 6, 2025, President Trump issued Executive Order 14203, declaring a "national emergency" based on the ICC's purportedly "illegitimate and baseless actions targeting America and our close ally Israel." Built atop two demonstrably false premises—that the ICC lacks jurisdiction over atrocity crimes committed by U.S. and Israeli nationals, and that both countries' militaries "strictly adhere to the laws of war"—the Order invokes the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, to authorize the sanctioning (or "designation") of any foreign person who assists the ICC's investigation, arrest, or prosecution of U.S. or Israeli persons. It also makes it a crime for U.S. citizens to provide or receive "any . . .

2

services" to or from a designated person. Defendants have since used that authority to designate eleven ICC prosecutors and judges in retaliation for their role overseeing or authorizing the offending investigations—in other words, for doing the very job the international community assigned them. Defendants have gone further, designating Albanese and the three Palestinian NGOs for simply *calling upon* the ICC to investigate alleged U.S. and Israeli crimes.

4.    The chilling effect on Plaintiffs has been profound. They now face prison terms and ruinous fines if, in their interactions with the designated parties, they provide or receive anything that Defendants could plausibly characterize as a "service"—an extraordinarily capacious term that potentially reaches any act that confers a benefit on its recipient. Fearing liability, Plaintiffs— and countless others like them—have turned to self-censorship. TAAG has abstained from filing an ICC submission containing eight months' worth of research documenting U.S. complicity in Israeli atrocity crimes; and DAWN has refrained altogether from further work on ICC submissions. DAWN has also halted its informational exchanges and its coordinated advocacy efforts with Albanese and the NGOs; scrapped a proposal to invite Albanese to become an unpaid fellow; limited its platforming of Albanese and the NGOs' research and advocacy work; and shelved plans to invite them to events where they might receive (or provide) specialized trainings on topics like open-source investigation techniques and advocacy before domestic and international tribunals.

5.    The Order and designations (collectively, "the Sanctions") are a quintessential example of viewpoint discrimination: they penalize speech that advances Plaintiffs' and the designated parties' efforts, while leaving speech that criticizes or undermines those efforts entirely untouched. This Court has twice held that the Order's speech restrictions trigger strict scrutiny. The Sanctions fail that test several times over. They do not serve a compelling interest. They impermissibly censor when the settled cure for the Government's concern (that someone might

persuade the ICC to pursue a "baseless" prosecution) is government counter-speech. They burden vast swaths of speech far afield of the ICC's investigations. And they are hopelessly ineffective at achieving the Order's stated objective: suppressing *Plaintiffs'* speech, after all, does nothing to prevent ICC prosecutors from conducting their own investigations, acting on State Party referrals demanding ICC action, considering submissions from innumerable other parties, or consulting the vast public record. Indeed, ICC prosecutors need only read a newspaper to amass evidence of possible Israeli atrocity crimes in the oPt, and of U.S. complicity in those crimes.

6. Even if the Sanctions' speech and association restrictions somehow survived strict scrutiny, their enforcement would still be unlawful. The Sanctions are predicated on a spurious "national emergency" and thus invalid on their face. Moreover, Congress expressly barred the President from using IEEPA to regulate "personal communications" that convey nothing of commercial value, or to regulate the flow of "information or informational materials," 50 U.S.C. §§ 1702(b)(1), (b)(3). Every "service" that Plaintiffs wish to provide or receive falls within one or both of these exemptions.

7. Congress enacted § 1702(b)'s guardrails to "preserve First Amendment freedoms" and to prevent policies that would "isolate the people of the United States from the people of any other country," H.R. Rep. No. 95-459, at 16 (1977)—in other words, to prevent the very thing the Executive seeks to accomplish with the ICC sanctions. If the Executive is permitted to blow past constitutional and statutory restraints here, there is little to stop it from weaponizing IEEPA to target other disfavored viewpoints. A future president could, for example, declare a "national emergency" over high energy prices, designate foreign environmental groups that campaign against fossil fuel extraction, and cut off American climate advocates from their overseas partners—or, conversely, declare an emergency over climate change and use IEEPA designations

to bar U.S. industry groups from supporting or collaborating with foreign groups opposed to decarbonization policies. A future president could even declare a "national emergency" with respect to Israel's human rights abuses, designate anyone who *opposes* the ICC's investigations targeting Israeli nationals, and firewall Israel's supporters in the United States from its supporters abroad. The list of potential abuses is virtually endless.

8.     The Sanctions' speech and association restrictions are unconstitutional and unlawful. Plaintiffs wish to continue the advocacy efforts that the Sanctions have forced them to cease. Plaintiffs accordingly seek, *inter alia*, (1) a declaration that the Sanctions' speech and association restrictions violate the First Amendment and exceed the President's authority under IEEPA, and (2) an order enjoining Defendants from implementing or enforcing the Sanctions' speech and association restrictions.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and IEEPA.

10.     This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and injunctive relief pursuant to 5 U.S.C. § 702 and the Court's inherent equitable powers.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because Defendants are U.S. agencies and U.S. officials being sued in their official capacity, no real property is involved in this action, and Plaintiff Doares resides in this district.

## THE PARTIES

12.     Plaintiff Democracy for the Arab World Now, Inc. ("DAWN") is a U.S.-based 501(c)(3) organization, incorporated in Delaware, and staffed by U.S. citizens. Founded in 2018 by the late journalist and dissident Jamal Khashoggi, DAWN conducts research and policy

5

advocacy on human rights and democratic governance across the Middle East and North Africa ("MENA"). It seeks to end U.S. military, economic, technical, and diplomatic support for repressive MENA governments; to build new avenues for holding the perpetrators of grave human rights abuses to account; and to amplify the voices of human rights defenders and dissidents working across the region and in exile.

13.    DAWN uses a range of tools to spotlight human rights violations by MENA states—including Israel—that receive U.S. military and financial support. DAWN conducts research, drafts reports and policy papers, makes legal submissions to domestic and international courts, files and helps develop lawsuits, and engages with governmental officials and other actors to push for human rights accountability measures. DAWN also provides forums for human rights activists, analysts, and experts working on the MENA region to share and publish their views. It organizes both open- and closed-door conferences in which participants can exchange information about human rights and governance issues; learn specialized techniques for conducting human rights investigations; and brainstorm policy proposals, advocacy strategies, and legal methods of holding human rights violators to account.

14.    Plaintiff TAAG is an unincorporated association currently consisting of ten taxpaying U.S. citizens who reside across the United States. TAAG was formed (i) to prepare and submit communications to the ICC OTP documenting how U.S. officials have aided and abetted atrocity crimes abroad, including the commission of war crimes, crimes against humanity, and genocide by Israel in Gaza, and (ii) to engage in related research, educational, and advocacy efforts in support of accountability for those abuses. TAAG is committed to defending the First Amendment rights of U.S. taxpayers to engage in such information sharing with the ICC and ensuring that its members can do so without fear of governmental reprisal.

6

15.     TAAG sues on its own behalf and on behalf of its individual members—each of whom has been chilled from participating in the completion and filing of an ICC submission detailing U.S. support for Israeli atrocity crimes, and each of whom has been chilled from sending a modified version of that submission to Albanese.

16.     Plaintiff Tarik Kanaana is the president of TAAG, and wishes to play an active role in the preparation and filing of the ICC submission. He resides in Santa Rosa, California.

17.     Plaintiff William Doares is the treasurer of TAAG, and wishes to play an active role in the preparation and filing of the ICC submission. He resides in Manhattan, New York.

18.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

19.     Defendant Department of State is a U.S. agency headquartered in Washington, D.C.

20.     Defendant Marco Rubio is the Secretary of State and is sued in his official capacity. The Secretary of State is tasked under the Executive Order with determining, *inter alia*, whether "any foreign person" has "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality" or "materially assisted" such efforts. EO 14203 § 1(a)(ii).

21.     Defendant Department of the Treasury is a U.S. agency headquartered in Washington, D.C. The Department of the Treasury is charged with administering and enforcing the economic sanctions imposed by the Executive Order.

22.     Defendant Scott Bessent is the Secretary of the Treasury and is sued in his official capacity.

23.    Defendant the Department of Justice ("DOJ") is a U.S. agency headquartered in Washington, D.C. DOJ is responsible for criminal enforcement of violations of IEEPA, including violations of the prohibitions in the Executive Order.

24.    Defendant Todd Blanche is the Acting Attorney General and is sued in his official capacity.

25.    Defendant Office of Foreign Assets Control ("OFAC") is an office within the Department of the Treasury located in Washington, D.C. OFAC is responsible for civil enforcement of violations of IEEPA, including violations of the prohibitions in the Executive Order.

26.    Defendant Brad Smith is the Director of OFAC and is sued in his official capacity.

## FACTUAL BACKGROUND

### I.    THE INTERNATIONAL CRIMINAL COURT

27.    The ICC is a permanent international court headquartered in The Hague, the Netherlands. It was established by the Rome Statute, the culmination of a decades-long effort to create a standing transnational forum in which victims of the gravest international crimes could seek justice. *See* Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90, 37 I.L.M. 999 (entered into force July 1, 2002) ("Rome Statute").

28.    Today, 125 countries ("States Parties"), including 30 of NATO's 32 members, have ratified or acceded to the Rome Statute.[2] The United States has signed but not ratified the Rome Statute. Israel signed the Rome Statute in 2000 but withdrew its signature in 2002.

---

[2] ICC, *The States Parties to the Rome Statute*, https://perma.cc/WA3Z-FZ3S.

