**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DEMOCRACY FOR THE ARAB WORLD NOW, INC., d/b/a DAWN, TAXPAYER ALLIANCE AGAINST GENOCIDE, TARIK KANAANA, and WILLIAM DOARES,

*Plaintiffs*,

v.

DONALD J. TRUMP *et al.*,

*Defendants*.

**No. 26-cv-5957(JMF)**
Rel. 26-cv-5305(JMF)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Joseph Pace
J. PACE LAW, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
(917) 336-3948
jpace@jpacelaw.com

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ............ i

INTRODUCTION ............ 1

STATEMENT OF FACTS ............ 4

I. PLAINTIFFS ............ 4

II. THE INTERNATIONAL CRIMINAL COURT ............ 5

A. The ICC's Operations ............ 5

B. The ICC's Investigations of Alleged U.S. and Israeli Atrocity Crimes ............ 7

III. THE SANCTIONS ............ 8

A. Executive Order 14203 and IEEPA ............ 8

B. The Designations Under Executive Order 14203 ............ 10

(1) ICC Judges and Deputy Prosecutors ............ 10

(2) The Palestinian Human Rights NGOs ............ 11

(3) U.N. Special Rapporteur Francesca Albanese ............ 13

IV. THE SANCTIONS HAVE CHILLED PLAINTIFFS' SPEECH ............ 15

A. Work with the ICC ............ 15

B. Work with the Palestinian NGOs ............ 16

C. Work with U.N. Special Rapporteur Albanese ............ 18

ARGUMENT ............ 19

I. LEGAL STANDARD ............ 19

II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............ 20

A. The Sanctions Violate the First Amendment ............ 20

(1) The Sanctions Restrict Speech Based on Its Content and Viewpoint ............ 20

(2) The Sanctions Impair DAWN's Right to Association ............ 21

(3) The Sanctions Fail Strict Scrutiny ............ 22

i. The Sanctions Do Not Advance a Compelling Interest ............ 22

ii. The Sanctions' Speech and Associational Restrictions Are Not Narrowly Tailored ............ 25

B. The Sanctions' Restrictions Are *Ultra Vires* and Violate the APA ............ 30

(1) Section 1702(b)(1): Personal Communications Exception ......................................31

(2) Section 1702(b)(3): Information and Informational Materials Exception ................32

III. ABSENT A PRELIMINARY INJUNCTION, THE SANCTIONS WILL CONTINUE TO CAUSE IRREPARABLE HARM ........................................................................................................38

IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF ............38

CONCLUSION ........................................................................................................................39

## TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*281 Care Comm. v. Arneson*,
766 F.3d 774 (8th Cir. 2014) .......... 27

*Abramski v. United States*,
573 U.S. 169 (2014) .......... 36

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of the Treasury*,
686 F.3d 965 (9th Cir. 2012) .......... 21

*Animal Legal Def. Fund v. Wasden*,
878 F.3d 1184 (9th Cir. 2018) .......... 21

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) .......... 29

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
481 U.S. 537 (1987) .......... 21

*Bittner v. United States*,
598 U.S. 85 (2023) .......... 36

*Bond v. United States*,
572 U.S. 844 (2014) .......... 29

*Bronx Household of Faith v. Bd. of Educ.*,
331 F.3d 342 (2d Cir. 2003) .......... 38

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .......... 25,26,29

*Capital Cities/ABC, Inc. v. Brady*,
740 F. Supp. 1007 (S.D.N.Y. 1990) .......... 36

*Cayuga Nation v. Tanner*,
6 F.4th 361 (2d Cir. 2021) .......... 35

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......... 21

*Citizens Against Rent Control/Coalition for Fair Hous. v. Berkeley*,
454 U.S. 290 (1981) .......... 21

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) .................... 25,27

*E. Bay Sanctuary Covenant v. Trump*,
950 F.3d 1242 (9th Cir. 2020) .................... 39

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council* ,
485 U.S. 568 (1988) .................... 36

*Est. of Tov v. United Nations Relief & Works Agency* ,
807 F. Supp. 3d 208 (S.D.N.Y. 2025) .................... 22,23

*Exxon Mobil Corp. v. Mnuchin*,
430 F. Supp. 3d 220 (N.D. Tex. 2019) .................... 14

*FCC v. Fox TV Stations, Inc.*,
567 U.S. 239 (2012) .................... 37

*FCC v. League of Women Voters*,
468 U.S. 364 (1984) .................... 29

*Green Party v. N.Y. State Bd. of Elections*,
389 F.3d 411 (2d Cir. 2004) .................... 38

*Hardin v. BATFE*,
65 F.4th 895 (6th Cir. 2023) .................... 36

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .................... 20

*Jacoby & Meyers, L.L.P. v. Presiding Justices of the First, Second, Third & Fourth Dep'ts* ,
852 F.3d 178 (2d Cir. 2017) .................... 21

*Kalantari v. NITV, Inc.*,
352 F.3d 1202 (9th Cir. 2003) .................... 31

*Korematsu v. United States*,
323 U.S. 214 (1944) .................... *passim*

*L.C. v. Trump*,
2026 U.S. Dist. LEXIS 106000 (D.D.C. May 13, 2026) .................... 13

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................... 38

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026) .................... 37

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 36

*Marland v. Trump*,
498 F. Supp. 3d 624 (E.D. Pa. 2020) .......... 31

*Meyer v. Grant*,
486 U.S. 414 (1988) .......... 21

*N.Y. Progress & Prot. PAC v. Walsh* ,
733 F.3d 483 (2d Cir. 2013) .......... 38,39

*NAACP v. Button*,
371 U.S. 415 (1963) .......... 21

*Nat'l Inst. of Family & Life Advocates v. Becerra* ,
585 U.S. 755 (2018) .......... 21,29

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) .......... 20

*NLRB v. SW Gen., Inc.*,
580 U.S. 288 (2017) .......... 34

*Open Soc'y Just. Initiative v. Trump*,
510 F. Supp. 3d 198 (S.D.N.Y. 2021) .......... *passim*

*Penson v. Ohio*,
488 U.S. 75 (1988) .......... 26

*Ramon Cernuda & Ed. Cernuda, Inc. v. Heavey* ,
720 F. Supp. 1544 (S.D. Fla. 1989) .......... 32

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 20

*Reno v. ACLU*,
521 U.S. 844 (1997) .......... 26

*Republican Party v. White*,
536 U.S. 765 (2002) .......... 25

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......... 21

*Rona v. Trump*,
797 F. Supp. 3d 278 (S.D.N.Y. 2025) .......... *passim*

*Showtime Ent., L.L.C. v. Town of Mendon*,
769 F.3d 61 (1st Cir. 2014) ........................................................................ 25

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.* ,
502 U.S. 105 (1991) ........................................................................ 29

*Stone v. INS*,
514 U.S. 386 (1995) ........................................................................ 34

*Tabbaa v. Chertoff*,
509 F.3d 89 (2d Cir. 2007) ........................................................................ 21,29

*TikTok Inc. & ByteDance Ltd. v. Garland* ,
122 F.4th 930 (D.C. Cir. 2024) ........................................................................ 29

*Tiktok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020) ........................................................................ 39

*TikTok Inc. v. Trump*,
507 F. Supp. 3d 92 (D.D.C. 2020) ........................................................................ 30

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ........................................................................ 35

*United States v. Ali Amirnazmi*,
645 F.3d 564 (3d Cir. 2011) ........................................................................ 36

*United States v. Alvarez*,
567 U.S. 709 (2012) ........................................................................ 26,27

*United States v. Gonzales*,
520 U.S. 1 (1997) ........................................................................ 35

*United States v. Playboy Ent. Grp.*,
529 U.S. 803 (2000) ........................................................................ 20,26

*United Transp. Union v. State Bar of Mich.*,
401 U.S. 576 (1971) ........................................................................ 21

*Whitney v. Cal.*,
274 U.S. 357 (1927) ........................................................................ 26

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ........................................................................ 20

**Statutes**

50 U.S.C. § 1702 ........................................................................ *passim*

50 U.S.C. § 1705 .......... 10

Free Trade in Ideas Act, Pub. L. No. 103-236, 108 Stat. 382, 474 (1994) .......... 33

International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* .......... *passim*

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 .... 33

**Regulations**

31 C.F.R. Part 528 .......... 10

31 C.F.R. § 536.201 .......... 10

31 C.F.R. § 544.201 .......... 10

31 C.F.R. § 578.201 .......... 10

31 C.F.R. § 583.201 .......... 10

31 C.F.R. § 587.201 .......... 10

31 C.F.R. § 594.201 .......... 10

54 Fed. Reg. 5229 (Feb. 2, 1989) .......... 32

85 Fed. Reg. 36,139 (June 15, 2020) .......... 11,12,13

90 Fed. Reg. 3687 (Jan. 15, 2025) .......... 10

90 Fed. Reg. 9369 (Feb. 12, 2025) .......... 9,10

**Executive Orders**

Exec. Order No. 13928, 85 Fed. Reg. 36139 (June 15, 2020) .......... 10

Exec. Order No. 14203, 90 Fed. Reg. 9369 (Feb. 12, 2025) .......... *passim*

**Other Authorities**

Application of the Convention on the Prevention and Punishment of the Crime of Genocide (*S. Afr. v. Isr.*), Order (Dec. 29, 2023) .......... 27

Cong. Research Serv., *War Crimes in Ukraine*, R47762 (Oct. 16, 2023) .......... 23

ICC, *Deif* .......... 8

ICC, *Situations Under Investigation* .......... 7

*Indep. Int'l Comm'n of Inquiry on the Occupied Palestinian Territory*, U.N. Doc. A/80/337 (Aug. 14, 2025), .......... 27

*Israel's Deliberate Targeting of Palestinian Children in the Occupied Palestinian Territory Since 7 October 2023*, U.N. Doc. A/HRC/62/CRP.2 (June 18, 2026) .......... 27

Marco Rubio, *Why We're Dismantling the International Criminal Court*, Wall St. J. (July 13, 2026) ........ 15

Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90 .... *passim*

*Situation in the State of Palestine*, ICC-01/18, Decision on the "Prosecution Request Pursuant to Article 19(3) for a Ruling on the Court's Territorial Jurisdiction in Palestine" (Feb. 5, 2021) ........ 26

**INTRODUCTION**

Executive Order 14203 and the accompanying designations ("the Sanctions") make it a federal offense for U.S. citizens to support the International Criminal Court's ("ICC") investigations of alleged U.S. and Israeli atrocity crimes[1] or to collaborate with several of the most prominent foreign advocates for Palestinian rights. The Executive has barred these activities, not because they further a crime or benefit a criminal enterprise, but because they potentially advance a viewpoint this Administration finds objectionable: that the ICC should investigate alleged atrocity crimes by U.S. and Israeli nationals—and, where warranted, hold those nationals accountable—if their own governments will not.

