**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEMOCRACY FOR THE ARAB WORLD NOW, INC., d/b/a DAWN, TAXPAYER ALLIANCE AGAINST GENOCIDE, TARIK KANAANA, and WILLIAM DOARES,<br>*Plaintiffs*,<br>v.<br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; and BRADLEY T. SMITH, in his official capacity as Director of the Office of Foreign Assets Control,<br>*Defendants*. | **No. 26-cv-5957(JMF)** |

**DECLARATION OF OMAR SHAKIR**

I, Omar Shakir, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Executive Director of Democracy for the Arab World Now, Inc. ("DAWN"), a plaintiff in this action. I have held that position since March 2, 2026. I submit this declaration in support of Plaintiffs' motion for a preliminary injunction.

2. I have personal knowledge of the facts set forth below based on my role at DAWN and my familiarity with its past and present operations, programs, personnel, and decision-making.

3. DAWN is a U.S.-based 501(c)(3) nonprofit organization. Founded in 2018 by the late journalist and dissident Jamal Khashoggi, DAWN conducts research and policy advocacy concerning human rights and democracy in the Middle East and North Africa ("MENA"). It seeks to end U.S. technical, economic, military, and diplomatic support to repressive regimes in MENA, identify new pathways to hold perpetrators of grave human rights abuses accountable, and amplify the voices of human rights activists and dissidents from the region.

4. DAWN uses a range of tools to spotlight human rights violations by MENA states that receive U.S. military and financial support. DAWN conducts research, drafts reports and policy papers, makes legal submissions to domestic and international courts, files and helps develop lawsuits, and engages with governmental officials and other actors to push for human rights accountability measures.

5. DAWN also provides forums for human rights activists, analysts, and experts working on the MENA region to share and publish their views. DAWN maintains an online journal, *Democracy in Exile*. It also organizes both open- and closed-door events in which participants can exchange information about human rights and governance issues; learn specialized techniques for conducting human rights investigations; and brainstorm policy proposals, advocacy strategies, and legal methods for holding human rights violators to account.

6. One of DAWN's priorities is documenting Israeli violations of international law in the Occupied Palestinian Territory ("oPt") and ending U.S. complicity in those violations.

## I. DAWN's ICC Work

7. DAWN has made multiple Article 15 submissions to the Office of the Prosecutor ("OTP") of the International Criminal Court ("ICC") detailing crimes committed by Israeli officials and the role of U.S. officials in aiding and abetting those crimes. DAWN's ICC

submissions typically combine open-source information, witness and victim interviews, and legal analysis. DAWN's most recent ICC submissions include:

a. A November 2022 submission compiling evidence that the 97th Netzah Yehuda Battalion of the Israeli army committed numerous human rights violations in the occupied West Bank, including extrajudicial killings, beatings, and physical and sexual torture.

b. A November 2023 submission compiling evidence supporting an investigation into 40 Israeli army commanders suspected of war crimes in the Gaza Strip during hostilities in the weeks after the October 7 attacks.

c. A January 2025 submission arguing that former President Joe Biden, former Secretary of State Antony Blinken, and former Secretary of Defense Lloyd Austin continued aiding and abetting Israeli war crimes and crimes against humanity even after the ICC issued arrest warrants for Israeli Prime Minister Benjamin Netanyahu and former Israeli Defense Minister Yoav Gallant.

8. DAWN's aim in filing these submissions is not merely to encourage an ICC investigation. The submissions also serve a broader expressive and public advocacy purpose. They enable DAWN to garner more press attention than a typical advocacy report might. They serve a public shaming function. They convey to voters, civil society, and government officials that the conduct at issue is sufficiently grave to warrant scrutiny by an international tribunal established to prosecute only the gravest international crimes. As such, these submissions are designed to build public pressure on state actors to obey the law, irrespective of whether the ICC commences an investigation.

9. DAWN intended to continue making ICC submissions documenting atrocity crimes committed by Israeli and U.S. officials. However, DAWN halted its work on these submissions in February 2025, following the issuance of Executive Order 14203, out of fear that such submissions could be construed as an unlawful "service" and subject DAWN to civil and criminal penalties.

10. If the Government were enjoined from enforcing Executive Order 14203, DAWN would immediately resume its work on ICC submissions. It would prepare additional submissions documenting further atrocity crimes committed by Israeli authorities in the oPt as well as a submission detailing how Trump Administration officials have aided and abetted those crimes.

11. DAWN also seeks to make ICC submissions detailing U.S. crimes outside the oPt. In March 2026, DAWN called on Iran and other regional states to lodge declarations granting the ICC jurisdiction over crimes committed on their territory since the war with Iran began on February 28, 2026. Were that to occur, DAWN would likely file Article 15 submissions documenting U.S. violations of international humanitarian law in that conflict—including strikes on schools, hospitals, and other civilian infrastructure. DAWN would also consider filing Rule 103 submissions with the Pre-Trial Chamber on any questions as to which it had a unique insight or particular expertise.

## II. The Designated Palestinian NGOs

12. Al-Haq, Al Mezan, and the Palestinian Centre for Human Rights ("PCHR") (collectively, "the NGOs") are three of the most highly respected human rights organizations in the oPt. They have been instrumental in documenting human rights and law of war violations in Gaza, particularly because Israeli authorities have almost entirely banned foreign journalists from entering Gaza since October 7, 2023.

13. Before their designation in September 2025, DAWN maintained a close working relationship with these NGOs. For example, DAWN (i) invited representatives from these organizations to attend conferences and publish papers in its online journal, *Democracy in Exile*; (ii) included representatives on conference calls with congressional staff to discuss Israel's crackdown on Palestinian NGOs; (iii) exchanged views about the best ways to pursue accountability for U.S. and Israeli officials and corporations who committed or aided legal violations in the oPt; and (iv) signed joint statements to amplify each other's work.