8

**A.  The ICC's Operations**

29.     The ICC has jurisdiction over individuals accused of "the most serious crimes of international concern," including the crime of aggression, war crimes, crimes against humanity, and genocide (collectively, "atrocity crimes"). Rome Statute arts. 1, 5. To ensure that the ICC remains a court of last resort, the Rome Statute limits the court's jurisdiction to cases in which the States that would otherwise investigate and prosecute the crimes are "unwilling or unable genuinely to carry out the investigation or prosecution." *Id.* arts. 1, 5, 17(1)(a).

30.     The ICC has three Judicial Divisions—the Pre-Trial Division, Trial Division, and Appeals Division—comprising 18 judges who are elected by the Rome Statute's Assembly of States Parties upon nomination by a State Party. *Id.* arts. 34-35. The Rome Statute mandates that judges "shall be independent in the performance of their functions" and "shall not engage in any activity which is likely to interfere with their judicial functions or to affect confidence in their independence." *Id*. art. 40. Judges must also abide by a Code of Judicial Ethics, which enshrines their independence, impartiality, integrity, the confidentiality of their deliberations, diligence in the exercise of their duties, and their conduct during proceedings.[3]

31.     The ICC's Office of the Prosecutor is responsible for investigating and prosecuting the commission of atrocity crimes within the ICC's jurisdiction. It consists of a Prosecutor and two Deputy Prosecutors. The OTP is duty-bound to "act independently": it may not "seek or act on instructions from any external source," nor may it delegate its investigative and prosecutorial functions to any other party. *Id.* arts. 42(1), 54(1)(b). The Prosecutor and Deputy Prosecutors must "be highly competent," "have extensive practical experience," and cannot "engage in any activity

---

[3] ICC, *Code of Judicial Ethics*, arts. 3-8, ICC-BD/02-01-05 (Mar. 9, 2005), https://perma.cc/MB27-A2MW.

which is likely to interfere with [their] prosecutorial functions or to affect confidence in [their] independence." *Id*. art. 42.

32.    The OTP must also respect the rights of the accused, including the right against self-incrimination; the right to be free from coercion, duress, threat, torture, or arbitrary arrest or detention; and the right to be informed of their right to remain silent and to have legal counsel of their choosing. *Id.* arts. 54(1)(c), 55.

33.    The first step in ICC proceedings is a preliminary examination, during which the OTP assesses all available information to determine, among other things, whether there is a reasonable basis to believe a crime within the ICC's jurisdiction has been committed and whether the alleged crimes are genuinely being investigated in the national system that would ordinarily exercise jurisdiction.[4]

34.    Following a preliminary examination, the Prosecutor may open an investigation into a situation referred by a State Party or the U.N. Security Council. The Prosecutor may also open an investigation *proprio motu* (on the Prosecutor's own initiative). To do so, however, the Prosecutor must obtain authorization from the ICC's Pre-Trial Chamber, which must independently verify that the Rome Statute's preconditions are satisfied. *Id.* arts. 13(c), 15.

35.    During the examination and investigation stages, the OTP dispatches missions— typically composed of investigators, advisers, and prosecutors—to the relevant countries, where it collects evidence and questions suspects, witnesses, and victims.[5]

36.    When a State Party refers a situation to the Prosecutor or the Prosecutor initiates an investigation *proprio motu*, the Prosecutor must notify the States that would ordinarily have jurisdiction over the crimes concerned. If, within a set time period, a State informs the OTP that it

---

[4] ICC, *Preliminary Examinations*, https://perma.cc/DNJ5-PMH2.
[5] ICC, *Office of the Prosecutor*, https://perma.cc/W75Y-LNPR.

is investigating the accused individuals and requests deferral, the Prosecutor must defer to the national proceedings unless the Pre-Trial Chamber—on the Prosecutor's application—decides there is good cause to authorize the ICC's investigation to proceed. *Id.* art. 18.

37.    The ICC must satisfy itself at each stage that it possesses jurisdiction, and an accused person or any State with jurisdiction over a crime may challenge the ICC's exercise of jurisdiction. *Id.* art. 19.

38.    The Prosecutor may apply for an arrest warrant, which a three-judge panel must review to determine whether "[t]here are reasonable grounds to believe that the person has committed a crime within the jurisdiction of the Court." *Id*. art. 58(1)(a). The ICC has no independent enforcement power; it relies on States to arrest individuals named in its warrants. *Id*. arts. 59, 89.

39.    Following the individual's appearance before the ICC, the case proceeds to the pre-trial stage, during which a panel of judges evaluates whether there is sufficient cause to proceed to trial. If so, a trial follows, during which the OTP must prove the charges beyond a reasonable doubt. Those convicted have an automatic right of appeal. If the conviction is upheld on appeal, the sentence is served in a country that has agreed to enforce ICC sentences.[6]

40.    Under Article 15, any interested party—including victims, civil society groups, States, and academics—may submit evidence and legal analysis (so-called "Article 15 submissions") to the OTP. Non-parties may also seek leave to file amicus briefs directly with the Pre-Trial Chamber under Rule 103 of the ICC Rules of Procedure and Evidence.

---

[6] *See generally* ICC, *How the Court Works: Legal Process*, https://www.icc-cpi.int/about/how-the-court-works.

41.     Any member of the U.N. Security Council may introduce a resolution under Article 16 of the Rome Statute to defer an ICC investigation or prosecution for a twelve-month period. Such deferral requests may be renewed indefinitely.

42.     The United States has twice invoked Article 16 to defer an ICC investigation. *See* S.C. Res. 1422, U.N. Doc. S/RES/1422 (July 12, 2002) (adopting U.S.-proposed resolution to defer the investigation or prosecution of any cases "involving current or former officials or personnel from a contributing State not Party to the Rome Statute over acts or omissions related to a United Nations established or authorized operation"); S.C. Res. 1487, U.N. Doc. S/RES/1487 (June 12, 2003) (extending Resolution 1422 for an additional year).

43.     The ICC has successfully prosecuted atrocity crimes in various conflict zones—often with the support of the United States. These include, for instance, the conviction of a Congolese warlord for enlisting and conscripting children,[7] an al Qaeda-aligned militant for intentionally directing attacks against religious shrines and historic buildings,[8] and a former Lord's Resistance Army commander for forced marriage, torture, rape, and sexual slavery perpetrated against civilians in Uganda.[9] The OTP's critical work continues today. Its current investigations and prosecutions—each of which the United States has supported in one form or another—concern arbitrary detentions, torture, rape and sexual violence perpetrated by the Maduro regime in Venezuela,[10] and war crimes and forced deportations committed by Russia in Ukraine and Georgia.[11]

---

[7] *See Prosecutor v. Lubanga Dyilo*, ICC-01/04-01/06-2842, Judgment (Mar. 14, 2012).

[8] *See Prosecutor v. Al Mahdi*, ICC-01/12-01/15-171, Judgment and Sentence (Sept. 27, 2016).

[9] *See Prosecutor v. Ongwen*, ICC-02/04-01/15-1762, Trial Judgment (Feb. 4, 2021).

[10] Beth Van Schaack, Amb.-at-Large for Glob. Crim. Just., *Statement of the United States at the 22nd Session of the Assembly of States Parties of the ICC* (Dec. 8, 2023), https://perma.cc/Z9W5-ULYQ.

[11] *See, e.g.*, Consolidated Appropriations Act, 2023, § 7073(a), Pub. L. No. 117-328, div. K, tit. VII, 136 Stat. 4459, 5092 (2022) (authorizing U.S. cooperation with ICC respecting investigation of Russian atrocity crimes committed during invasion of Ukraine); Further Consolidated Appropriations Act, 2024, § 7034(r),

44.    In an October 2024 statement to the U.N. General Assembly, the Legal Advisor to the United States Mission stated: "The United States remains steadfast in its commitment to international justice and promoting accountability for violations of international humanitarian law . . . . The work of the International Criminal Court is vital to this mission, and we welcome the ICC's continued efforts . . . to deliver justice in situations where atrocities have been committed with impunity, including in Ukraine, Darfur, and the Central African Republic."[12]

### B.  ICC Proceedings Concerning U.S. Personnel

45.    In 2007, the OTP announced that it was conducting a preliminary examination of atrocity crimes in Afghanistan, including possible crimes by U.S. forces.[13]

46.    In 2017, the OTP requested that the Pre-Trial Chamber authorize an investigation into, *inter alia*, allegations that U.S. armed forces and members of the CIA had "committed acts of torture, cruel treatment, outrages upon personal dignity, rape and sexual violence against conflict-related detainees in Afghanistan and other locations, principally in the 2003-2004 period."[14] In March 2020, the ICC Appeals Chamber allowed the investigation to proceed.[15]

47.    In September 2021, then-Prosecutor Karim Khan issued a statement explaining that his office had decided to focus its investigation on crimes allegedly committed by the Taliban and

---

Pub. L. No. 118-47, 138 Stat. 460, 793 (2024) (appropriating funds for the ICC's investigation related to the situation in Ukraine); Charlie Savage, *Biden Orders U.S. to Share Evidence of Russian War Crimes With Hague Court*, N.Y. Times (July 26, 2023).

[12] U.S. Mission to the U.N., *Remarks at a U.N. General Assembly Meeting on a Report of the ICC* (Oct. 28, 2024), https://perma.cc/4UY8-PNZM.

[13] ASIL ICC Task Force Report, *The 'Situation in Afghanistan*,' https://perma.cc/7HS7-GMYJ.

[14] ICC-OTP, *Situation in Afghanistan, Summary of the Prosecutor's Request for Authorisation of an Investigation Pursuant to Article 15*, ¶¶ 25-26 (Nov. 20, 2017), https://perma.cc/KL2Z-WBXE.

[15] *See* Human Rights Watch, *ICC: Afghanistan Inquiry Can Resume* (Oct. 31, 2022), https://perma.cc/68VC-C5A3.