Plaintiffs Democracy for the Arab World Now, Inc. ("DAWN") and Taxpayer Alliance Against Genocide ("TAAG") are U.S.-based NGOs devoted to promoting human rights abroad and ending U.S. economic, diplomatic, and military support for states that commit grave human rights abuses. In furtherance of that mission, both have prepared (or are preparing) communications to the Office of the Prosecutor ("OTP") of the ICC compiling evidence that Israel has committed atrocity crimes in the Occupied Palestinian Territory ("oPt"), often with U.S. backing. In addition to its ICC-facing work, DAWN has published research, convened conferences, lobbied policymakers, and supported litigation in U.S. courts—all aimed at promoting human rights in the oPt. To do that work effectively, DAWN has cultivated relationships with regional experts and Palestinian partners, including U.N. Special Rapporteur Francesca Albanese and three of the most eminent Palestinian human rights NGOs, Al-Haq, Al Mezan, and the Palestinian Centre for Human Rights ("PCHR") (collectively, "the NGOs" or "the Palestinian NGOs"). For years, DAWN exchanged evidence and legal analysis with Albanese and

---

[1] "Atrocity crimes" encompass genocide, crimes against humanity, war crimes, and the crime of aggression.

the NGOs, invited them to events, signed on to joint statements, and coordinated advocacy campaigns.

The Sanctions have brought these activities to a halt. In February 2025, President Trump issued Executive Order 14203 ("the Order"), declaring a "national emergency" based on the ICC's purportedly "illegitimate and baseless actions targeting America and our close ally Israel." Founded on two false premises—that the ICC lacks jurisdiction over U.S. and Israeli atrocity crimes, and that both countries' militaries "strictly adhere to the laws of war"—the Order invokes the International Emergency Economic Powers Act ("IEEPA") to authorize the designation of any foreign person who assists the ICC's investigation, arrest, or prosecution of U.S. or Israeli nationals. It then bars anyone—including U.S. citizens—from providing or receiving "any . . . services" to or from a designated person. Defendants have since wielded that authority to designate eleven ICC prosecutors and judges in retaliation for their role overseeing or authorizing the offending investigations, and to designate Albanese and the Palestinian NGOs for merely *calling upon* the ICC to investigate alleged U.S. and Israeli crimes.

The consequences for Plaintiffs are stark. They now face ruinous fines and potential prison terms if they provide or receive anything that Defendants could plausibly characterize as a "service"—a staggeringly capacious term that potentially reaches any act that confers a benefit on its recipient. Fearing liability, Plaintiffs have turned to self-censorship. Both Plaintiffs have abstained from making ICC submissions. DAWN, for its part, has halted its informational exchanges and coordinated advocacy efforts with Albanese and the NGOs; limited its platforming of Albanese and the NGOs' research and advocacy work; scrapped a proposal to invite Albanese to become an unpaid fellow; and shelved plans to convene events in which invitees might provide

specialized trainings on topics ranging from universal jurisdiction statutes to open-source investigation techniques.

The Sanctions run headlong into the First Amendment. This Court has twice held that they are content-based restrictions, triggering strict scrutiny. They fail that test at every step. The Sanctions do not further a compelling interest. They impermissibly resort to censorship when the settled remedy for the Government's concern about others persuading the ICC to bring "baseless" prosecutions is government counter-speech. They burden vast swaths of speech untethered to the ICC's investigations. And they are hopelessly ineffective at achieving the Order's stated end, since silencing *Plaintiffs* does nothing to stop ICC prosecutors from conducting their own investigations, acting on State-Party referrals, receiving submissions from countless others—or simply reading the newspapers, which feature a steady drip of reporting about Israel's alleged crimes in the oPt.

Even if the Order survived strict scrutiny, it would fail for a separate reason. Congress expressly barred the President from using IEEPA to regulate noncommercial "personal communications" or to restrict the flow of "information or informational materials," 50 U.S.C. §§ 1702(b)(1), (b)(3)—limitations which were designed to prevent the President from weaponizing IEEPA to trample on Americans' expressive and associational rights. Every "service" that Plaintiffs wish to provide or receive falls within one or both exemptions, rendering the Sanctions *ultra vires* and unlawful under the APA.

* * *

If Defendants are permitted to hop the constitutional and statutory guardrails here, IEEPA will "lie[] about like a loaded weapon" that can be trained on any cause a president disfavors. *Korematsu v. United States*, 323 U.S. 214, 246 (1944) (Jackson, J., dissenting). The President could declare a "national emergency" concerning Greenland and use his designation powers to bar

Americans from participating in international advocacy campaigns to protect that territory's independence; or declare an emergency concerning climate change and use IEEPA designations to firewall U.S. industry groups from their foreign counterparts advocating against restrictions on carbon emissions; or—conversely—declare an emergency regarding high energy prices, designate foreign groups opposed to fossil fuel extraction, and prevent Americans from supporting or collaborating with climate activists abroad. The list of potential abuses is virtually endless.

The Sanctions are unconstitutional and exceed the President's authority. Each day they remain in force inflicts irreparable injury by chilling protected speech and association. The Court should preliminarily enjoin their enforcement.

## STATEMENT OF FACTS

### I. PLAINTIFFS

DAWN is a U.S.-based 501(c)(3) organization committed to ending U.S. military, economic, and diplomatic support for repressive Middle East and North Africa ("MENA") governments and holding human rights abusers accountable. Founded in 2018 by Saudi dissident and journalist Jamal Khashoggi, DAWN uses a wide range of advocacy tools. It conducts research, drafts reports, makes legal submissions to international courts, develops and files lawsuits in U.S. courts, and engages with governmental officials and other actors to push for human rights accountability measures. Declaration of Omar Shakir ("Shakir Decl.") ¶¶ 3-4. DAWN provides forums for human rights activists and experts to share and publish their views, including in its online journal, *Democracy in Exile*. It also organizes open- and closed-door events at which participants can exchange information about human rights and governance issues, learn specialized techniques for conducting human rights investigations, and brainstorm policy proposals, advocacy strategies, and legal methods for holding human rights violators to account. *Id.* ¶ 5.

One of DAWN's areas of focus is ending Israeli human rights abuses in the oPt. To that end, it has made several submissions to the ICC urging the OTP to investigate Israeli nationals for alleged atrocity crimes and to investigate U.S. officials for aiding and abetting those crimes. *Id.* ¶¶ 6-7. Prior to their designation, DAWN also actively engaged and coordinated its advocacy efforts with Albanese and the three Palestinian NGOs. *Id.* ¶¶ 12-23.

TAAG is an unincorporated association consisting of ten taxpaying U.S. citizens. It was formed to gather and submit evidence to the ICC documenting how U.S. officials have aided and abetted atrocity crimes abroad, including Israel's atrocity crimes in the oPt, and to engage in related research, educational, and advocacy efforts in support of accountability for those violations. Declaration of Tarik Kanaana ("Kanaana Decl.") ¶ 1.

## II. THE INTERNATIONAL CRIMINAL COURT

### A. The ICC's Operations

The ICC is a permanent court based in The Hague, the Netherlands. It was created by the 1998 Rome Statute, which was the culmination of a decades-long push by the international community to create a transnational system of justice for victims of the gravest international crimes. Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90 (the "Rome Statute"). The ICC's jurisdiction encompasses crimes of aggression, war crimes, crimes against humanity, and genocide. *Id.* art. 5. By design, the ICC is a court of last resort. Thus, its remit is limited by the concept of "complementarity," which holds that the ICC may not exercise jurisdiction over crimes that are adequately addressed by national criminal justice systems. *Id*. arts. 1, 5, 17(1). Today, 125 countries ("States Parties") have signed and ratified the Rome Statute. Compl. n.2.

There are six phases to an ICC prosecution: (1) a preliminary examination, during which the OTP determines, *inter alia*, whether there is a reasonable basis to believe that a crime within the ICC's jurisdiction has been committed and whether the State with primary jurisdiction is genuinely investigating it; (2) a formal investigation, during which the OTP gathers evidence, identifies suspects, and requests arrest warrants; (3) pre-trial proceedings, during which a panel of judges determines whether there is sufficient cause to take the case to trial; (4) trial, which requires proof of guilt beyond a reasonable doubt; (5) appeals; and (6) the enforcement of any sentence. Compl. n.6.

ICC proceedings are subject to a robust set of procedural protections. The OTP, which oversees investigations and prosecutions, may receive evidence and analysis from a broad range of actors—including civil society groups, academics, and victims—through so-called "Article 15" submissions. However, prosecutors are prohibited from "seek[ing] or act[ing] on instructions from any external source," or "engag[ing] in any activity which is likely to interfere with his or her prosecutorial functions or to affect confidence in his or her independence." *Id.* arts. 42(1) & (5). The OTP must conduct its own investigation, which it typically does by sending staff and advisers on fact-finding missions to collect evidence and question suspects, witnesses, and victims. Compl. n.5.