14. These NGOs have a wealth of information and unique insights about the human rights situation in the oPt because of their prominence, physical location, and long-standing relationships with impacted communities. Indeed, Al-Haq, Al Mezan, and PCHR are among the few organizations with direct access to the victims, witnesses, and primary documentation on which DAWN's Israel-Palestine accountability work depends. DAWN has relied on them to provide information for use in its reports, press releases, and advocacy campaigns. For example, Al-Haq provided critical information used in a joint 2023 DAWN-Amnesty International complaint to the Hyundai corporation cataloguing how that company's heavy equipment was being used in illegal home demolitions in the occupied West Bank. DAWN also relied on information obtained from Al-Haq in its 2025 submission to the U.N. Special Rapporteur on the Right to Adequate Housing on the use of Caterpillar bulldozers to unlawfully destroy Palestinian homes. Al-Haq, Al Mezan, and PCHR have provided DAWN with invaluable insights regarding advocacy tactics before the ICC. DAWN also enlisted these NGOs' assistance to identify and locate Palestinian victims and witnesses, and to help develop an evidentiary record for use in DAWN's U.S. litigation efforts—including, for example, a pending lawsuit in the District of Columbia alleging that the United States's continued supply of arms to Israel violates the Leahy Law.

15. DAWN has been forced to halt its collaborations and professional exchanges with these NGOs, for fear that they would be construed as the provision or receipt of a "service," thereby exposing DAWN to IEEPA penalties.

16. Fearing liability, DAWN has (i) refrained from inviting NGO representatives to attend conferences and publish articles in *Democracy in Exile*; (ii) abstained from providing and receiving specialized trainings on subjects including universal jurisdiction statutes, visual forensics, methods for using Israeli and Palestinian open-source materials, the Rome Statute, and best practices when advocating before U.S. policymakers and domestic and international tribunals; (iii) ended its practice of exchanging evidence, legal analysis, advocacy ideas, and other information concerning the human rights situation in the oPt; (iv) stopped issuing joint press releases to amplify each other's work; (v) abandoned plans to arrange meetings where NGO representatives could share their perspective on the human rights situation in the oPt with various advocacy targets, including U.S. officials; and (vi) eschewed joint advocacy efforts on a wide range of subjects, including campaigns to get the ICC sanctions lifted, to cut U.S. military aid to Israeli army units credibly accused of war crimes, to use universal jurisdiction statutes to hold Israel accountable for crimes committed in the oPt, and to support proceedings regarding Israel/Palestine at the International Court of Justice.

17. If the Government were enjoined from enforcing Executive Order 14203's speech and associational restrictions, DAWN would immediately resume these activities.

## III. <u>U.N. Special Rapporteur Francesca Albanese</u>

18. Prior to her designation, DAWN also maintained a working relationship with the current U.N. Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967 ("UNSR-oPt"), Francesca Albanese.

19. For example, DAWN exchanged evidentiary materials and legal analysis with Albanese regarding ongoing human rights violations in the oPt, discussed advocacy strategies, and exchanged introductions to other advocacy groups, researchers, and parties affected by Israel's unlawful actions in the oPt.

20. DAWN had also responded to Albanese's periodic Calls for Input from civil society. For example, in November 2024, DAWN made a responsive submission to one such Call for Input, detailing how a U.S. company—the Development Corporation for Israel—was using the sale of so-called "Israel Bonds" to fund the expansion of illegal settlements in the occupied West Bank.

21. DAWN has halted professional exchanges with Albanese for fear of facing IEEPA penalties. It has (i) abstained from inviting her to meetings, including closed-door events, during which experts would exchange evidence and legal analysis, provide trainings on the law and investigative techniques, and share advocacy strategies concerning the human rights situation in the oPt; (ii) stopped making submissions in response to her Calls for Input; (iii) stopped exchanging information relevant to her mandate; and (iv) shelved plans to invite her to become a DAWN Fellow—an unpaid position that would entail periodic contributions to *Democracy in Exile* and integrate her into DAWN's organization and network.

22. If the Government were enjoined from enforcing Executive Order 14203's speech and associational restrictions, DAWN would immediately resume these activities.

23. Executive Order 14203 and the designations have greatly impaired DAWN's ability to engage in effective advocacy. It has forced DAWN to work in isolation, cut off from a leading regional expert and the Palestinian groups most knowledgeable about the oPt. It has made it more difficult for DAWN to obtain victim accounts and gather the information it needs to educate

policymakers, inform the public, and pursue its own litigation efforts. And it has made it impossible for DAWN to coordinate its messaging with four of the most important advocates for human rights accountability in the oPt.

24. Those restraints have become increasingly intolerable. On March 31, 2026, shortly after becoming DAWN's Executive Director, we submitted a letter via OFAC's Compliance Hotline, seeking confirmation that DAWN could continue making ICC submissions and engaging with the Palestinian NGOs and Albanese in the above-described manner without running afoul of Executive Order 14203 or IEEPA. That letter requested that OFAC respond no later than April 13, 2026 to ensure that DAWN was able to meet a April 30 deadline to respond to Albanese's most recent Call for Submission. OFAC never sent a substantive response; instead, on April 13, 2026, it directed DAWN to make a request to OFAC's Licensing Division. On May 5, 2026, DAWN sent a second request to the Licensing Division requesting interpretive guidance as well as a public FAQ clarifying that DAWN's proposed activities are lawful. The second letter sought an answer by May 20, 2026. OFAC never responded to that request.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on July 20, 2026.

Omar Shakir

Omar Shakir