13

the Islamic State and to "deprioritise other aspects of this investigation." That deprioritization effectively ended the threat of prosecutorial action targeting U.S. persons.[16]

48.    In January 2025, Khan announced that the OTP had applied for arrest warrants for senior members of the Taliban for crimes against humanity.[17] No applications for arrest warrants have been announced for U.S. personnel.

### C.  ICC Proceedings Concerning Israel and the Occupied Palestinian Territory

49.    Following Palestine's accession to the Rome Statute in 2015, the OTP opened a preliminary examination of atrocity crimes committed on Palestinian territory. In May 2018, Palestine made a referral requesting that the OTP open a formal investigation; and, in December 2019, the OTP announced that there was a "reasonable basis" to believe that the Israel Defense Forces ("IDF"), Hamas, and members of other Palestinian armed groups had committed atrocity crimes.[18]

50.    Before proceeding, however, the OTP sought guidance from the Pre-Trial Chamber regarding its jurisdiction. The OTP invited Palestine, Israel, and victims to submit written observations, and encouraged other States and interested parties to seek leave from the Pre-Trial

---

[16] *See* ICC-OTP, *Statement of the Prosecutor of the International Criminal Court, Karim A. A. Khan QC, Following the Application for an Expedited Order under Article 18(2) Seeking Authorisation to Resume Investigations in the Situation in Afghanistan* (Sept. 27, 2021), https://perma.cc/7875-VU6T.

[17] ICC-OTP, *Statement of ICC Prosecutor Karim A. A. Khan KC: Applications for Arrest Warrants in the Situation in Afghanistan*, ICC (Jan. 23, 2025), https://perma.cc/N6VE-BWXW.

[18] *Referral by the State of Palestine Pursuant to Articles 13(a) and 14 of the Rome Statute* (May 15, 2018), https://perma.cc/ZKL6-E9VQ; ICC-OTP, *Statement of ICC Prosecutor, Fatou Bensouda, on the Conclusion of the Preliminary Examination of the Situation in Palestine, and Seeking a Ruling on the Scope of the Court's Territorial Jurisdiction* (Dec. 20, 2019), https://perma.cc/T5F6-XN9X.

Chamber to do the same.[19] The Pre-Trial Chamber ultimately received and reviewed more than 40 amicus briefs on the jurisdiction question.[20]

51.     On February 5, 2021, the Pre-Trial Chamber confirmed the court's jurisdiction over crimes committed in the oPt.[21] The following month, the OTP announced it had opened an investigation respecting the Situation in Palestine following "a painstaking preliminary examination . . . that lasted close to five years," during which the OTP "engaged with a wide array of stakeholders, including in regular and productive meetings with representatives of the Governments of Palestine and Israel[.]"[22]

52.     Between November 2023 and January 2024, seven more States Parties—South Africa, Bangladesh, Bolivia, Comoros, Djibouti, Mexico, and Chile—made referrals to the OTP concerning alleged atrocity crimes committed by Israel in the oPt.[23]

53.     On May 20, 2024, ICC Prosecutor Karim Khan filed arrest warrant applications for three Hamas leaders (Mohammed Deif, Yahya Sinwar, and Ismail Haniyeh) and for Israeli Prime Minister Benjamin Netanyahu and then-Defense Minister Yoav Gallant, for war crimes and crimes against humanity perpetrated on and in the aftermath of October 7, 2023.[24]

---

[19] *Id.*

[20] *Situation in the State of Palestine*, ICC-01/18, Decision on the "Prosecution Request Pursuant to Article 19(3) for a Ruling on the Court's Territorial Jurisdiction in Palestine" (Feb. 5, 2021), ¶¶ 49-52 (describing amicus submissions), https://perma.cc/8LZM-W32N.

[21] *See generally id.*

[22] ICC-OTP, *Statement of ICC Prosecutor, Fatou Bensouda, Respecting an Investigation of the Situation in Palestine* (Mar. 3, 2021), https://perma.cc/RX6B-VREA.

[23] ICC-OTP, *Statement of the Prosecutor of the ICC, Karim A.A. Khan KC, on the Situation in the State of Palestine: Receipt of a Referral from Five States Parties* (Nov. 17, 2023), https://perma.cc/BE5H-XLUL; Republic of Chile & United Mexican States, *State Party Referral in Accordance with Article 14 of the Rome Statute of the International Criminal Court* (Jan. 18, 2024), https://perma.cc/LEL4-9MY7.

[24] ICC-OTP, *Statement of ICC Prosecutor Karim A.A. Khan KC: Applications for Arrest Warrants in the Situation in the State of Palestine* (May 20, 2024), https://perma.cc/S6RW-8JGM.

54. Israel challenged the ICC's jurisdiction to issue the arrest warrants. Consistent with its practice of permitting input from a wide array of actors, the Pre-Trial Chamber, on July 22, 2024, granted leave to dozens of interested parties—including the United Kingdom, a sitting U.S. Senator, the United States, numerous professors, the Israeli Bar Association, several U.S. law school clinics, the Simon Wiesenthal Centre, Al-Haq, Al Mezan, and PCHR—to file amicus briefs addressing Israel's jurisdictional challenge.[25] Approximately 60 amicus briefs were ultimately filed (including one by the United States[26]), the majority of which favored the exercise of jurisdiction.[27]

55. On November 21, 2024, the Pre-Trial Chamber rejected Israel's jurisdictional challenge and issued arrest warrants for Netanyahu, Gallant, and Deif. (By then, the Prosecutor had withdrawn the applications for Sinwar and Haniyeh, both of whom had since been killed.) On December 15, 2025, the Appeals Chamber rejected Israel's appeal.[28]

## II. THE ICC SANCTIONS

### A. The International Emergency Economic Powers Act

56. IEEPA authorizes the President, upon declaring a "national emergency" to address an "unusual and extraordinary" external threat, to block all property interests of foreign countries or persons whom the President designates, and to prohibit transactions involving that property. 50

---

[25] Pre-Trial Chamber I, *Situation in the State of Palestine: Decision on Requests for Leave to File Observations Pursuant to Rule 103 of the Rules of Procedure and Evidence*, ICC-01/18 (July 22, 2024), https://perma.cc/NB9S-WQUQ.

[26] *Situation in the State of Palestine*, ICC-01/18, Written Observations of the United States Pursuant to Rule 103 of the Rules of Procedure and Evidence (Aug. 6, 2024), https://perma.cc/45R9-GPUT.

[27] *See Situation in the State of Palestine: Joint Submissions on Behalf of Palestinian Victims Pursuant to Article 68(3) of the Rome Statute Related to Article 19 Proceedings*, ICC-01/18-451 ¶ 13 (June 27, 2025), https://perma.cc/V3A8-3MKB.

[28] *Situation in the State of Palestine*, ICC-01/18-481 OA3, Judgment on the Appeal of the State of Israel Against Pre-Trial Chamber I's "Decision on Israel's Challenge to the Jurisdiction of the Court Pursuant to Article 19(2) of the Rome Statute" (Dec. 15, 2025), https://perma.cc/VHM4-PPUK.

U.S.C. §§ 1701(a), 1702(a)(1)(B). The President typically exercises this authority by executive order, which identifies the targeted conduct, establishes designation criteria, and delegates to agency heads the authority to designate persons and promulgate implementing regulations.

57.     Once a person is designated, OFAC adds that person to its Specially Designated Nationals and Blocked Persons List (the "SDN List"). SDN designation carries two operative consequences: (i) the person's property interests in the United States or in the possession or control of a U.S. person are blocked; and (ii) U.S. persons are prohibited from engaging in virtually any transaction or dealing with that person.

58.     IEEPA makes it unlawful for anyone "to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the statute. 50 U.S.C. § 1705(a). The penalties for IEEPA violations are severe. An unintentional violation may trigger a civil fine equaling the greater of $377,700 or twice the value of the transaction giving rise to the violation. *Id.* § 1705(b); 90 Fed. Reg. 3687, 3688 (Jan. 15, 2025). Anyone who willfully violates IEEPA sanctions, attempts or conspires to do so, or aids and abets a violation faces up to $1,000,000 in criminal fines and up to twenty years in prison. 50 U.S.C. § 1705(c).

59.     Congress enacted IEEPA in 1977 to rein in Executive abuse of the emergency powers under the 1917 Trading with the Enemy Act. To that end, Congress specified that IEEPA's restrictions "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and *may not be exercised for any other purpose.*" *Id*. § 1701(b) (emphasis added).

60.     IEEPA, the enacting Congress explained, was "clearly limited to the regulation of international *economic* transactions." H.R. Rep. No. 95-459, at 10-11 (1977) (emphasis added).

17

The law did not confer "the authority to control noneconomic aspects of international intercourse such as personal communications[.]" *Id.* at 11. Congress codified this restriction in 50 U.S.C. § 1702(b)(1), which states that the President's powers under the statute do not include the authority to "regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communications which does not involve a transfer of anything of value." This provision was "designed both to preserve First Amendment freedoms of expression, and to preclude policies that would totally isolate the people of the United States from the people of any other country." H.R. Rep. No. 95-459, at 16.

61.     Troubled by the Executive's use of IEEPA to infringe on First Amendment freedoms, Congress amended the law in 1988 by adding the so-called Berman Amendment, which barred the President from using IEEPA to regulate or prohibit, "directly or indirectly," "the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials." Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 2502(b), 102 Stat. 1107, 1371-72 (codified as amended at 50 U.S.C. § 1702(b)). In the accompanying House Report, Congress expressed its view that "no prohibitions should exist on imports to the United States of ideas and information if their circulation is protected by the First Amendment." H.R. Rep. No. 100-40, pt. 3, at 113 (1987).