To open an investigation, the OTP must either receive a referral from a State Party or the U.N. Security Council, or it must obtain authorization from the court's Pre-Trial Chamber. *Id.* arts. 13, 15. The Prosecutor may seek an arrest warrant only from a three-judge panel, which must independently find "reasonable grounds to believe that the person has committed a crime within the jurisdiction of the Court." *Id.* art. 58(1)(a). The ICC has no police force of its own and depends on States to execute its warrants. *Id.* arts. 59, 89. If the State with primary jurisdiction over the

crimes notifies the OTP in a timely manner that it is investigating its nationals, the Prosecutor "shall defer to the State's investigation of those persons unless the Pre-Trial Chamber, on the application of the Prosecutor, decides to authorize the investigation." *Id.* art. 18(2). Furthermore, any member of the U.N. Security Council may introduce a resolution to suspend any ICC investigation or prosecution for a renewable twelve-month period. *Id.* art. 16.

An accused person or the State with jurisdiction over the crime may challenge the ICC's jurisdiction. *Id.* art. 19. During those proceedings, interested parties may submit amicus briefs to the Pre-Trial Chamber. ICC Rule of Procedure and Evidence 103. The judges, however, are obligated to make an independent and impartial determination. Rome Statute art. 40.

The ICC has successfully prosecuted atrocity crimes in various conflict zones—often with the support of the United States. For example, the United States has backed ICC prosecutions of a Congolese warlord who conscripted child soldiers, an al Qaeda-aligned militant who destroyed cultural and religious sites, and a Lord's Resistance Army commander responsible for mass rape and sex slavery in Uganda. Compl. nn.7-9. Its current investigations and prosecutions—all of which have been supported in one form or another by the United States—include investigations into crimes against humanity perpetrated by the Maduro regime in Venezuela and Russian war crimes in Ukraine and Georgia. *See* ICC, *Situations Under Investigations*, https://www.icc-cpi.int/situations-under-investigations.

**B. The ICC's Investigations of Alleged U.S. and Israeli Atrocity Crimes**

**Afghanistan**. In 2007, the OTP announced that it was examining alleged crimes committed by Taliban and U.S. forces in Afghanistan after 2002. In 2021, however, the Prosecutor announced that it had "deprioritise[d]" all aspects of the investigation into U.S. crimes, thereby eliminating any realistic prospect of the investigation leading to the prosecution of U.S. nationals. In 2025, the

OTP applied for arrest warrants against Taliban leaders for gender persecution crimes; no arrest warrant applications were made for U.S. persons. Compl. ¶¶ 45-48 & nn.13-17.

**Palestine**. In 2015, shortly after Palestine's accession to the Rome Statute, the OTP opened a preliminary examination into atrocity crimes committed in Palestine. In 2018, Palestine made a referral requesting that the ICC open a formal investigation and, in January 2020, the OTP invited Palestine, Israel, and victims to submit written observations addressing whether the ICC had jurisdiction over crimes committed on Palestinian territory. The Pre-Trial Chamber received over 40 amicus briefs addressing that question. *Id.* ¶¶ 49-50 & nn.18-20. In February 2021, the Pre-Trial Chamber confirmed the court's jurisdiction and, in March 2021, the Prosecutor announced that she was initiating a formal investigation after "a painstaking preliminary examination" which included "regular and productive meetings with representatives of the Governments of Palestine and Israel." *Id.* ¶ 51 & nn.21-22.

In the months following the October 7 attacks, seven States Parties submitted additional referrals calling on the OTP to investigate Israel for alleged crimes committed in the oPt. On May 20, 2024, the Prosecutor filed arrest warrant applications for three senior Hamas leaders and for Israeli Prime Minister Netanyahu and former Defense Minister Gallant. *Id.* ¶¶ 52-53 & nn.23-24. Israel raised a jurisdictional challenge, which prompted the filing of approximately 60 amicus briefs—including one by the United States. On November 21, 2024, the Pre-Trial Chamber rejected the jurisdictional challenge and issued arrest warrants for Netanyahu, Gallant, and a senior Hamas leader.[2] On December 15, 2025, the Appeals Chamber denied Israel's appeal. *Id.* ¶¶ 54-55 & nn.25-28.

---

[2] The arrest warrants for the Hamas leaders were voided after the leaders' deaths. Compl. ¶ 55; ICC, *Deif*, https://www.icc-cpi.int/defendant/deif.

## III. THE SANCTIONS

### A. Executive Order 14203 and IEEPA

On February 6, 2025, President Trump issued Executive Order 14203, declaring that "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States."[3] EO 14203, pmbl., 90 Fed. Reg. 9369 (Feb. 12, 2025). The Order claims that a "national emergency" exists because the ICC has "asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel," and issued "arrest warrants targeting" Netanyahu and Gallant. *Id.* According to the Order, these steps are "illegitimate and baseless" because neither the United States nor Israel "has ever recognized the ICC's jurisdiction," and because "both nations are thriving democracies with militaries that strictly adhere to the laws of war." *Id.*

In response to this purported emergency, the Order invokes IEEPA to block "[a]ll property and interests in property" under U.S. jurisdiction belonging to the ICC Prosecutor, *id.* § 1(a)(i), and to any foreign person whom the Secretary of State, in consultation with other officials, determines has "directly engaged in" or "materially supported" "any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality." *Id.* §§ 1(a)(ii)(A)-(B). Of particular importance here, the Order prohibits (i) "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked" under the Order, *id.* § 3(a); and (ii) "the receipt of any contribution or provision of funds, goods, or services from" any blocked

[3] "Protected person" includes (but is not limited to) U.S. and Israeli nationals. EO 14203 § 8(d).

person. *Id.* § 3(b).[4] The Government has insisted that it may use this authority to bar the provision of presentations, trainings, or other interactive speech-based "services" to designated persons, *see infra*, notwithstanding the fact that Congress expressly banned the President from using IEEPA to regulate—directly or indirectly—(i) any "personal communication" that does not convey a thing of commercial value and (ii) the cross-border flow of "any information or informational materials." *Id.* §§ 1702(b)(1) & (3).

Anyone who violates the Order's prohibition on the provision or receipt of "funds, goods, or services" potentially faces severe penalties under IEEPA. Civil violators face fines up to the greater of $377,700 or twice the value of the transaction giving rise to the violation. 50 U.S.C. § 1705(b); 90 Fed. Reg. 3687, 3688 (Jan. 15, 2025). Anyone who willfully violates IEEPA sanctions, attempts or conspires to do so, or aids and abets a violation faces criminal fines of up to $1,000,000 and up to twenty years in prison. 50 U.S.C. § 1705(c).

Presidents have historically invoked IEEPA to regulate economic transactions connected to *bona fide* national-security threats, such as weapons proliferation, terrorism, cyberattacks, foreign aggression, narcotics trafficking, and serious foreign corruption or human rights abuses. *See, e.g.,* 31 C.F.R. § 544.201 (weapons proliferation); *id.* § 594.201 (terrorism); *id.* § 578.201 (cyberattacks); *id.* §§ 587.201, 589.201 (Russia- and Ukraine-related aggression); *id.* § 536.201 (narcotics trafficking); *id.* § 583.201 (human rights abuse and corruption). Indeed, the only other time a President has used IEEPA to target those seeking justice before an international tribunal was in 2020, when President Trump issued a substantially similar order sanctioning the ICC. *See* EO 13928, "Blocking Property of Certain Persons Associated with the International Criminal

[4] The regulations implementing the Order restate the Order's prohibitions without defining any of the terms relevant to the instant action. *See* 31 C.F.R. Part 528.

Court," 85 Fed. Reg. 36139 (June 15, 2020). That order was rescinded by President Biden shortly after taking office. Compl. ¶¶ 65-66.

**B. The Designations Under Executive Order 14203**

(1) ICC Judges and Deputy Prosecutors

Between June 5 and August 20, 2025, Secretary Rubio designated six ICC judges for "authoriz[ing] the ICC's investigation against U.S. personnel in Afghanistan" or "rul[ing] to authorize the ICC's issuance of arrest warrants" targeting Netanyahu and Gallant, and two Deputy Prosecutors for "continuing to support illegitimate ICC actions against Israel, including upholding the ICC's arrest warrants." On December 18, 2025, Secretary Rubio designated two more ICC judges as retaliation for "voting with the majority in favor of the ICC's ruling against Israel's appeal on December 15." The two ICC judges who dissented from that ruling were spared designation. *Id.* ¶ 74 & nn.36-37.

(2) The Palestinian Human Rights NGOs

On September 4, 2025, Secretary Rubio designated Al-Haq, Al Mezan, and PCHR under Executive Order 14203 for "directly engag[ing] in efforts by the [ICC] to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent." *Id.* ¶ 83 & n.62.

Al-Haq, Al Mezan, and PCHR are three highly respected, independent human rights organizations based in the oPt. Consistent with their perpetrator-neutral mandates, they document and protest abuses by all actors in the oPt, including the Palestinian Authority and Hamas. *Id.* ¶ 76 & nn.40-42. All three hold consultative status with the U.N. Economic and Social Council; each is a member of or affiliated with respected international rule-of-law organizations such as the International Commission of Jurists, the Euro-Mediterranean Human Rights Network, and the World Organisation Against Torture; and each has received international recognition for its work.

They are widely regarded as among the most experienced and reliable organizations documenting abuses in the oPt—a role that has become particularly important since Israel barred virtually all independent journalists from entering Gaza following the October 7 attacks. Compl. ¶¶ 77-79 & nn.43, 52; Shakir Decl. ¶ 12.