62.     Over the next few years, the Treasury Department construed the Berman Amendment narrowly, prompting Congress to intervene yet again. In 1994, Congress clarified and expanded the scope of that provision through the Free Trade in Ideas Act. Pub. L. No. 103-236, tit. V, § 525, 108 Stat. 382, 474-75 (1994) (codified as amended at 50 U.S.C. § 1702(b)(3)-(4)). As revised, the Berman Amendment now expressly forbids the President from relying on IEEPA

18

to regulate "directly or indirectly" "the importation from any country, or the exportation to any country, *whether commercial or otherwise, regardless of format or medium of transmission*, of *any information or informational materials*[.]" 50 U.S.C. § 1702(b)(3) (emphasis added).

63.    When amending the law, Congress explained that "the President should not restrict travel or exchanges for informational, educational, religious, cultural, or humanitarian purposes or for public performances or exhibitions, between the United States and any other country." Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, § 525(a), 108 Stat. 382, 474 (1994). Congress further explained that it was expanding the Berman Amendment to "protect the constitutional rights of Americans to educate themselves about the world by communicating with peoples of other countries in a variety of ways, such as by sharing information and ideas with persons around the world, traveling abroad, and engaging in educational, cultural and other exchanges with persons from around the world." H.R. Rep. No. 103-482, at 239 (1994) (Conf. Rep.).

64.    Presidents have historically invoked IEEPA to regulate economic transactions connected to *bona fide* national-security threats, such as weapons proliferation, terrorism, cyberattacks, foreign aggression, narcotics trafficking, and serious foreign corruption or human-rights abuses. *See, e.g.,* 31 C.F.R. § 544.201 (weapons proliferation); *id.* § 594.201 (terrorism); *id.* § 578.201 (cyberattacks); *id.* §§ 587.201, 589.201 (Russia- and Ukraine-related aggression); *id.* § 536.201 (narcotics trafficking); *id.* § 583.201 (human-rights abuse and corruption).

65.    Only once before has a President attempted to use IEEPA to sanction people for pursuing justice before an international court: in 2020, President Trump issued a substantively identical executive order targeting the ICC. *See* Exec. Order No. 13928, *Blocking Property of Certain Persons Associated With the International Criminal Court*, 85 Fed. Reg. 36139 (June 15,

19

2020). That order promptly faced legal challenges, and this Court preliminarily enjoined its enforcement as an impermissible content-based regulation of speech that likely violated the First Amendment. *See Open Soc'y Just. Initiative v. Trump* ("*OSJI*"), 510 F. Supp. 3d 198 (S.D.N.Y. 2021).

66.     President Biden rescinded Executive Order 13928 shortly after taking office, declaring that "the threat and imposition of financial sanctions against the Court, its personnel, and those who assist it are not an effective or appropriate strategy for addressing the United States' concerns with the ICC." Exec. Order No. 14022, *Termination of Emergency with Respect to the International Criminal Court*, 86 Fed. Reg. 17895 (Apr. 1, 2021).

### B.   Executive Order 14203 and the Designation of ICC Prosecutors and Judges

67.     On February 6, 2025, President Trump issued Executive Order 14203, declaring a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons," defined as "any United States person, unless the United States provides formal consent to ICC jurisdiction over that person or becomes a state party to the Rome Statute" and "any foreign person that is a citizen or lawful resident of an ally of the United States that has not consented to ICC jurisdiction over that person or is not a state party to the Rome Statute." Exec. Order No. 14203, pmbl. & § 8(d), 90 Fed. Reg. 9369 (Feb. 12, 2025).

68.     The Order asserts that the ICC has, "without a legitimate basis, asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel, and has further abused its power by issuing baseless arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant." *Id.* pmbl. The Order further asserts that these actions are "illegitimate and baseless" because (i) the ICC lacks jurisdiction as neither the United States nor Israel "is party to the Rome

Statute or a member of the ICC," and (ii) "both nations are thriving democracies with militaries that strictly adhere to the laws of war." *Id.*

69.     Both premises are demonstrably false. The Rome Statute expressly authorizes the ICC to exercise jurisdiction over crimes committed by non-State Party nationals on the territory of a State Party. Rome Statute art. 12(2). And because Afghanistan and Palestine are States Parties, the ICC has jurisdiction over crimes committed on their territory, even by non-State Parties like the United States and Israel.

70.     Both Congress and the Executive have implicitly recognized Article 12(2)'s jurisdictional grant by supporting the ICC's investigation into atrocity crimes committed in Ukraine by Russia—a country that has not consented to the ICC's jurisdiction and is not a party to the Rome Statute. In 2022, for example, the Senate unanimously passed a resolution praising the ICC as a "tribunal that seeks to uphold the rule of law, especially in areas where no rule of law exists," and resolving to "encourage[] member states to petition the ICC . . . to take any steps to investigate war crimes and crimes against humanity committed by the Russian Armed Forces and their proxies." S. Res. 546, 117th Cong. (2022). Later that year, Congress appropriated funds to assist the ICC's investigation of Russia's atrocity crimes in Ukraine. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 7073(b), 136 Stat. 4459 (2022). And in March 2023, then-President Biden called the ICC's arrest warrant for President Putin "justified."[29]

71.     Moreover, the U.S. Government's own official assessments belie the Order's claim that U.S. and Israeli forces have "strictly adhere[d] to the laws of war." For example:

---

[29] Jeff Mason and Simon Lewis, *Biden Says Putin Committed War Crimes, Calls Charges Justified*, Reuters (Mar. 18, 2023), https://perma.cc/E5WG-SAAE.

a.    The 2014 Senate "Torture Report" details how CIA personnel tortured detainees in Afghanistan during the period subject to the OTP's now-deprioritized investigation of U.S. personnel.[30]

b.    A 2023 State Department report described "credible reports" that Israeli security forces had engaged in:

> arbitrary or unlawful killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment; harsh and life-threatening prison or detention conditions; arbitrary arrest or detention; . . . serious abuses in a conflict, including widespread civilian deaths or harm, enforced disappearances or abductions, forcible transfers of civilian populations, torture, physical abuses, conflict-related sexual violence or punishment; . . . violence or threats of violence against journalists . . . ; . . . serious government restrictions on or harassment of domestic and international human rights organizations; and crimes involving violence or threats of violence targeting Palestinians.[31]

The report also noted that "Israeli authorities operating in Gaza took no publicly visible steps to identify and punish officials accused of committing human rights abuses"[32]—in other words, that they did nothing that would divest the ICC of jurisdiction under the principle of complementarity.

c.    A joint State and Defense Department report issued in May 2024 concluded that U.S.-supplied munitions were "likely" used "in incidents involving civilian harm" that "raise concerns about Israel's [international humanitarian law] compliance."[33] The report described "reporting from multiple credible UN and non-governmental sources

---

[30] *Report of the Senate Select Committee on Intelligence, Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, S. Rep. No. 113-288, at xix, 49-54 (2014), https://perma.cc/ZR4S-3WLJ.

[31] U.S. Dep't of State, Bureau of Democracy, Hum. Rts. & Lab., *2023 Country Reports on Human Rights Practices: Israel, West Bank and Gaza—West Bank and Gaza*, Exec. Summary (2024), https://perma.cc/HS93-CFTG.

[32] *Id.*

[33] U.S. Dep't of State & U.S. Dep't of Def., *Report to Congress Under Section 2 of the National Security Memorandum on Safeguards and Accountability with Respect to Transferred Defense Articles and Defense Services (NSM-20)* 20-21 (2024), https://perma.cc/TM5G-65EF.

22

on alleged human rights violations by Israeli forces" that raised "serious concerns" that Israel was abetting "[e]xtremist settlers," attacking humanitarian workers, and striking "civilian infrastructure" "in densely populated areas" "under circumstances that call into question whether expected civilian harm may have been excessive relative to the reported military objective."[34]

      d.     According to public reports, the State Department's Office of Inspector General found in October 2025 that the IDF had committed "many hundreds" of potential human rights violations.[35]

72.     As relevant here, Section 1(a)(ii) of the Order authorizes the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to designate any foreign person found:

(A) to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality; [or]

(B) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in subsection (a)(ii)(A) of this section or any person whose property or interests in property are blocked pursuant to this order[.]

73.     Section 3 of the Order prohibits anyone—including U.S. citizens—from making "any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked." *Id*. § 3(a). It likewise prohibits anyone from "recei[ving] . . . any contribution or provision of funds, goods, or services from" a blocked person. *Id*. § 3(b).

---

[34] *Id.* at 21-25.

[35] John Hudson, *Classified U.S. Report Finds Backlog of Hundreds of Possible Israeli Human Rights Violations*, Wash. Post (Oct. 30, 2025).

74.    ICC Prosecutor Karim Khan was designated contemporaneously with the Order's issuance. *Id.* annex. Between June 5 and August 20, 2025, Secretary Rubio designated six ICC judges for "authoriz[ing] the ICC's investigation against U.S. personnel in Afghanistan" or "rul[ing] to authorize the ICC's issuance of arrest warrants" targeting Netanyahu and Gallant. He also designated two Deputy Prosecutors for "continuing to support illegitimate ICC actions against Israel, including upholding the ICC's arrest warrants."[36] On December 18, 2025, Secretary Rubio designated two more ICC judges in retaliation for "voting with the majority in favor of the ICC's ruling against Israel's appeal on December 15."[37] The two ICC judges who dissented from that ruling were spared designation.