The NGOs pursue accountability for Israeli abuses in the oPt through a broad range of research, educational, advocacy, and litigation efforts—the vast preponderance of which are not directed at the ICC. They investigate and publish reports concerning settlement expansion and land confiscation, settler violence, home demolitions, unlawful detention and prisoner abuse, gender-based violations, abuses against children, torture, unlawful restrictions on humanitarian aid in Gaza, attacks on hospitals and other civilian infrastructure, and the targeting of Palestinian journalists. *Id.* ¶ 79 & nn.44-51. They also pursue accountability through international and domestic legal proceedings. Al-Haq, for example, has participated in proceedings concerning Israel before the International Court of Justice ("ICJ"); and all three NGOs have pursued claims in domestic courts, including by bringing litigation in the United Kingdom and Germany challenging arms transfers to Israel and litigation in Germany and France against IDF soldiers alleged to have targeted Palestinian civilians. *Id.* ¶¶ 80-81 & nn.53-56.

The NGOs have also engaged in advocacy before the ICC, including: (i) a 2020 amicus brief to the Pre-Trial Chamber arguing that the ICC had jurisdiction over atrocity crimes committed in the oPt; (ii) a 2023 open letter—joined by 106 human rights groups and genocide scholars—calling on the ICC Prosecutor to issue arrest warrants and commence an investigation to deter Israeli officials from inciting genocide; (iii) an Article 15 submission in November 2023 compiling evidence that Israeli officials had committed genocide or incitement to genocide in Gaza following the October 7 attacks; (iv) a May 2024 letter urging the ICC Prosecutor to intervene to

stop the impending ground invasion of Rafah; and (v) an August 2024 amicus brief to the Pre-Trial Chamber asserting that the ICC had the authority to issue arrest warrants against Netanyahu and Gallant. *Id.* ¶ 82 & nn.57-61.

(3) U.N. Special Rapporteur Francesca Albanese

On July 9, 2025, Secretary Rubio designated Albanese under Executive Order 14203 for "recommend[ing] that the ICC, without a legitimate basis, issue arrest warrants targeting" Netanyahu and Gallant, and for "recommend[ing] the ICC pursue investigations and prosecutions" of certain American companies and their executives. *Id.* ¶ 92 & n.80.

As with the NGOs, Albanese's recommendations to the ICC are merely one component of her work. In 2022, Albanese was appointed the U.N. Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967. Her U.N.-assigned mandate is to "investigate Israel's violations" of international law, to "receive communications [and] hear witnesses . . . as [she] may deem necessary for [her] mandate," and to report her "conclusions and recommendations" to various U.N. bodies. *Id.* ¶¶ 85, 87 & n.64. Since her appointment, she has become a highly visible and widely respected voice on the situation in Israel and Palestine. She has lectured at universities around the world and received international recognition for her work, including Spain's 2026 Order of Civil Merit. *Id.* ¶ 88 & nn.67-71.

Albanese is not an ICC official and has no authority to direct ICC judges or prosecutors to act. Like the approximately 60 other U.N. Special Rapporteurs, her work consists of conducting research, preparing reports, and making nonbinding recommendations through public advocacy. *Id.* ¶¶ 86, 91; *see also* *L.C. v. Trump*, 2026 U.S. Dist. LEXIS 106000, at *24 (D.D.C. May 13, 2026) (noting that "Albanese does not work for the ICC," lacks "any ability to direct action by the ICC," and can only engage the court by "offering her non-binding *opinion* and *recommendation*").

Because Albanese lacks a permanent investigative staff, she relies on information supplied by academics, activists, victims, and civil-society organizations to carry out her mandate. She periodically issues public Calls for Input seeking information on subjects ranging from alleged Israeli international-law violations following the October 7 attacks to the role of private actors in sustaining the occupation and Israel's mistreatment of Palestinian prisoners. *Id.* ¶¶ 86, 89 & nn.72-75. She uses the information obtained in response to Calls for Input to prepare her reports and recommendations to U.N. bodies and to the public. *Id.*

Some of Albanese's reports have included nonbinding recommendations calling on the ICC to investigate U.S. or Israeli actors for atrocity crimes committed in the oPt. Thus, in her October 2024 report to the U.N. General Assembly, she "urge[d] the ICC" to "investigate the commission" of alleged "crimes of genocide and apartheid by Israel." In August 2024, she filed an amicus brief—along with 19 Special Rapporteurs, U.N. Working Groups, and independent experts—urging the ICC Pre-Trial Chamber to grant the Prosecutor's applications for arrest warrants targeting Netanyahu and Gallant. And in July 2025, she submitted a report to the U.N. Human Rights Council urging the ICC "to investigate and prosecute" U.S. companies for providing Israel with "heavy machinery" used for home demolitions and "weaponry and technical support" used by the IDF to "devastate a virtually defenceless civilian population." *Id.* ¶ 90 & nn.76-79.

## IV. THE SANCTIONS HAVE CHILLED PLAINTIFFS' SPEECH

As a result of the designations, Plaintiffs now face potential civil fines and criminal penalties if they provide or receive "any . . . services" to or from the sanctioned ICC judges and prosecutors, the Palestinian NGOs, or Albanese.

Plaintiffs have every reason to fear that Defendants will take a maximalist view of "services"—a term that is never defined in the Order, the implementing regulations, or in IEEPA. OFAC has historically interpreted the term broadly, *see, e.g.*, *Exxon Mobil Corp. v. Mnuchin*, 430 F. Supp. 3d 220, 232 (N.D. Tex. 2019) (recounting the Government's position that a prohibited "service" includes anything that "provide[s] a 'benefit'" to a designated person), and this Court has twice held that activities akin to those that Plaintiffs wish to undertake fall within the Order's prohibitions. *See* *Rona v. Trump*, 797 F. Supp. 3d 278, 289 (S.D.N.Y. 2025) (providing OTP with advice, liaising with victims and witnesses to support the OTP's investigations, and submitting an amicus brief in support of ICC prosecutions "fall comfortably within the broad scope of the 2025 Order's prohibition on the . . . 'making of *any* . . . services by, to, or for the benefit of' designated persons like [the ICC Prosecutor]"); *Open Soc'y Just. Initiative v. Trump* ("*OSJI*"), 510 F. Supp. 3d 198, 210 (S.D.N.Y. 2021) (same).[5] While the regulations incorporate the § 1702(b) exemptions, *see* 31 C.F.R. § 528.205, Defendants have repeatedly asserted that the exemptions do not apply to the types of speech Plaintiffs wish to engage in. *Rona*, 797 F. Supp. 3d at 290; *OSJI*, 510 F. Supp. 3d at 215. DAWN also has reason to believe it will be specifically targeted: just last week, Secretary Rubio accused DAWN in the pages of the Wall Street Journal of encouraging the ICC's "assault against American self-government" for "urg[ing] the Iranian regime to request an ICC investigation of 'apparent war crimes' committed by American personnel." Marco Rubio, *Why We're Dismantling the International Criminal Court*, Wall St. J. (July 13, 2026).

On February 17, 2026, TAAG members sought confirmation from OFAC that they could make an Article 15 submission detailing U.S. abetment of Israeli atrocity crimes without running afoul of U.S. sanctions law. On March 31 and May 5, 2026, DAWN likewise sought clarification

[5] Unless otherwise noted, quotation marks are cleaned up, internal citations omitted, and emphasis is in the original.

that it could make Article 15 submissions and continue engaging with Albanese and the Palestinian NGOs without violating IEEPA. OFAC has not responded substantively to any of these requests. Shakir Decl. ¶ 24; Kanaana Decl. ¶ 6. As a result, Plaintiffs have been forced to pare back their advocacy efforts, freeze their ICC work, and sever professional engagements with Albanese and the Palestinian NGOs.

**A. Work with the ICC**

Prior to Executive Order 14203, DAWN made multiple Article 15 submissions, including (i) a November 2022 submission compiling evidence that an IDF battalion committed extrajudicial killings, beatings, and physical and sexual torture in the West Bank; (ii) a November 2023 submission compiling evidence supporting the initiation of an investigation into 40 IDF commanders suspected of war crimes in Gaza; and (iii) a January 2025 submission setting forth the grounds for investigating former President Biden, former Secretary of State Blinken, and former Secretary of Defense Austin for aiding and abetting Israeli atrocity crimes after the ICC's issuance of arrest warrants for Netanyahu and Gallant. Shakir Decl. ¶ 7.

Since October 2025, TAAG members have been working on an Article 15 submission setting forth the basis for investigating various U.S. officials—including members of the Trump Administration—for aiding and abetting Israeli atrocity crimes by, *inter alia*, supplying 2,000-pound bombs that were used on civilian targets, and by facilitating the creation of militarized aid-distribution centers at which contractors and IDF soldiers corralled and killed Palestinian civilians seeking food aid. Kanaana Decl. ¶ 8.

The goal of these submissions is not merely to prompt an ICC investigation. They serve a broader expressive and public advocacy purpose as well: they enable TAAG and DAWN to garner more press attention than a typical advocacy report might. They serve a public shaming function, and they convey to voters, civil society, and government officials that the conduct at issue is

sufficiently serious to warrant scrutiny by an international tribunal established to prosecute only the gravest of international crimes. These submissions, in other words, are designed to build public pressure on state actors to obey the law, irrespective of whether the ICC ultimately takes action. Shakir Decl. ¶ 8; Kanaana Decl. ¶ 1.

As a result of the Sanctions, DAWN has discontinued its work on ICC submissions entirely. TAAG has refrained from filing its near-complete Article 15 submission. If the Sanctions were enjoined, DAWN would immediately resume work on ICC submissions—including submissions documenting additional atrocity crimes by Israeli and Trump Administration officials—and TAAG would complete and file its submission with the OTP. Shakir Decl. ¶¶ 9-11; Kanaana Decl. ¶¶ 9-10.