### C.    The Designation of the Palestinian NGOs—Al-Haq, Al Mezan, and PCHR

75.    Al-Haq, Al Mezan, and PCHR are independent, non-partisan human rights organizations based in the West Bank and Gaza.[38] They are "globally respected" and "among the oldest and most effective and reliable in covering human rights violations and abuses by all parties in the occupied Palestinian territories."[39]

76.    True to their perpetrator-neutral mandate, all three NGOs have exposed and condemned abuses committed by the Palestinian Authority and Hamas. For example, Al-Haq has documented assaults, arbitrary arrests, and the use of torture by Palestinian security forces.[40] Al

---

[36] U.S. Dep't of State, Press Release, *Imposing Sanctions in Response to the ICC's Illegitimate Actions Targeting the United States and Israel* (June 5, 2025), https://perma.cc/MV6X-VA7E; U.S. Dep't of State, Press Release, *Imposing Further Sanctions in Response to the ICC's Ongoing Threat to Americans and Israelis* (Aug. 20, 2025), https://perma.cc/Z7B9-BDXH.

[37] U.S. Dep't of State, Press Release, *Sanctioning ICC Judges Directly Engaged in the Illegitimate Targeting of Israel* (Dec. 18, 2025), https://perma.cc/EJP3-U6YR.

[38] Al-Haq, *History*, https://perma.cc/3A9G-FWBM; Al Mezan, *About Us*, https://perma.cc/YF9J-YBDP; PCHR, *About*, https://perma.cc/SRR6-H35N.

[39] U.N. Off. of the High Comm'r for Hum. Rts. ("OHCHR"), *UN Experts Dismayed by US Sanctions Against Palestinian Human Rights Organisations* (Sept. 22, 2025), https://perma.cc/5KSP-G5DE.

[40] *See, e.g.*, Al-Haq, *Field Report on Human Rights Violations in February 2022*, https://perma.cc/D2G8-HCMS; Al-Haq, *Open Letter from the Palestinian Human Rights Organisation Council to the Palestinian*

Mezan has protested extrajudicial executions, the violent dispersion of peaceful protests, and the crackdown on dissent by Hamas officials.[41] And PCHR has long campaigned to ban capital punishment in the oPt and documented torture, arbitrary detention, and other abuses by Palestinian security services.[42]

77.     All three organizations belong to or are affiliated with leading rule-of-law institutions, including the International Commission of Jurists-Geneva, the Euro-Mediterranean Human Rights Network, the World Organisation Against Torture, and the International Federation for Human Rights. All three also hold special consultative status with the U.N. Economic and Social Council, which entitles them to observe public meetings of the Council and its subsidiary bodies, submit official written statements, and deliver oral statements before the U.N. Human Rights Council.

78.     These organizations have also been widely honored for their work. Al-Haq's recognitions include the 1990 Carter-Menil Human Rights Prize, the 2018 Human Rights Prize of the French Republic, and the 2022 Middle East Studies Association Academic Freedom Award. Al Mezan's director received the 2020 Franco-German Prize for Human Rights and the Rule of Law. PCHR has been awarded the 1996 French Republic Award on Human Rights, the 2002 Bruno Kreisky Award for Outstanding Achievements in the Area of Human Rights, and the 2003

---

*President, Mr. Mahmoud Abbas, as the Commander-in-Chief of the Palestinian Security Forces* (Jan. 25, 2025), https://perma.cc/MSV7-UVNJ.

[41]*See, e.g.*, Al Mezan, *Al Mezan Condemns the Extrajudicial Execution of Palestinians in Gaza and Calls for Respect for the Rule of Law* (Oct. 15, 2025), https://perma.cc/ET2G-CV8P; Al Mezan, *Peaceful Protest Dispersed amid Increasing Internal Violations* (Feb. 26, 2019), https://perma.cc/P9JJ-Y4MZ; Al Mezan, *Police Disruption of NGO Conference in Gaza Is Illegal; Al Mezan Calls for Respect of Association Rights and Free Expression in Gaza*, https://perma.cc/7FNN-YDUF.

[42] PCHR, *Position Papers on Death Penalty*, https://perma.cc/9FKU-5F32; PCHR, *PCHR Requests Investigating the Arrest and Torture of a Person Until He Lost the Ability to Speak in PSS Office in Doura* (Apr. 30, 2013), https://perma.cc/Q7BS-SKK5; PCHR, *Arrests in Gaza on Grounds of Freedom of Expression and Youth Movement* (Oct. 29, 2019), https://perma.cc/T6VR-JDHN.

International Service Human Rights Award. Its founder and director, Raji Sourani, has amassed a string of honors in his own right, including the 2013 Right Livelihood Award, France's 2021 National Order of Merit, and the 2022 Honorary Human Rights Award from the Association for Human Rights of Spain.[43]

79.     The NGOs use a variety of tools in their advocacy efforts. They have investigated and documented war crimes and other abuses committed or abetted by the IDF, including: settlement expansion and land confiscation,[44] settler attacks,[45] home demolitions,[46] unlawful detention and prisoner abuse,[47] gender-based violations and assaults against children,[48] the use of torture,[49] Israel's humanitarian blockade of Gaza, its use of starvation as a weapon of war, the bombardment of hospitals and other civilian infrastructure,[50] and the deliberate targeting of Palestinian journalists.[51] These reports are a critical source of information for journalists, advocates, and other human rights monitors—particularly because Israel barred almost all foreign journalists from entering Gaza after the October 7, 2023 attacks.[52]

---

[43] TRT World Forum, *Raji Sourani*, https://perma.cc/Y6TZ-F7YY.

[44] *See, e.g.*, Al-Haq, *Al-Haq Calls for Immediate and Overdue Measures from Third States to Prevent Israel's Illegal Annexation of the Palestinian Territory Through Settlement Expansion* (May 8, 2026), https://perma.cc/4N9H-SG9T.

[45] *See, e.g.*, Al-Haq, *Al-Haq Calls for Immediate and Effective Measures from Third States and the EU to Stop Israeli Settler Attacks in the Occupied Palestinian Territory* (Mar. 13, 2026), https://perma.cc/T2FZ-V759; PCHR, *Settlers' Fire Kills Two Brothers and Injures Their Third Brother and Other Palestinians, Including a Child, in Nablus* (Mar. 4, 2026), https://perma.cc/4DK8-B6VT.

[46] *See, e.g.*, Al-Haq, *Consolidating Annexation of the West Bank: Israel's Demolitions in Area B* (Mar. 30, 2025), https://perma.cc/7MD9-9BFK.

[47] *See, e.g.*, Al-Haq, *Monitoring, Documentation and Means of Confrontation: Prevention of Torture in Palestine* (2021), https://perma.cc/X3QC-52SV.

[48] *See, e.g.*, Al-Haq, *Field Focus: Persecution of Children under Israeli Apartheid – The Case of Ahmad Awartani from Jenin* (Dec. 18, 2025), https://perma.cc/Q58R-95VX.

[49] *See, e.g.*, Al-Haq, *Affidavit: The Torture of 22-Month-Old Jawad* (Mar. 24, 2026), https://perma.cc/TUG5-XKSU.

[50] *See, e.g.*, Al-Haq, Al Mezan, PCHR, *Destruction of al-Rimal Neighborhood in Gaza City, an Attack on the Economic Existence of a National Group* (Oct. 19, 2023), https://perma.cc/AZ3N-TXK8.

[51] *See, e.g.*, Al Mezan, *Kill the Witness, Hide the Crimes* (Sept. 1, 2025), https://perma.cc/5LAH-59Y2.

[52] *Barred from Gaza for Two Years, International Journalists Are Still Fighting for Access*, NPR (Nov. 25, 2025), https://perma.cc/W52Q-TTPD.

80.    Al-Haq has also been an active participant in proceedings before the International Court of Justice ("ICJ") involving Israel. It submitted a brief arguing that Israel had violated the prohibition against apartheid—a position the ICJ ultimately adopted in its 2024 advisory opinion.[53] After the U.N. General Assembly requested an advisory ICJ opinion on Israel's obligations toward U.N. and other international actors operating within the oPt, Al-Haq publicly urged other States to submit their own filings condemning the restrictions Israel had imposed on those bodies.[54]

81.    All three NGOs have pursued litigation in domestic courts, including by bringing lawsuits in the UK and Germany to halt arms sales to Israel[55] and by filing complaints in Germany and France against IDF soldiers alleged to have targeted Palestinian civilians.[56]

82.    In addition, Al-Haq, Al Mezan, and PCHR have made numerous submissions to the ICC, including: (i) a March 2020 amicus filing to the Pre-Trial Chamber arguing that the ICC had jurisdiction over crimes committed in the oPt;[57] (ii) an October 19, 2023 open letter—joined by 106 human rights groups and genocide scholars—calling on the ICC Prosecutor to issue arrest warrants and open an investigation to deter Israeli officials from inciting genocide;[58] (iii) a November 9, 2023 Article 15 submission compiling evidence that Israeli officials had committed

---

[53] Al-Haq, *Al-Haq Submits its Position on Key Arguments to the International Court of Justice for the Advisory Opinion on the Legal Consequences Arising from Israel's Occupation* (July 29, 2023), https://perma.cc/H3K3-NFTU; *Summary of the Advisory Opinion of 19 July 2024*, I.C.J. Summary 2024/8, https://perma.cc/D5XM-KZAE.

[54] Al-Haq, *Al-Haq Sends Letters to Third States Ahead of the Public Hearings in the Forthcoming International Court of Justice Advisory Proceedings on the Obligations of Israel*, https://perma.cc/R3EE-KPQQ.

[55] *See, e.g.*, Al-Haq, *Legal and Human Rights Groups Take UK Government to High Court over Arms Exports to Israel* (Dec. 6, 2023), https://perma.cc/HCU3-L2BQ.

[56] Al-Haq, *Complaint Filed Against Franco-Israeli Soldier: The French Judiciary Must Open an Investigation* (Dec. 17, 2024), https://perma.cc/K2T2-84UA; FIDH, *Summary Executions in Gaza: Complaint Filed Against Dual National Snipers in France* (July 1, 2025), https://perma.cc/7K5Z-J5PJ.