**B. Work with the Palestinian NGOs**

Prior to their designation, DAWN maintained a close working relationship with the Palestinian NGOs. DAWN invited representatives from these organizations to attend events and publish papers in its online journal. It included representatives on conference calls with congressional staff to discuss Israel's crackdown on civil society; traded views about the best ways of pursuing accountability for U.S. and Israeli officials and corporations that committed or aided legal violations in the oPt; and signed joint statements to amplify each other's work. Shakir Decl. ¶ 13.

Their prominence and on-the-ground presence in the oPt have made these NGOs indispensable sources for DAWN's reports, press releases, and advocacy efforts in the United States and abroad. For example, DAWN used information obtained from Al-Haq in a complaint to Hyundai and a submission to the U.N. Special Rapporteur on the Right to Adequate Housing concerning the IDF's use of heavy machinery to illegally demolish Palestinian homes. All three

NGOs have also advised DAWN on advocacy before the ICC; and DAWN has enlisted the NGOs' assistance to locate Palestinian victims and witnesses and to develop an evidentiary record for DAWN's U.S. litigation efforts—including, for example, a pending lawsuit in the District of Columbia alleging that the United States's continued supply of arms to Israel violates the Leahy Law. *Id.* ¶ 14.

Fearing liability, DAWN has severed these professional relationships. It has (i) refrained from inviting NGO representatives to attend events and publish articles in its online journal; (ii) abstained from providing and receiving specialized trainings on subjects including universal jurisdiction statutes, visual forensics, methods for using Israeli and Palestinian open-source materials, and the Rome Statute; (iii) ended its practice of exchanging evidence, legal analysis, advocacy ideas, and other information concerning the human rights situation in the oPt; (iv) stopped issuing joint press releases to amplify each other's work; (v) abandoned plans to arrange meetings at which NGO representatives could share their perspective on the human rights situation in the oPt with various advocacy targets, including U.S. officials; and (vi) eschewed joint advocacy efforts on a wide range of subjects, including campaigns to get the ICC sanctions lifted, to cut U.S. military aid to IDF units credibly accused of war crimes, to use universal jurisdiction statutes to hold Israel accountable for crimes committed in the oPt, and to support ICJ proceedings concerning Israel. *Id.* ¶ 16.

If the Sanctions were enjoined, DAWN would immediately resume these activities. *Id.* ¶ 17. TAAG would also share the evidence it obtained while preparing its ICC submission with the NGOs. Kanaana Decl. ¶ 10.

### C. Work with U.N. Special Rapporteur Albanese

Prior to her designation, DAWN also maintained a working relationship with Albanese. DAWN exchanged evidentiary materials and legal analysis with Albanese regarding ongoing human rights violations in the oPt; discussed advocacy strategies; and exchanged introductions to other advocacy groups, researchers, and parties affected by Israel's unlawful conduct. DAWN relied on Albanese's insights and knowledge to advance its own advocacy efforts in the United States and abroad. DAWN also responded to Albanese's periodic Calls for Input from civil society, including by making a 2024 submission detailing how a U.S. company was using the sale of "Israel Bonds" to fund the expansion of illegal settlements in the occupied West Bank. Shakir Decl. ¶¶ 18-20.

DAWN has halted all professional exchanges with Albanese for fear of IEEPA penalties. It has (i) abstained from inviting her to meetings, including closed-door events at which experts would exchange evidence and legal analysis, provide trainings on the law and investigative techniques, and share advocacy strategies concerning the human rights situation in the oPt; (ii) stopped making submissions in response to her Calls for Input; (iii) stopped exchanging information relevant to her mandate; and (iv) shelved plans to invite her to become a DAWN Fellow—an unpaid position that would entail periodic contributions to *Democracy in Exile* and integrate her into DAWN's organization and network. *Id.* ¶ 21.

If the Sanctions were enjoined, DAWN would resume these activities, *id.* ¶ 22, and TAAG would share a revised version of its ICC submission with Albanese. Kanaana Decl. ¶ 10.

## <u>ARGUMENT</u>

### I. LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief,"

(3) "the balance of equities tips in [the plaintiff's] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the Government is a party to the suit, "the final two factors merge." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020). "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions" at the preliminary injunction stage. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).

## II. Plaintiffs Are Likely to Succeed on the Merits

### A. The Sanctions Violate the First Amendment

#### (1) The Sanctions Restrict Speech Based on Its Content and Viewpoint

A regulation is "content based" if it applies to "particular speech because of the topic discussed or the idea or message expressed," and viewpoint based if it is "based on the specific motivating ideology or the opinion or perspective of the speaker." *See* *Reed v. Town of Gilbert*, 576 U.S. 155, 168, 171 (2015). The Sanctions are both.

The Order prohibits the provision of "any . . . services by, to, or for the benefit of" a designated person. EO 14203, § 3(a). As this Court has twice recognized, this prohibition is "content based" because it only bars speech whose "function or purpose" is to confer a benefit on a designated party. *Rona*, 797 F. Supp. 3d at 288; *OSJI*, 510 F. Supp. 3d at 211 (same); *see also* *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010) (material support statute regulates speech "on the basis of its content" because whether someone may speak "depends on what they say"). The prohibition is viewpoint based for the same reason. Under the sanctions regime, Plaintiffs may file an amicus brief arguing that the ICC lacks jurisdiction over Israel; send communications to Albanese refuting her claims that the IDF has committed war crimes; or speak with the Palestinian NGOs to dissuade them from urging the ICC to investigate Israeli crimes. But

if they file a brief *supporting* ICC jurisdiction, share evidence *bolstering* Albanese's allegations, or speak with the Palestinian NGOs to *align* their messaging, Plaintiffs face civil fines and criminal prosecution.

Not only does the Order restrict what Plaintiffs can say based on content and viewpoint—it restricts what they may hear. *See* EO 14203, § 3(b) (preventing anyone from "receiving" any "services" from a designated party). Thus, DAWN may receive information unrelated to its mission—but it faces possible prosecution if, for example, it solicits a victim statement from the Palestinian NGOs for a report on home demolitions or asks one of the designated parties to provide specialized training on open-source investigative techniques or advice on advocating before international tribunals.[6]

(2) The Sanctions Impair DAWN's Right to Association

"An individual's freedom to speak . . . and to petition the government" also contains within it "a correlative freedom to engage in group effort toward those ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Thus, the First Amendment protects the rights of individuals "to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.*; *Citizens Against Rent Control/Coalition for Fair Hous. v. Berkeley*, 454 U.S. 290, 294 (1981) ("[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process."). That protection extends to associational activity with domestic and foreign groups alike. *See, e.g.*, *Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007).

[6] The fact that this information originates from outside the United States is of no moment. The Supreme Court has repeatedly held that the First Amendment protects the right of U.S. citizens to receive information from abroad. *See, e.g.*, *Lamont v. Postmaster General*, 381 U.S. 301 (1965) (recognizing right to receive communist literature from abroad); *see also* *Kleindienst v. Mandel*, 408 U.S. 753, 764 (1972) (refusal to allow nonresident alien scholar into the country implicates U.S. professors' "right to receive information").

The Sanctions directly burden DAWN's associational rights. DAWN does not wish merely to speak at or listen to Albanese and the Palestinian NGOs. It wishes to work jointly with them toward a shared objective: persuading policymakers, courts, and the public to support measures that will improve the human rights situation in the oPt. To that end, DAWN seeks, *inter alia*, to coordinate its advocacy with Albanese and the NGOs; to platform their efforts by signing joint press releases, hosting them at events, and offering unpaid fellowships; to work with them to devise litigation strategies in U.S. courts; and to create opportunities for the NGOs to press their case directly to U.S. officials. Shakir Decl. ¶¶ 14, 16, 21. This sort of coordinated advocacy and association lies at the heart of the First Amendment. *See* *Meyer v. Grant*, 486 U.S. 414, 422 (1988) (First Amendment's protections at their "zenith" with respect to "interactive communication concerning political change"); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987) (First Amendment protects "the exercise of one's right to choose one's associates"); *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971) ("[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment."); *accord* *NAACP v. Button*, 371 U.S. 415, 429-31 (1963).

(3) The Sanctions Fail Strict Scrutiny

The Sanctions trigger strict scrutiny several times over. *See* *Rona*, 797 F. Supp. 3d at 288 (the Order's content-based restrictions trigger strict scrutiny); *OSJI*, 510 F. Supp. 3d at 211 (same); *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts*, 852 F.3d 178, 191 (2d Cir. 2017) ("severe burdens on [plaintiffs'] associational rights" trigger strict scrutiny); *see also* *Al Haramain Islamic Found., Inc. v. United States Dep't of the Treasury*, 686 F.3d 965, 997 (9th Cir. 2012) (applying strict scrutiny to restriction on coordinated advocacy).

It is "rare" that a content-based regulation "will ever be permissible," *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026), and rarer still that a viewpoint regulation will survive strict scrutiny. As the Supreme Court recently reiterated, "[v]iewpoint discrimination . . . represents an egregious form of content regulation, and governments in this country must nearly always abstain from it." *Id.* (citing cases); *see also id.* at 1030 (Kagan, J., concurring) ("[V]iewpoint-based laws . . . are the most suspect of all speech regulations. So much so that this Court has refused to permit viewpoint discrimination even within unprotected categories of speech."). To survive strict scrutiny, the Government must prove that its restriction is "narrowly tailored to serve compelling state interests." *Id.* at 1021. "Precision must be the touchstone when it comes to regulations of speech, which so closely touch our most precious freedoms." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 775 (2018). The Government cannot satisfy this exacting test.