[57] Al-Haq, *Palestinian Human Rights Organisations Submit Amicus on Territorial Jurisdiction of the State of Palestine, to the Pre-Trial Chamber of the International Criminal Court* (Mar. 16, 2020), https://perma.cc/92L9-F722.

[58] Open Letter to ICC Prosecutor (Oct. 19, 2023), https://perma.cc/A2CE-8GUX.

genocide or incitement to genocide in Gaza;[59] (iv) a May 17, 2024 letter urging ICC intervention to stop the impending ground invasion of Rafah;[60] and (v) an August 6, 2024 amicus brief to the Pre-Trial Chamber arguing that the ICC had authority to issue arrest warrants against Netanyahu and Gallant.[61]

83.    On September 4, 2025, Secretary Rubio designated Al-Haq, Al Mezan, and PCHR under Section 1(a)(ii) of Executive Order 14203 for "directly engag[ing] in efforts by the . . . [ICC] to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent."[62]

84.    Those designations were widely condemned, including by a panel of U.N. human rights experts and more than 100 NGOs.[63]

### D.  The Designation of U.N. Special Rapporteur Francesca Albanese

85.    In 1993, the U.N. Commission on Human Rights—the predecessor to the U.N. Human Rights Council ("UNHRC")—created the position of "Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967" ("UNSR-oPt"). The UNSR-oPt's mandate is:

> (A) To investigate Israel's violations of the principles and bases of international law, international humanitarian law and the Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949, in the Palestinian territories occupied by Israel since 1967;

---

[59] Al-Haq, *Palestinian Human Rights Organisations Call on ICC to Issue Arrest Warrants Against Israeli Leaders for Genocide and Incitement to Genocide* (Nov. 9, 2023), https://perma.cc/7J6M-X9CB.

[60] Letter to Karim Khan (May 17, 2024), https://perma.cc/3ZNZ-Q6HP.

[61] *Situation in the State of Palestine*, ICC-01/18-308, Al-Haq, Al-Mezan Center for Human Rights and the Palestinian Centre for Human Rights' Written Observations Pursuant to Rule 103 of the Rules of Procedure and Evidence, Pre-Trial Chamber I (Aug. 6, 2024), https://perma.cc/RNY4-CWXT.

[62] *Sanctioning Foreign NGOs Directly Engaged in ICC's Illegitimate Targeting of Israel* (Sept. 4, 2025), https://perma.cc/3UKU-ZXNR.

[63] Human Rights Watch *et al.*, *Joint Statement: U.S. Sanctions on Palestinian Human Rights Organizations Erodes International Law*, Hum. Rts. Watch (Oct. 17, 2025), https://perma.cc/896G-NWT7; Amnesty Int'l, *NGOs Demand EU Action for U.S.-Sanctioned Palestinian Human Rights Organizations* (Sept. 29, 2025), https://perma.cc/S3JR-QNWM.

(B)  To receive communications, to hear witnesses, and to use such modalities of procedure as he may deem necessary for his mandate;

(C)  To report, with his conclusions and recommendations, to the Commission on Human Rights at its future sessions, until the end of the Israeli occupation of those territories.[64]

86.     There are approximately 60 U.N. Special Rapporteurs ("UNSRs"), each tasked with reporting on specific human rights situations to the U.N. Human Rights Council in Geneva and to the U.N. General Assembly in New York.[65] UNSRs do not receive a salary and are required to act "in an independent capacity."[66] They lack authority to initiate legal action or issue binding recommendations. Instead, their role is to inform U.N. bodies and engage in broader public advocacy within their respective mandates. Because they operate on limited budgets without permanent investigative staff, UNSRs rely heavily on information supplied by academics and civil society groups.

87.     In the spring of 2022, member states of the UNHRC appointed Francesca Albanese to be UNSR-oPt.

88.     In that role, Albanese has become a highly visible public figure and a widely recognized voice in the public discourse on Israel and Palestine. She has been invited to speak at leading universities, including Oxford, the London School of Economics, Columbia, and Princeton.[67] She has also delivered major public lectures, including the Nelson Mandela Annual

---

[64] U.N. Comm'n on Human Rights, *Question of the violation of human rights in the occupied Arab territories, including Palestine*, E/CN.4/RES/1993/2 (Feb. 19, 1993).
[65] Off. of the U.N. High Comm'r for Hum. Rts., *Current and Former Mandate Holders (Existing Mandates), valid as of 1 May 2026*, https://perma.cc/ELE2-433C.
[66] U.N. Human Rights Council Res. 5/2, arts. 3-4, U.N. Doc. A/HRC/RES/5/2 (June 18, 2007); *Manual of Operations of the Special Procedures of the Human Rights Council* ¶¶ 10-13 (2008), https://perma.cc/L5CZ-QWX6.
[67] *Human Rights in the Occupied Palestinian Territory*, Refugee Stud. Ctr., Univ. of Oxford (Mar. 13, 2024), https://perma.cc/PVG7-L9AY; *Francesca Albanese*, LSE Students' Union (Nov. 11, 2024), https://perma.cc/5XBR-6YYR; *Presentation by UN Special Rapporteur of the Occupied Territories, Francesca Albanese*, Ctr. for Palestine Stud., Columbia Univ. (Oct. 24, 2022), https://perma.cc/5GVJ-

Lecture, the Edward Said Memorial Lecture, and the inaugural Dries van Agt Lecture at The Hague.[68] In April 2026, the University of Antwerp, Ghent University, and Vrije Universiteit Brussel jointly conferred on Albanese an honorary doctorate.[69] Her many accolades include the 2025 Dries van Agt Award by The Rights Forum[70] and Spain's 2026 Order of Civil Merit—one of that country's highest civilian honors.[71]

89.      Albanese relies on States, NGOs, academics, and other stakeholders to supply the information and analysis underlying her reports to the U.N. General Assembly and the UNHRC. To that end, she has issued periodic Calls for Input on subjects including: (i) Israel's international law violations after October 7, 2023;[72] (ii) the role of private actors—including financial institutions and weapons manufacturers—in sustaining Israel's illegal occupation of the oPt;[73] (iii) the steps taken by Israel and third-party states to comply with the ICJ's advisory opinion on Israel's unlawful occupation of the oPt;[74] and (iv) Israel's mistreatment of Palestinian prisoners.[75]

---

6QT4; *Dean's Leadership Series—Francesca Albanese, UN Special Rapporteur on the Occupied Palestinian Territories*, Princeton Sch. of Pub. & Int'l Affs. (Oct. 29, 2024), https://perma.cc/3RE3-HZXZ.

[68] *Francesca Albanese, Human Rights Lawyer and UN Special Rapporteur, to Deliver the 23rd Nelson Mandela Annual Lecture*, Nelson Mandela Found. (Oct. 2, 2025), https://perma.cc/FZ8Y-HLCK; *The Australian 2023 Edward Said Memorial Lecture*, Austl. Friends of Palestine Ass'n (Nov. 11, 2023), https://perma.cc/WU8Y-VZRS; *Dries van Agt-Lezing 2025*, The Rights Forum (Feb. 12, 2025), https://perma.cc/G544-8HNK.

[69] *UAntwerpen, UGent and VUB Jointly Award Honorary Doctorate to Francesca Albanese*, Vrije Universiteit Brussel Press (Apr. 2, 2026), https://perma.cc/2GSH-ECH2.

[70] *Francesca Albanese Wins the Dries van Agt Award 2025*, The Rights Forum (Feb. 13, 2025), https://perma.cc/AW5F-RTSX.

[71] *UN's Francesca Albanese Receives Top Civilian Honour in Spain for Condemning Gaza War*, The National (May 8, 2026), https://perma.cc/PVR6-WDVU.

[72] OHCHR, *Call for Input for the Report of the Special Rapporteur on the Occupied Palestinian Territory to General Assembly 79th Session* (2024), https://perma.cc/N92Q-TYFG.

[73] OHCHR, *Call for Input for the Report of the Special Rapporteur on the Occupied Palestinian Territory to the Human Rights Council 58th Session* (2024), https://perma.cc/9MQ5-5669.

[74] OHCHR, *Call for Input for the Report of the Special Rapporteur on the Occupied Palestinian Territory to the General Assembly 80th Session* (2025), https://perma.cc/J5YM-PERD.

[75] OHCHR, *Call for Input for the Report of the Special Rapporteur on the Occupied Palestinian Territory to Human Rights Council 61st Session* (2025), https://perma.cc/U6XF-W9DN.

90.    As UNSR-oPt, Albanese has submitted at least eight reports to the U.N. General Assembly and UNHRC.[76] In several of those reports, she has called on the ICC to investigate atrocity crimes committed against Palestinians. Thus, in her October 2024 report to the U.N. General Assembly, she "urge[d] the ICC" to "investigate the commission" of alleged "crimes of genocide and apartheid by Israel."[77] And in her July 2025 report to the U.N. Human Rights Council, she urged the ICC "to investigate and prosecute" U.S. companies for supplying Israel with "heavy machinery" used for home demolitions and "weaponry and technical support" used by the IDF to "devastate a virtually defenceless civilian population" in Gaza.[78] In addition, in August 2024, she joined 19 other Special Rapporteurs, U.N. Working Groups, and independent experts in filing an amicus brief urging the ICC Pre-Trial Chamber to grant the Prosecutor's applications for arrest warrants targeting Netanyahu and Gallant.[79]

91.    Albanese has no role—formal or otherwise—with the ICC and, apart from the power of persuasion, has no ability to prompt the OTP to commence an investigation.