*i. The Sanctions Do Not Advance a Compelling Interest*

The Order claims an interest in preventing "illegitimate and baseless [ICC] actions targeting" America and Israel and in shielding U.S. service members from "harassment, abuse, and possible arrest." EO 14203, pmbl. That is a contrived interest predicated on faulty premises.

To start, a compelling interest requires a "*pressing* public necessity." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018) (emphasis added). None exists here. The ICC halted its active investigation into U.S. war crimes in Afghanistan in 2021, Compl. ¶ 47, n.16, and there is no indication that the ICC is currently "targeting" U.S. service members—much less taking action exposing them to "harassment, abuse, and possible arrest." Nor does any pressing public necessity exist with respect to the investigations targeting Israeli nationals. The ICC's examination of alleged Israeli atrocity crimes had been underway for more than a decade when the Order issued, and the Executive waited more than eight months after the OTP sought arrest

warrants for Netanyahu and Gallant before imposing the Sanctions. That delay belies any claim that restrictions on Americans' speech are necessary to avert some imminent public harm.[7]

Moreover, the two assumptions underlying the Order's charge that the ICC's actions are "illegitimate and baseless" are manifestly incorrect and therefore entitled to no deference. The first assumption is that the ICC cannot lawfully investigate U.S. and Israeli nationals because neither country has "recognized the ICC's jurisdiction." EO 14203, pmbl. But the Rome Statute expressly authorizes the ICC to exercise jurisdiction over crimes committed by nationals of non-State Parties on the territory of a State Party. Rome Statute art. 12(2). Congress and the Executive have recognized that jurisdictional grant through their enthusiastic support for the ICC's investigation of atrocity crimes committed in Ukraine by Russian nationals—even though Russia, like the United States and Israel, has never consented to the ICC's jurisdiction. Compl. ¶ 70 & n.29; *see also* Cong. Research Service, *War Crimes in Ukraine*, R47762, at 13, 17-18, 26 (Oct. 16, 2023) (recognizing that "[t]he ICC can investigate and prosecute atrocity crimes committed on the territory . . . of a state that has submitted to its jurisdiction," and detailing U.S. Government's financial and diplomatic support for the ICC's investigation of Russian crimes in Ukraine).

Both Afghanistan and Palestine are States Parties. Thus, under the plain language of the Rome Statute, the ICC has jurisdiction over U.S. and Israeli crimes within each state's respective territory. The President cannot wish away that legal truism by executive fiat. *See Est. of Tov v. United Nations Relief & Works Agency*, 807 F. Supp. 3d 208, 224 (S.D.N.Y. 2025) (no deference owed to Executive's interpretation of a treaty that violates the treaty's unambiguous text).

---

[7] Moreover, the real party of interest in the ICC investigations targeting Israeli nationals is undoubtedly Israel itself. Yet, unlike the Trump Administration, the Israeli government has not prohibited its own citizens from cooperating with the ICC. *See* U.N. Special Rapporteurs Letter (June 20, 2025), https://perma.cc/L6MN-U32R (describing proposed laws in the Knesset that would bar cooperation with the ICC, none of which have passed).

The Order's second premise—that the ICC's actions are "illegitimate and baseless" because U.S. and Israeli forces "strictly adhere to the laws of war"—is contradicted by the Government's own reports. Thus, the 2014 Senate "Torture Report" detailed how CIA personnel tortured detainees in Afghanistan during the period covered by the OTP's now-deprioritized investigation. Compl. ¶ 71(a) & n.30. A 2023 State Department report described "credible reports" that Israeli security forces had engaged in:

> arbitrary or unlawful killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment; harsh and life-threatening prison or detention conditions; arbitrary arrest or detention; . . . serious abuses in a conflict, including widespread civilian deaths or harm, enforced disappearances or abductions, forcible transfers of civilian populations, torture, physical abuses, conflict-related sexual violence or punishment; . . . violence or threats of violence against journalists . . . ; . . . serious government restrictions on or harassment of domestic and international human rights organizations; and crimes involving violence or threats of violence targeting Palestinians.

*Id.* ¶ 71(b) & n.32. A joint State and Defense Department report issued in May 2024 raised "concerns about Israel's [international humanitarian law] compliance" and described "credible" allegations that the IDF was abetting settler attacks, attacking humanitarian workers, and striking civilian infrastructure. *Id.* ¶ 71(c) & nn.33-34. And an October 2025 report by the State Department's Office of Inspector General apparently found that the IDF had committed "many hundreds" of potential human rights abuses. *Id.* ¶ 71(d) & n.35.

To be clear, this Court need not definitively decide whether U.S. or Israeli nationals have actually committed atrocity crimes. The relevant point is that the Government's own reports document allegations sufficiently serious and credible to warrant further investigation. Against that record, the Order's *ipse dixit* assertion that U.S. and Israeli forces "strictly adhere to the laws of war"—and that any ICC inquiry is *ipso facto* "illegitimate and baseless"—is entitled to no deference, particularly when invoked to justify encroachments on Americans' First Amendment rights.

The Government's stated interest lacks credibility for an additional reason: the Sanctions regime is severely underinclusive. The Government has asserted a compelling interest in "discourag[ing]" people like Albanese from "demanding" and "provid[ing] factual and legal support for" ICC actions targeting Israel. Defs.' Opp. to Mot. for Prelim. Inj. at 30, *L.C. v. Trump*, No. 26-cv-00688(RJL) (D.D.C. Mar. 18, 2026), ECF No. 26. Yet Defendants have only designated *four* of the hundred-plus individuals and organizations that have made similar demands and supplied similar evidence. They have not, for example, designated any of the 19 UNSRs, working groups, and experts who joined Albanese's amicus brief defending the ICC's jurisdiction to issue arrest warrants for Netanyahu and Gallant, Compl. ¶ 90; any of the 106 human rights organizations and genocide scholars who joined Al-Haq's October 2023 letter calling on the ICC to investigate Israeli officials for incitement to genocide, *id.* ¶ 82; or the signatories of the 20 amicus briefs arguing that the ICC had jurisdiction to open an investigation into Israeli crimes in the oPt.[8]

Designating such a marginal fraction of those engaged in advocacy that has supposedly occasioned a "national emergency" is precisely the kind of underinclusiveness that "raises serious doubts about whether the government is in fact pursuing the interest it invokes," rather than singling out particular speakers. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011); *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002); *see also* *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) ("Exemptions from an otherwise legitimate regulation of a medium of speech . . . diminish the credibility of the government's rationale for restricting speech in the first place."); *Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61, 73 (1st Cir. 2014) ("[W]e rightly

[8] *See Situation in the State of Palestine*, ICC-01/18, Decision on the "Prosecution Request Pursuant to Article 19(3) for a Ruling on the Court's Territorial Jurisdiction in Palestine" ¶ 52 (Feb. 5, 2021), https://perma.cc/8LZM-W32N.

pay attention to underinclusiveness where it reveals significant doubts that the government indeed has a substantial interest that is furthered by its proffered purpose.”).

#### *ii. The Sanctions’ Speech and Associational Restrictions Are Not Narrowly Tailored*

Even assuming, *arguendo*, that the Sanctions advance a compelling interest, they are not narrowly tailored to that end. To satisfy narrow tailoring, the Government must demonstrate that its “chosen restriction on the speech at issue [is] *actually necessary* to achieve its interest.” *United States v. Alvarez*, 567 U.S. 709, 725 (2012) (emphasis added). That, in turn, requires proof of “a direct causal link between the restriction imposed and the injury to be prevented,” *id.*; *Brown*, 564 U.S. at 799-800, and proof that less speech-restrictive alternatives would “not be as effective.” *Reno v. ACLU*, 521 U.S. 844, 879 (1997); *accord Playboy*, 529 U.S. at 816. Defendants cannot satisfy any part of that burden.

First, the Government has numerous less restrictive means of advancing its asserted interest. To the extent the Government fears that Plaintiffs—or any other civil society organization—will persuade the ICC to commence “baseless” investigations or “illegitimately” assert jurisdiction over protected persons, “the remedy to be applied is more speech, not enforced silence.” *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). The U.S. Government is perfectly capable of filing its own Article 15 submissions to the OTP or submitting amicus briefs to the Pre-Trial Chamber to refute the arguments advanced by those urging investigations of U.S. and Israeli nationals. *Cf. Penson v. Ohio*, 488 U.S. 75, 84 (1988) (the adversarial system of justice is premised on “the well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question.”).[9] It can engage

[9] It is doubtful that artificially limiting the OTP and ICC’s access to information will *lessen* the likelihood that the ICC improperly exercises jurisdiction over protected persons, and at least as likely that such restrictions will distort the ICC’s adjudicatory processes and produce results that are contrary to the facts

directly with the OTP to make its case that the U.S. or Israeli legal systems are adequately addressing alleged crimes, thereby divesting the ICC of jurisdiction under the complementarity principle. Compl. ¶ 29; *Alvarez*, 567 U.S. at 726 (law failed strict scrutiny where government "has not shown, and cannot show, why counterspeech would not suffice to achieve its interest"); *281 Care Comm. v. Arneson*, 766 F.3d 774, 793 (8th Cir. 2014) (same). Or it may use its vast diplomatic powers to persuade States Parties not to cooperate with ICC investigations or enforce ICC warrants. And if counter-persuasion fails, the United States can invoke Article 16 of the Rome Statute and introduce a resolution to the U.N. Security Council deferring any prosecution or investigation for a renewable twelve-month period—a step the Government has apparently yet to attempt.