92.    On July 9, 2025, Secretary Rubio designated Albanese for "recommend[ing] that the ICC, without a legitimate basis, issue arrest warrants targeting" Netanyahu and Gallant and for

---

[76] Albanese, *Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967*, U.N. Doc. A/77/356 (Sept. 21, 2022), https://perma.cc/68MJ-4PVJ; Albanese, *Situation of Human Rights in the Palestinian Territories Occupied Since 1967*, U.N. Doc. A/78/545 (Oct. 20, 2023), https://perma.cc/9H4K-HHS6; Albanese, *Genocide as Colonial Erasure*, U.N. Doc. A/79/384 (Oct. 1, 2024), https://perma.cc/BF5P-WZ3M; Albanese, *Gaza Genocide: A Collective Crime*, U.N. Doc. A/80/492 (Oct. 20, 2025), https://perma.cc/5PGX-TCTQ; Albanese, *Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967*, U.N. Doc. A/HRC/53/59 (June 9, 2023), https://perma.cc/TG58-RH2Y; Albanese, *Anatomy of a Genocide*, U.N. Doc. A/HRC/55/73 (July 1, 2024), https://digitallibrary.un.org/record/4060409; Albanese, *From Economy of Occupation to Economy of Genocide*, U.N. Doc. A/HRC/59/23 (July 2, 2025), https://perma.cc/JM8R-SM5Y; Albanese, *Torture and Genocide*, U.N. Doc. A/HRC/61/71 (Feb. 19, 2026), https://perma.cc/V2N5-H9BG.
[77] Albanese, *Genocide as Colonial Erasure* 32, *supra* n.76.
[78] Albanese, *From Economy of Occupation to Economy of Genocide* 7-8, 12, 26-27, *supra* n.76.
[79] *Situation in the State of Palestine*, ICC-01/18-320, *Amicus Curiae* Submission by U.N. Mandate Holders (Aug. 6, 2024), https://perma.cc/5TRU-3JQH.

"recommend[ing] the ICC pursue investigations and prosecutions of" certain American companies and their executives.[80]

93. Albanese's designation was widely condemned, including by the EU and dozens of U.N. human rights experts and NGOs.[81]

### III. PLAINTIFFS' WORK WITH THE ICC, THE PALESTINIAN NGOS, AND ALBANESE

94. **The ICC**. Prior to Executive Order 14203, DAWN made multiple Article 15 submissions to the OTP setting forth the evidentiary and legal basis for investigating Israeli and U.S. officials. DAWN's most recent ICC submissions include: (i) a November 2022 submission compiling evidence that the IDF's 97th Netzah Yehuda Battalion committed numerous human rights violations in the West Bank, including extrajudicial killings, beatings, and physical and sexual torture; (ii) a November 2023 submission compiling evidence supporting the initiation of an investigation into 40 IDF commanders suspected of war crimes in Gaza in the weeks following the October 7, 2023 attacks; and (iii) a January 2025 submission compiling evidence and articulating the legal basis for investigating former President Biden, former Secretary of State Blinken, and former Secretary of Defense Austin for aiding and abetting Israeli atrocity crimes.

95. In October 2025, individual researchers who later formed TAAG began working on their first Article 15 submission setting forth the legal and evidentiary basis for investigating various U.S. officials—including President Trump, members of his administration, and senior congressional leaders—for aiding and abetting Israeli atrocity crimes by, *inter alia*, supplying

---

[80] Press Statement, U.S. Dep't of State, *Sanctioning Lawfare that Targets U.S. and Israeli Persons* (July 9, 2025), https://perma.cc/J3RH-44CK.

[81] *See, e.g.*, *EU "Deeply Regrets" U.S. Sanctions on U.N. Expert on Palestinians, Says EU Spokesperson*, Reuters (July 11, 2025), https://perma.cc/R9QK-V2PF; U.N. Hum. Rts. Off. of the High Comm'r, *U.S. Sanctions on Special Rapporteur Francesca Albanese Threaten Human Rights System: U.N. Experts* (Aug. 8, 2025), https://perma.cc/VY5V-C6VW; CIVICUS, *United States of America: Sanctions on the United Nations Special Rapporteur an Assault on Human Rights* (July 15, 2025), https://perma.cc/RQC7-95P9.

Israel with 2,000-pound bombs that are used against civilian targets and by facilitating the creation of militarized aid-distribution centers at which IDF soldiers and private security contractors corralled and killed Palestinian civilians seeking food aid.

96. The purpose of these filings is not merely to encourage an ICC investigation. They also serve a broader expressive and public-advocacy function. They enable Plaintiffs to garner more press attention than a typical advocacy report might; and they signal to the public, civil society, and government officials that the conduct at issue is sufficiently grave to warrant scrutiny by an international tribunal established to prosecute only the gravest international crimes.

97. **The Palestinian NGOs**. Prior to their designation, DAWN maintained a close working relationship with each of the Palestinian NGOs. DAWN invited representatives from these organizations to attend events it hosted and to publish papers in its online journal, *Democracy in Exile*. It included NGO representatives on conference calls with congressional staff to discuss Israel's crackdown on Palestinian NGOs. It exchanged views about the best ways of pursuing accountability for U.S., Israeli, and corporate wrongdoers who committed or aided legal violations in the oPt. And it signed joint statements amplifying the NGOs' work.

98. These NGOs are among the few organizations with direct access to the victims, witnesses, and primary documentation on which DAWN's Israel-Palestine accountability work depends. DAWN has relied on the NGOs to provide information for use in its reports, press releases, and advocacy campaigns. For example, Al-Haq provided critical information that was used in a 2023 joint DAWN-Amnesty International complaint to Hyundai cataloging how that company's heavy equipment was being used in home demolitions in the West Bank in violation of international humanitarian law. Al-Haq also furnished evidence that was used in DAWN's 2025

submission to the U.N. Special Rapporteur on the Right to Adequate Housing concerning the use of Caterpillar bulldozers in the destruction of Palestinian homes.

99.    All three NGOs have also provided guidance to DAWN regarding advocacy strategies before the ICC.

100.    In addition, DAWN previously collaborated with these NGOs to identify potential victims and witnesses who could serve as parties or provide evidence for use in U.S. federal litigation efforts that DAWN supported.

101.    **Albanese**. Prior to her designation, DAWN maintained a mutually beneficial working relationship with Albanese. DAWN provided her with evidentiary materials and legal analysis, including in response to her Calls for Input. In November 2024, for example, DAWN submitted materials detailing how a U.S. company—the Development Corporation for Israel— used the sale of so-called "Israel Bonds" to fund the expansion of illegal settlements in the occupied West Bank.

102.    DAWN relied on Albanese's expertise and network to inform and advance its own advocacy efforts in the United States and abroad. It conferred with her about advocacy strategies; exchanged information concerning Israel's human rights abuses in the oPt; and exchanged introductions to advocacy groups, researchers, and other parties of interest in the oPt.

IV.    THE SANCTIONS HAVE CHILLED PLAINTIFFS' SPEECH

103.    The Sanctions have forced Plaintiffs to discontinue speech they were previously engaged in and to abandon or defer speech they had planned before the designations were made. DAWN has halted its work on ICC submissions documenting atrocity crimes committed by Israel and abetted by the United States. TAAG has refrained from completing and filing an Article 15

34

submission detailing how Trump Administration officials and senior congressional leaders have aided and abetted Israeli war crimes and genocide.

104.    DAWN has stopped exchanging evidence, legal analysis, and other information pertaining to the human rights situation in the oPt with the designated NGOs; stopped inviting NGO representatives to attend events or publish articles in its online journal; and halted its collaborations with the NGOs to identify Palestinian victims and witnesses who could participate in DAWN-supported federal court litigation aimed at cutting off U.S. economic and military support to Israel. DAWN has also discontinued its joint advocacy efforts with the NGOs. It no longer issues joint statements to amplify each other's work, coordinates messaging, arranges opportunities for NGO representatives to speak with U.S. policymakers, or consults with the NGOs about the best ways to petition international tribunals. DAWN has also abstained from collaborating with the NGOs on various advocacy campaigns, including campaigns to get the ICC sanctions lifted, to cut U.S. military aid to IDF units credibly accused of grave human rights violations, to use universal jurisdiction statutes to hold Israeli nationals accountable for crimes committed in the oPt, and to support proceedings regarding Israel/Palestine at the International Court of Justice. In addition, DAWN has abandoned plans to invite NGO representatives to provide (or receive) specialized trainings on how to use Israeli and Palestinian sources and databases to conduct human rights investigations, and to attend events at which experts would provide trainings on a wide range of technical subjects related to their shared mission, including the Rome Statute, best practices for petitioning U.S. policymakers and judicial bodies, and visual forensics.

105.    DAWN has been forced to discontinue its professional engagements with Albanese. It has ceased responding to her Calls for Input and ended its practice of exchanging evidence, legal

35

analysis, and other information concerning the human rights situation in the oPt with her. It no longer solicits her views on advocacy strategy or provides its own. And it has abandoned its plans to invite her to become a DAWN Fellow—an unpaid position that would entail periodic contributions to Democracy in Exile and integrate her into DAWN's organization—as well as its plans to invite her to closed-door events at which experts would provide specialized trainings on a range of subjects, including investigative and advocacy techniques. TAAG has also been forced to abstain from making evidentiary submissions to Albanese.