Second, Defendants cannot demonstrate that suppressing Plaintiffs' proposed ICC submissions would materially advance the Order's stated objective. *Turner*, 512 U.S. at 664 (strict scrutiny requires showing that regulations "will in fact alleviate [the purported] harms in a direct and material way"). The OTP is obligated to conduct its own investigation into credible accusations of atrocity crimes, and muzzling Plaintiffs' speech to the ICC will do nothing to eliminate public reports detailing alleged Israeli crimes in the oPt,[10] prevent States Parties from triggering investigations through their own referrals, or dim the chorus of voices calling for the

---

and law. *Cf. Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001) ("By seeking to prohibit the analysis of certain legal issues and to truncate presentation to the courts, the enactment under review prohibits speech and expression upon which courts must depend for the proper exercise of the judicial power.").

[10] *See, e.g.*, UNHRC, *Report of the Independent International Commission of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel*, U.N. Doc. A/80/337 (Aug. 14, 2025), https://perma.cc/3B4M-R55K (concluding that Israel has committed acts of genocide); Application Instituting Proceedings, Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (*South Africa v. Israel*) (Dec. 29, 2023), https://perma.cc/644F-WMXK (detailing evidence that Israel had violated the Genocide Convention); *Def. for Children Int'l-Palestine v. Biden*, 714 F. Supp. 3d 1160, 1162-63, 1167 (N.D. Cal. 2024) (finding it "plausible," after an evidentiary hearing, that Israel's conduct amounts to genocide).

ICC to take action. *See, e.g.*, UNHRC, "*The essence of childhood has been destroyed": Israel's Deliberate Targeting of Palestinian Children in the Occupied Palestinian Territory since 7 October 2023*, at 87, U.N. Doc. A/HRC/62/CRP.2 (June 18, 2026), https://perma.cc/VWR9-YJ7H (urging ICC to investigate Israel's atrocity crimes against children).

The restrictions on speech-based services to and from Albanese and the Palestinian NGOs fail for the same reasons: the Government may use its own speech to counter advocacy by Albanese and the NGOs, and cutting them off from their American supporters will not have a material impact on the ICC's investigations. These particular restrictions fail for two additional reasons. First, they are "vastly overinclusive." *Brown*, 564 U.S. at 804; *see also* *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991) ("significantly overinclusive" restriction fails strict scrutiny). The Sanctions bar Plaintiffs from providing or receiving services that have no nexus to the parties' efforts to persuade the ICC to investigate U.S. or Israeli nationals. *See* *Becerra*, 585 U.S. at 777 (law fails strict scrutiny where it restricts speech "wholly disconnected" from government's stated interest). For example, the Sanctions prevent DAWN from soliciting information for use in its own domestic lobbying and litigation efforts; from providing or receiving trainings on topics like human rights investigative techniques and universal jurisdiction statutes; from generally exchanging information about human rights abuses in the oPt, including abuses that fall outside the ICC's jurisdiction; and from coordinating advocacy campaigns directed at U.S. officials or the public at large. Even if those activities concern the same underlying human rights conditions that have prompted ICC scrutiny, any link between those activities and Albanese and the NGOs' ICC work is far too attenuated to satisfy narrow tailoring. *See* *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 250 (2002) (law fails strict scrutiny where the "causal link" between the speech and the harm is "contingent and indirect").

Second, the speech restrictions vis-à-vis Albanese and the NGOs are also "wildly underinclusive." *Brown*, 564 U.S. at 802. Underinclusiveness is fatal where a regulation cannot "fairly be said to advance any genuinely substantial governmental interest, because it provides only ineffective or remote support for the asserted goals, or limited incremental support." *TikTok Inc. & ByteDance Ltd. v. Garland*, 122 F.4th 930, 965 (D.C. Cir. 2024); *FCC v. League of Women Voters*, 468 U.S. 364, 396-97 (1984) (striking down speech restriction that was so underinclusive as to "provide[] only ineffective or remote support for the government's purpose"). This case is a paradigmatic example of such underinclusiveness. As explained above, Defendants have only designated four advocates for urging the ICC to investigate U.S. and Israeli nationals. Plaintiffs thus remain free to provide funds, goods, and services to the countless undesignated persons who have provided materially identical support to the ICC. A regime that restricts Plaintiffs' interactions with only four advocates, while leaving them free to support countless other organizations engaged in the same ICC-facing advocacy, cannot plausibly be said to genuinely advance the Government's stated interest here.

Nor can the associational restrictions survive strict scrutiny. Where, as here, a regulation severely burdens associational rights, the Government must show that the regulation "serve[s] compelling state interests, *unrelated to the suppression of ideas*, that cannot be achieved through means significantly less restrictive of associational freedoms." *Tabbaa*, 509 F.3d at 102 (emphasis added). But the express purpose of the Sanctions is to suppress a specific idea: that the ICC should investigate U.S. and Israeli nationals for alleged atrocity crimes.

### B. The Sanctions' Restrictions Are *Ultra Vires* and Violate the APA

Plaintiffs' claims can be resolved on purely statutory grounds, without undertaking the strict scrutiny analysis. *Bond v. United States*, 572 U.S. 844, 855 (2014) ("[N]ormally the Court will not decide a constitutional question if there is some other ground upon which to dispose of

the case.”). When Congress enacted IEEPA, it explained that the statute was “clearly limited to the regulation of international *economic transactions*” and did “not include authorities more appropriately lodged in other legislation, such as . . . authority to control *noneconomic* aspects of international intercourse[.]” H.R. Rep. No. 95-459, at 10-11 (emphasis added).[11] Consistent with that limitation, Congress expressly withdrew the President’s authority to use IEEPA to regulate noncommercial “personal communications” or the cross-border flow of “any information or informational materials.” Every speech-based activity Plaintiffs seek to engage in falls within one or both of those safe harbors. Any attempt to regulate those activities is thus *ultra vires*; and to the extent Defendants read the IEEPA exemptions as permitting such regulation, that interpretation violates the APA.

(1) Section 1702(b)(1): Personal Communications Exception

Section 1702(b)(1) bars the President from using IEEPA to “regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value[.]” 50 U.S.C. § 1702(b)(1). This provision was designed to “prevent the President from hindering communications which are not commercial or financial transactions,” to “preserve First Amendment freedoms of expression,” and to prevent the misuse of IEEPA to “isolate the people of the United States from the people of any other country,” H.R. Rep. No. 95-459, at 15-16. *See also* *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 107 (D.D.C. 2020) (“[T]his provision is best read as referring to the transfer of money (or other value) as a part of the personal communication itself.”).

[11] IEEPA does not contain any grant of authority to limit “services.” Indeed, the term “service” appears only once in the statute, inside a provision *restricting* the President’s powers. *See* 50 U.S.C. § 1702(b)(4) (barring the President from regulating “transactions ordinarily incident to travel to or from any country” “including payment of living expenses and acquisition of goods or services for personal use” while traveling).

Each of the "services" at issue—*e.g.*, transmitting an ICC submission; exchanging evidence and analysis about human rights abuses and advocacy strategies; facilitating, delivering, or receiving trainings; and coordinating advocacy strategies—consists of exempted personal communications. Each serves a First Amendment-protected purpose. None involves a commercial or financial transaction; and none transfers money or another thing of commercial value as part of the communication. The President therefore may not regulate these activities under IEEPA, directly or indirectly. Any attempt to do so is *ultra vires*, and any agency action resting on a contrary construction of § 1702(b)(1) violates the APA. *See generally id.* (holding that TikTok posts were "personal communications" and that an executive order effectively shuttering TikTok violated the prohibition against "indirect" regulation of those communications).

(2) Section 1702(b)(3): Information and Informational Materials Exception

Section 1702(b)(3) (the "Berman Amendment") provides that the President may not use IEEPA to "regulate or prohibit, directly or indirectly" the import or export, "whether commercial or otherwise, regardless of format or medium of transmission, of *any information or informational materials*, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." 50 U.S.C. § 1702(b)(3) (emphasis added). This provision contains three narrow carveouts, which—until 2018—permitted the President to regulate certain information or informational materials related to non-proliferation, terrorism, and espionage. *Id.*[12] By enacting the Berman Amendment, Congress created "an IEEPA-free zone," *Marland v. Trump*, 498 F. Supp. 3d 624, 641 (E.D. Pa. 2020), intended to "prevent the executive branch from restricting the international

[12] The first two carveouts were nullified when the cross-referenced Title was repealed. *See* Pub. L. No. 115–232, div. A, title XVII, § 1766(a), 132 Stat. 2232 (2018). Only the third carveout (espionage) remains operative.

flow of materials protected by the First Amendment." *Kalantari v. NITV, Inc*., 352 F.3d 1202, 1205 (9th Cir. 2003).

The legislative history confirms that Congress intended this provision to be construed expansively to protect free speech. When Congress enacted the original Berman Amendment in 1988, it explained that the provision implemented "'the principle that no prohibitions should exist on imports to [or exports from] the United States of ideas and information if their circulation is protected by the First Amendment.'" *Cernuda v. Heavey*, 720 F. Supp. 1544, 1548 (S.D. Fla. 1989) (quoting H.R. Rep. No. 100-40, pt. 3, at 113 (1987)). The original provision, however, only exempted "informational materials,"[13] and OFAC interpreted that phrase as preserving its right to regulate any transactions related to "informational materials not fully created and in existence at the date of the transaction" as well as "intangible items, such as telecommunications transmissions." 54 Fed. Reg. 5229 (Feb. 2, 1989) (codified at 31 C.F.R. §§ 500.206, 500.332).