106.    Plaintiffs have refrained from these activities for fear they will be classified as prohibited "services," triggering IEEPA sanctions. That fear is hardly hypothetical. Neither IEEPA nor the Order nor the implementing regulations, 31 C.F.R. Part 528 (the "Regulations"), define "service." OFAC has traditionally read the term broadly, and this Court has twice held that activities of the kind Plaintiffs wish to undertake fall within the Order's prohibitions. *See Rona v. Trump*, 797 F. Supp. 3d 278, 289 (S.D.N.Y. 2025) (providing the ICC Prosecutor with advice, liaising with victims and witnesses to support the OTP's investigations, and submitting an amicus brief in support of ICC prosecutions "fall comfortably within the broad scope of the 2025 Order's prohibition on the . . . 'making of *any* . . . services by, to, or for the benefit of' designated persons like Khan") (emphasis in original); *OSJI*, 510 F. Supp. 3d at 210 (presentations, advice, trainings, amicus briefs, and other "interactive" speech-based services to the ICC Prosecutor could trigger IEEPA liability).

107.    Moreover, Defendants have steadfastly maintained that the Berman Amendment's informational-materials exemption does not protect the exchanges that Plaintiffs wish to engage in. In prior challenges to the ICC sanctions, Defendants have asserted that § 1702(b)(3) exempts only "information or informational materials" that are "fully created and in existence at the date

of the transaction"—and not materials that are "substantive[ly] . . . alter[ed] or enhance[d]" or made "bespoke" for a designated person. *See* Defs.' Opp. to Prelim. Inj. at 21, *Rona v. Trump*, No. 25-cv-3114 (S.D.N.Y. May 13, 2025) (ECF No. 56); Defs.' Opp. to Prelim. Inj. at 23-25, *Open Soc'y Just. Initiative v. Trump*, No. 20-cv-8121 (S.D.N.Y. Nov. 9, 2020); *see also Rona*, 797 F. Supp. 3d at 290 (recounting the Government's position that the Berman Amendment protects only "informational materials that are widely circulated in a standardized format," not "interactive and dynamic 'training' or 'education'"). None of Plaintiffs' informational exchanges fits within Defendants' artificially narrow construction of § 1702(b)(3).

108.    Defendants have made equally clear that they will not hesitate to use IEEPA to reach personal communications that transfer nothing of commercial or financial value, notwithstanding § 1702(b)(1)'s exception. Indeed, Secretary Rubio designated Albanese and the Palestinian NGOs for non-commercial communications merely urging the ICC to investigate and prosecute U.S. and Israeli personnel—the very communications Plaintiffs wish to make here. Moreover, OFAC has signaled in other contexts that it would not view DAWN's intended services and collaborations as falling within § 1702(b)(1)'s ambit. For example, OFAC has previously authorized conference organizers to invite designated persons to speak, but on two conditions: first, that the organizers were acting on their "own initiative," not "on behalf" of a designated person; and second, that the organizers were not providing a designated person with "any specialized training or assistance."[82] Those conditions create a reasonable fear that OFAC would penalize DAWN for coordinating its activities with Albanese or the NGOs, for taking their wishes

---

[82] OFAC Letter from Lisa M. Palluconi to Foundation for Global Political Exchange (Nov. 8, 2024), https://perma.cc/55YB-U6PS; OFAC Letter from Kelly M. Falconi to Kiangnong Wang (Dec. 10, 2025), https://perma.cc/6DNQ-ZMHC.

into account when setting a conference agenda or messaging strategy, or for organizing a lecture on a "specialized" topic like the Rome Statute or open-source investigation techniques.

109.    DAWN and TAAG each sought clarification from OFAC that their proposed activities are protected by the First Amendment and by § 1702(b). Members of TAAG sought OFAC confirmation on February 17, 2026, but never received a response. On March 31, 2026, DAWN submitted a letter via OFAC's Compliance Hotline, seeking confirmation that DAWN could continue making ICC submissions and engaging with the Palestinian NGOs and Albanese in the above-described manner without running afoul of Executive Order 14203 or IEEPA. That letter notified OFAC that DAWN wished to file a response to Albanese's most recent Call for Input in the coming weeks, and requested that OFAC respond no later than April 13, 2026. OFAC never sent a substantive response; instead, on April 13, 2026, it directed DAWN to make a request to OFAC's Licensing Division. On May 5, 2026, DAWN sent a second request to the Licensing Division seeking interpretive guidance as well as a public FAQ clarifying that DAWN's proposed activities are lawful. The second letter sought an answer by May 20, 2026. OFAC never responded to that request.

110.    Plaintiffs have thus been left in an untenable holding pattern. If Defendants were enjoined from enforcing the Order and designations, Plaintiffs would immediately resume or undertake each of the activities described above. See supra ¶¶ 94-105. TAAG would also share with Albanese and the Palestinian NGOs the evidence it compiled while preparing its Article 15 submission.

## CAUSES OF ACTION

### CLAIM I
### Violation of the First Amendment
### Against All Defendants

111.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

112.    The Sanctions violate the First Amendment because they prohibit Plaintiffs and others like them from engaging in constitutionally protected speech, restrict their ability to hear or receive information and ideas, and trench on their associational rights under threat of civil and criminal penalties.

113.    Plaintiffs wish to continue communicating, engaging in joint advocacy, and exchanging information and ideas with the parties designated under the Order, but are chilled from doing so because of the substantial risk that they will be penalized for providing or receiving a prohibited "service."

114.    The Sanctions are not narrowly tailored to serve any compelling government interest, and they fail any level of First Amendment scrutiny as applied to Plaintiffs' protected speech and association.

115.    The Sanctions are also facially overbroad. The prohibition on providing or receiving a "service" to, from, or for the benefit of a designated person captures a substantial amount of constitutionally protected speech and association judged in relation to any legitimate sweep the prohibition may have. Because the "service" prohibition's unconstitutional applications are substantial both in absolute terms and relative to any legitimate applications, the prohibition is invalid on its face.

**CLAIM II**
**Violation of the Fifth Amendment**
**Against All Defendants**

116.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

117.    The Due Process Clause of the Fifth Amendment prohibits the Government from enforcing a law that fails to give a person of ordinary intelligence fair notice of what it forbids or that is so standardless as to invite arbitrary and discriminatory enforcement. That requirement applies with particular force where, as here, a law imposes criminal penalties and reaches expression protected by the First Amendment.

118.    Liability under the Order and the Regulations turns on whether a person has provided a "service to, or for the benefit of" a designated person, or has received a "service" from one. Neither the Order nor the Regulations define the term "service," and OFAC has construed it expansively and inconsistently. OFAC has also declined Plaintiffs' requests to confirm whether their proposed activities fall within the Order's prohibition.

119.    As a result, Plaintiffs cannot definitively determine which of their activities constitute a prohibited "service." Forced to guess at the Order's reach, Plaintiffs have refrained from those activities altogether.

120.    Because the "service" prohibition is unconstitutionally vague as applied to a wide range of speech-based activities, and because that vagueness chills the exercise of rights protected by the First Amendment, it must be invalidated under the void-for-vagueness doctrine.

## CLAIM III
### *Ultra Vires* Action in Violation of IEEPA – 50 U.S.C. § 1702(b) Exemptions
### Against All Defendants

121.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

122.    The President is prohibited from using IEEPA to regulate "personal communications" that do not convey a thing of commercial value, or the cross-border transmission of "any information or informational materials." 50 U.S.C. §§ 1702(b)(1), (b)(3). The speech-based activities Plaintiffs have suspended for fear of liability fall within one or both exemptions.

123.    The Sanctions are therefore ultra vires. In authorizing civil and criminal penalties for conduct that §§ 1702(b)(1), (b)(3) place beyond the President's reach, they exceed the authority IEEPA grants and are unenforceable as applied to that conduct.

## CLAIM IV
### Violation of the APA
### Against Defendants Department of State, Rubio, Department of the Treasury, Bessent, Department of Justice, Blanche, OFAC, and Smith

124.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

125.    The regulations implementing the Order purport to incorporate the exemptions set forth in 50 U.S.C. § 1702(b). *See* 31 C.F.R. § 528.205(a). Properly construed, those exemptions protect all of Plaintiffs' speech. OFAC, however, has adopted an impermissibly narrow construction of the exemptions and repeatedly asserted the right to penalize the speech at issue here.

126.    The Regulations, as construed by Defendants, violate the APA because they are "not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right," *id.* §

706(2)(B), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

## CLAIM V
### *Ultra Vires* Action in Violation of IEEPA – Absence of "Unusual and Extraordinary Threat"
### Against All Defendants

127.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

128.    When Congress enacted IEEPA, it made clear that the President's powers "may only be exercised to deal with *an unusual and extraordinary threat* with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). The ICC's investigations targeting U.S. and Israeli persons do not constitute an "unusual and extraordinary threat."

129.    Any exercise of authority pursuant to the Order is *ultra vires* because the Order is not based on a qualifying "national emergency," as required by IEEPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that the speech and associational restrictions imposed by the Sanctions violate the First Amendment;

B.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that the speech and associational restrictions imposed by the Sanctions are *ultra vires* and in violation of 50 U.S.C. §§ 1702(b)(1), (b)(3);

C.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that Defendants' construction of the personal-communications and informational-materials

exemptions, 50 U.S.C. §§ 1702(b)(1), (b)(3), is contrary to law under the Administrative Procedure Act;

D.      Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that the Sanctions' "service" prohibition is unconstitutionally vague, both facially and as applied to Plaintiffs, in violation of the Due Process Clause of the Fifth Amendment;

E.      Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that the Sanctions are *ultra vires* in their entirety under IEEPA because they are not based on a qualifying "national emergency";

F.      Enjoin Defendants from implementing or enforcing the speech and associational restrictions imposed by the Sanctions, including through the civil and criminal penalty provisions of IEEPA;

G.      Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

H.      Grant any other and further relief that this Court may deem just and proper.

Dated: July 15, 2026
      New York, NY

Respectfully submitted,

/s/ Joseph Pace
J. PACE LAW, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
(917) 336-3948
jpace@jpacelaw.com