In 1994, Congress overrode OFAC's interpretation via the Free Trade in Ideas Act ("FTIA"), which clarified that the exemption applied to "information" (not merely "informational materials") "regardless of format or medium of transmission." Pub. L. No. 103-236, § 525(c)(1), 108 Stat. 382, 474 (1994). Congress also expanded the list of exempted media and made clear that the list was nonexhaustive by adding the phrase "including but not limited to." *Id.* The accompanying House Report explained that the original Berman Amendment was designed to prohibit the President from using IEEPA to obstruct the flow of "information that is protected

[13] As originally drafted, the Berman Amendment denied the President the "authority to regulate or prohibit, directly or indirectly, the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, *or other informational materials*." Pub. L. No. 100-418, 102 Stat. 1107, 1371-72, § 2502(b)(1)(C) (emphasis added).

under the First Amendment," and it admonished OFAC for "narrowly and restrictively interpret[ing]" a restriction on presidential powers that was intended to have a "broad scope." H.R. Rep. No. 103-482, at 239 (1994). The FTIA amendments, the Report explained, were designed to "protect the constitutional rights of Americans to educate themselves about the world by communicating with peoples of other countries . . . by sharing information and ideas with persons around the world." *Id.* As if anticipating Defendants' position here, Congress added that the free flow of ideas guaranteed by § 1702(b)(3) would "significantly promote the foreign policy objectives of encouraging democracy and human rights abroad." *Id.*

Every proposed activity at issue here involves the cross-border transmission of "information or informational materials" with designated persons. Those activities are therefore immune from regulation under § 1702(b)(3). The Government, however, has steadfastly maintained otherwise. Thus, in prior litigation challenging the ICC sanctions, Defendants have embraced OFAC's view that § 1702(b)(3) only applies to "informational materials that are widely circulated in a standardized format" and "fully created and in existence at the date of the transactions"—not to "bespoke" or "substantive[ly] . . . alter[ed] or enhance[d]" materials, nor to "marketing and business consulting services." *See* Defs.' Opp. to Prelim. Inj. at 21, *Rona v. Trump*, No. 25-cv-3114 (S.D.N.Y. May 13, 2025) (ECF No. 56); Defs.' Opp. to Prelim. Inj. at 22-24, *Open Soc'y Just. Initiative v. Trump*, No. 20-cv-8121 (S.D.N.Y. Nov. 9, 2020). On that basis, Defendants have insisted that they retain the power to prohibit amicus briefs, education, training, advice, and any other "interactive and dynamic" speech-based services to any person designated under the Order. *Rona*, 797 F. Supp. 3d at 290.

OFAC's interpretation of the Berman Amendment is contrary to the text, the legislative history, and every pertinent canon of statutory interpretation. To start, its interpretation only

addresses "informational *materials*," ignoring Congress's addition of the word "information" in the FTIA amendments and reducing that term to mere surplusage. *See* *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 304 (2017) (noting the "cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute"). Moreover, OFAC's insistence that § 1702(b)(3) only exempts pre-existing, standardized-format, non-bespoke informational materials disregards the FTIA's expansion of the provision to protect informational materials "regardless of format or medium of transmission." *See* *Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, [the courts] presume it intends its amendment to have real and substantial effect.").

Other language confirms the exemption's breadth. Congress protected "any" information or informational materials, and "any" ordinarily "convey[s] nearly limitless breadth." *Cayuga Nation v. Tanner*, 6 F.4th 361, 378 (2d Cir. 2021); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (when Congress uses "any" without language limiting its breadth, a court "must" read the term as "referring to all"). Congress also prohibited both "direct[]" and "indirect[]" regulation. *See, e.g.*, *United States v. Prasad*, 18 F.4th 313, 325 (9th Cir. 2021) (the phrase "directly or indirectly" conveys breadth) (citing cases).

Moreover, unlike § 1702(b)(2)—which bars the regulation of humanitarian donations unless the President makes one of three findings—§ 1702(b)(3) does not permit a presidential override. Instead, Congress identified three discrete domains (non-proliferation, espionage, and anti-terrorism) where the President would retain the power to regulate information and informational materials. None of those carveouts are applicable here. And by expressly enumerating those three exceptions, Congress signaled that § 1702(b)(3)'s withholding of IEEPA authority was otherwise categorical. *See* *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where

Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

The decisions that upheld OFAC's interpretation are neither binding nor persuasive. *Capital Cities/ABC v. Brady*, 740 F. Supp. 1007 (S.D.N.Y. 1990), preceded the FTIA amendments and thus construed materially different statutory text. All post-FTIA decisions upholding OFAC's interpretation treated § 1702(b)(3) as ambiguous and relied on *Chevron* to break the tie. *See, e.g.*, *United States v. Amirnazmi*, 645 F.3d 564, 586-88 (3d Cir. 2011); *United States v. Griffith*, 515 F. Supp. 3d 106, 117 (S.D.N.Y. 2021) (citing *Amirnazmi*). But as explained above, the statute, as amended by the FTIA, is hardly ambiguous. Those decisions therefore reached the wrong result even under the *Chevron* framework.

But even assuming § 1702(b)(3) were ambiguous, OFAC's interpretation would still fail. The Supreme Court has overruled *Chevron*, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392 (2024); and because § 1702(b)(3) defines the scope of conduct punishable under IEEPA, the rule of lenity—not deference to the enforcing agency—now supplies the relevant tie-breaker. *See id.* at 435 (Gorsuch, J., concurring); *Hardin v. BATFE*, 65 F.4th 895, 901 (6th Cir. 2023) (applying lenity when the agency's interpretation was not "unambiguously correct" and *Chevron* deference was unwarranted); *see also* *Abramski v. United States*, 573 U.S. 169, 191 (2014) ("[C]riminal laws are for courts, not for the Government, to construe"; the agency's position is "not relevant at all"). Under that rule, § 1702(b)(3) must be construed "strictly against the government and in favor of individuals." *Bittner v. United States*, 598 U.S. 85, 101 (2023).[14]

[14] The fact that the Berman Amendment defines what conduct can be punished civilly as well as criminally does not alter the analysis. *See* *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (rule of lenity applies to provision which has "criminal and noncriminal applications"); *Bittner*, 598 U.S. at 101-02.

Finally, constitutional avoidance principles independently foreclose OFAC's artificially narrow, atextual construction. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Defendants claim the authority to regulate a vast range of U.S. citizens' noncommercial, expressive communications with anyone the Executive chooses to designate. That construction raises serious First Amendment concerns. It also lays claim to "expansive power on an uncertain statutory basis," thereby implicating the major-questions doctrine. *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 638 (2026) ("We have long expressed reluctance to read into ambiguous statutory text extraordinary delegations of Congress's powers.") (applying the major-questions doctrine to IEEPA).

OFAC's interpretation also raises grave vagueness concerns. It provides no intelligible answer to how its conception of "informational materials" applies to information communicated through oral conversation, which has no fixed format; or to widely circulated materials that were created "bespoke" at a designated person's request, like an Article 15 submission requested by ICC prosecutors but made public moments before its transmission to the OTP; or to informational materials provided for free, without any accompanying "transaction." *See* *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (explaining that, "[w]hen speech is involved," the void-for-vagueness doctrine requires "rigorous adherence" to requirements of fair notice and standards to prevent arbitrary enforcement and "to ensure that ambiguity does not chill protected speech"). Plaintiffs' interpretation avoids each of these constitutional problems and gives effect to the text Congress enacted. The Court should therefore hold that Plaintiffs' proposed communications and

exchanges fall within § 1702(b)'s exclusions and that Defendants may not regulate them under IEEPA.

## III. ABSENT A PRELIMINARY INJUNCTION, THE SANCTIONS WILL CONTINUE TO CAUSE IRREPARABLE HARM

Irreparable harm is presumed where a plaintiff "alleges injury from a rule or regulation that directly limits speech," *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003), or impairs the right to association. *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 423 (2d Cir. 2004); *id.* at 418 ("[W]here a First Amendment right has been violated, the irreparable harm requirement for the issuance of a preliminary injunction has been satisfied."). "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

Alleged "injury from a rule or regulation that may only *potentially* affect speech" is sufficient to establish irreparable harm. *Bronx Household of Faith*, 331 F.3d at 350 (emphasis added). In fact, Plaintiffs have established more than a potential injury; they have established "an actual chilling effect." *Id.* at 349. Because of the Sanctions, Plaintiffs have refrained from filing Article 15 submissions with the ICC and engaging in joint advocacy campaigns with Albanese and the NGOs, and have halted their informational exchanges with the sanctioned parties. Shakir Decl. ¶¶ 9, 15-16, 21; Kanaana Decl. ¶ 9; *see also* *OSJI*, 510 F. Supp. 3d at 216 (finding that prior ICC order caused irreparable injury); *accord* *Rona*, 797 F. Supp. 3d at 293.

## IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF

For reasons explained above, the Sanctions' speech, information, and associational restrictions violate the First Amendment and contravene the express limits Congress placed on the Executive's authority under IEEPA. The Government suffers no cognizable hardship from an injunction preventing it from enforcing unlawful restrictions. It has no legitimate interest "in the

perpetuation of unlawful agency action," *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), or "in the enforcement of an unconstitutional law." *New York Progress & Protection PAC v. Walsh*, 733 F.3d, 483, 488 (2d Cir. 2013). Nor can it "suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020).

The public interest, by contrast, strongly favors an injunction. The public has a profound interest in safeguarding First Amendment rights, *Walsh*, 733 F.3d at 488, and an independent interest "in ensuring that the statutes enacted by [its] representatives are not imperiled by executive fiat." *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1281 (9th Cir. 2020). Both interests would be served by an injunction preventing Defendants from enforcing the Sanctions against Plaintiffs' protected speech and associational activities.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction and enjoin Defendants from enforcing the Sanctions' speech and associational restrictions.

Dated: July 23, 2026
New York, NY

Respectfully submitted,

/S/ Joseph Pace
J. PACE LAW, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
(917) 336-3948
jpace@jpacelaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I, Joseph Pace, hereby certify that the foregoing memorandum of law complies with the word count limitation set forth in the Court's July 22, 2026 Order, ECF No. 27, in that it contains 11,991 words excluding the caption, table of contents, table of authorities, signature block, and required certificates.

/S/ Joseph Pace