**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DEMOCRACY FOR THE ARAB WORLD NOW, INC., d/b/a DAWN, TAXPAYER ALLIANCE AGAINST GENOCIDE, TARIK KANAANA, and WILLIAM DOARES,

Plaintiffs,

-v-

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; and BRADLEY T. SMITH, in his official capacity as Director of the Office of Foreign Assets Control,

Defendants.

No. 26 Civ. 5957 (JMF)

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2689/2713/2768
Email: danielle.marryshow@usdoj.gov
mark.osmond@usdoj.gov
kamika.shaw@usdoj.gov

DANIELLE J. MARRYSHOW
MARK OSMOND
KAMIKA S. SHAW

Assistant United States Attorneys
– Of Counsel –

# TABLE OF CONTENTS

**PAGE**


PRELIMINARY STATEMENT ....... 1

BACKGROUND ....... 3

I. The International Emergency Economic Powers Act ....... 3

II. International Criminal Court ....... 5

III. Executive Order 13928 ....... 6

IV. Executive Order 14203 ....... 6

V. Plaintiffs' Lawsuit ....... 8

LEGAL STANDARD ....... 10

ARGUMENT ....... 10

I. Plaintiffs Cannot Show a Likelihood of Success on Their First Amendment Claims ....... 10

A. Plaintiffs' Facial Challenge Fails ....... 11

B. Plaintiffs Cannot Demonstrate that Executive Order 14203 Violates the First Amendment ....... 13

1. The Executive Order is Content and Viewpoint Neutral ....... 13

2. Executive Order 14203 Does not Burden the Right to Association ....... 16

3. Any Incidental Burden on Speech Would Satisfy Strict Scrutiny ....... 17

II. Plaintiffs are Unlikely to Succeed on Their Ultra Vires or APA Claims ....... 20

A. Legal Standards ....... 21

B. There is No Final Agency Action Under the APA ....... 22

C. The Ultra Vires Claim Is Not Cognizable or Ripe ....... 23

D. Any Cognizable Ultra Vires or APA Claim Concerning Section 1702(b)(3) Would Fail on the Merits ....... 24

III. Plaintiffs Do Not Meet the Remaining Requirements to Establish Entitlement to Injunctive Relief ....... 26

CONCLUSION ........................................................................................................................ 27

# TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

*Am. Fed. of Gov. Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
786 F. Supp. 3d 647 (S.D.N.Y. 2025) ........ 21

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 21, 22

*Brokamp v. James*,
66 F.4th 374 (2d Cir. 2023) ........ 17

*Butler v. City of New York*,
559 F. Supp. 3d 253 (S.D.N.Y. 2021) ........ 17

*Capital Cities/ABC, Inc. v. Brady*,
740 F. Supp. 1007 (S.D.N.Y. 1990) ........ 25

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41(1986) ........ 14, 15

*Clementine Co., LLC v. Adams*,
74 F.4th 77 (2d Cir. 2023) ........ 15

*Comm'n v. Texas,*
605 U.S. 665 (2025) ........ 21, 22

*Consortium for Indep. Journalism, Inc. v. Unit*ed States,
No. 23 Civ. 7088 (KPF), 2025 WL 919504 (S.D.N.Y. Mar. 26, 2025) ........ 13

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
452 F.3d 798 (D.C. Cir. 2006) ........ 23

*Davidson v. Mann*,
129 F.3d 700 (2d Cir. 1997) ........ 11

*Davis v. Pension Benefit Guarantee Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ........ 27

*Dickerson v. Napolitano*,
604 F.3d 732 (2d Cir. 2010) ........ 11

*Ellingson Drainage, Inc. v. United States Fish & Wildlife Serv.*,
2025 WL 2926381 (D.D.C. Oct. 15, 2025) ........ 22

*Farrell v. Burke*,
449 F.3d 470 (2d Cir.2006)........................................................................................ 11

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022)........................................................................................ 22

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)........................................................................................ 21

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1, 145 S. Ct. 2090, 222 L. Ed. 2d 296 (2025)................................................ 18

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007)........................................................................................ 10

*Guan v. Mayorkas*,
530 F. Supp. 3d 237 (E.D.N.Y. 2021) ........................................................................ 16

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)........................................................................................ 19

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
219 F. Supp. 2d 57 (D.D.C. 2002)........................................................................ 27

*Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Departments, App. Div. of the Supreme Ct. of New York*,
852 F.3d 178 (2d Cir. 2017)........................................................................ 17, 18

*Kadi v. Geithner*,
42 F. Sp. 3d 1 (D.D.C. 2012)........................................................................ 16

*Kalantari v. NITV, Inc.*,
352 F.3d 1202 (9th Cir. 2003) ........................................................................ 26

*Kiobel v. Royal Dutch Petroleum Co.*,
621 F.3d 111 (2d Cir. 2010)........................................................................ 5

*Kraham v. Lippman*,
478 F.3d 502 (2d Cir. 2007)........................................................................ 18

*LabMD, Inc. v. F.T.C.*,
776 F.3d 1275 (11th Cir. 2015) ........................................................................ 24

*Loper Bright Ent. v. Raimondo*,
603 U.S. 369 (2024)........................................................................ 26

*Marcavage v. City of New York*,
689 F.3d 98 (2d Cir. 2012)........................................................................ 14, 15

*Masroor v. Noem*,
No. Civ. 25-256 (JDB), 2025 WL 2439176 (D.D.C. Aug. 25, 2025).............................. 21

*Mejia v. Time Warner Cable Inc.*,
No. 15 Civ. 6445 (JPO), 2017 WL 3278926 (S.D.N.Y. Aug. 1, 2017)........................... 19

*Milena Ship Mgmt. Co. v. Newcomb,*
804 F. Supp. 846, 854 (E.D. La. 1992)............................................................... 27

*Morales v. United States Dep't of the Treasury*,
No. Civ. 24-2519 (BAH), 2026 WL 2137999 (D.D.C. July 24, 2026) ........................... 12

*N.Y. Progress & Protection PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013)........................................................................ 26

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)................................................................................ 11

*Nat'l Org. for Marriage, Inc. v. Walsh*,
714 F.3d 682 (2d Cir. 2013)........................................................................ 24

*New York v. Admin. for Child. & Fams.*,
No. 26 Civ.172 (VSB), 2026 WL 673848 n.9 (S.D.N.Y. Mar. 10, 2026)........................ 22

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................ 27

*NYC C.L.A.S.H., Inc. v. City of New York*,
315 F. Supp. 2d 461 (S.D.N.Y. 2004)................................................................ 16

*Olenga v. Gacki*,
507 F. Supp. 3d 260 (D.D.C. 2020) ..................................................................... 3

*Open Soc'y Just. Initiative v. Trump,*
510 F. Supp. 3d 198 (S.D.N.Y. 2021)..........................................................*passim*

*Rahmani v. Yellen*,
No. Civ. 24-0285 (RC), 2024 WL 1701681 (D.D.C. Apr. 19, 2024).............................. 12

*Railway Clerks v. Association for Benefit of Non-contract Employees*,
380 U.S. 650 (1965)................................................................................ 21

*Real Est. Bd. of New York, Inc. v. City of New York*,
786 F. Supp. 3d 788 (S.D.N.Y. 2025)........................................................................ 15

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 .................................................................................................... 13, 18

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)................................................................................................ 16

*Rona v. Trump*,
797 F. Supp. 3d 278 (S.D.N.Y. 2025).................................................................*passim*

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995)................................................................................................ 14

*Sabri v. United States,*
541 U.600, 609........................................................................................................ 11

*Serv. Emps. Int'l Union Loc. 200 United v. Trump*,
420 F. Supp. 3d 65 (W.D.N.Y. 2019) ........................................................................ 21

*Sharkey v. Quarantillo*,
541 F.3d 75 (2d Cir. 2008)........................................................................................ 21

*Smith v. Trump*,
791 F. Supp. 3d 90 (D. Me. July 18, 2025).......................................................*passim*

*Students for Fair Admissions v. U.S. Mil. Acad. at West Point*,
709 F. Supp. 3d 118 (S.D.N.Y. 2024).......................................................................... 9

*Tabbaa v. Chertoff*,
509 F.3d 89 (2d Cir. 2007)........................................................................................ 17

*Thibodeau v. Portuondo,*
486 F.3d 61 (2d Cir.2007).......................................................................................... 11

*TikTok Inc. v. Garland*,
122 F.4th 930 (D.C. Cir.) ........................................................................................... 19

*Tiktok Inc. v. Garland*,
604 U.S. 56, 145 S. Ct. 57, 220 L.Ed.2d 319 (2025) ...................................................... 13

*United States v. Amirnazmi*,
645 F.3d 564 (3d Cir. 2011)........................................................................... 4, 25, 26

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) ..... 27

*Univ. at Buffalo Young Americans for Freedom v. Univ. at Buffalo Student Ass'n Inc.*,
No. 25-140 Civ., 2025 WL 3075633 (2d Cir. Nov. 3, 2025) ..... 14

*Vincenty v. Bloomberg*,
476 F.3d 74 (2d Cir. 2007) ..... 17

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) ..... 11

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ..... 10

*West Virginia v. EPA*,
597 U.S. 697 (2022) ..... 26

*Williams-Yulee v. Fla. Bar,*
575 U.S. 433, 135 S. Ct. 1656, 191 L. Ed. 2d 570 (2015) ..... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..... 10, 26, 27

*Yale New Haven Hosp. v. Becerra*,
56 F.4th 9 (2d Cir. 2022) ..... 23

**Statutes**

5 U.S.C. § 704 ..... 21

5 U.S.C. § 706(2)(C) ..... 23

22 U.S.C. § 7421(5) ..... 5

22 U.S.C. § 7423 ..... 5

22 U.S.C. § 7424 ..... 5

22 U.S.C. §7425 ..... 5

50 U.S.C. § 1702(a)(1)(B) ..... 3, 4

50 U.S.C. § 1702(b)(1) ..... *passim*

50 U.S.C. § 1702(b)(3) ..... *passim*

50 U.S.C. § 1705(b) .......... 4

Pub. L. No. 107-206 .......... 5

50 U.S.C. § 1701 .......... 3

**Regulations**

31 C.F.R. part 501 .......... 4, 5

31 C.F.R. § 501.801 .......... 5, 9

31 C.F.R. § 528.205(a) .......... 7, 22

31 C.F.R. § 560.210(c)(2) .......... 25

**Other Authorities**

Exec. Order 14022, 86 Fed. Reg. 17,895 (Apr. 1, 2021) .......... 6

Exec. Order 13382, 70 Fed. Reg. 38,567 (June 28, 2005) .......... 4, 12

Exec. Order 13694, 80 Fed. Reg. 18,077 (Apr. 1, 2015) .......... 4

Exec. Order No. 13219, 66 Fed. Reg. 34,777 (June 26, 2001) .......... 12

Executive Order 13928, 85 Fed. Reg. 36,139 (June 11, 2020) .......... 5

Executive Order 14203, 90 Fed. Reg. 9369 (Feb. 6, 2025) .......... *passim*

Defendants President Donald J. Trump, U.S. Department of State, Secretary of State Marco Rubio, United States Department of the Treasury, Secretary of the Treasury Scott Bessent, United States Department of Justice, and Attorney General Todd Blanche, Office of Foreign Assets Control ("OFAC"), and Director of OFAC Bradley T. Smith (collectively, the "Government") submit this memorandum of law in opposition to the motion for a preliminary injunction, Dkt. No. 29 ("Pl. Br."), filed by plaintiffs Democracy for the Arab World Now, Inc. ("DAWN"), Taxpayer Alliance Against Genocide ("TAAG"), Tarik Kanaana, and William Doares (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

The International Criminal Court ("ICC") has asserted jurisdiction to investigate and prosecute the personnel of the United States and its closest allies—including Israel—even though neither nation has consented to the ICC's jurisdiction. In Executive Order 14203 (the "Executive Order" or the "Order"), President Trump authorized sanctions against foreign persons who directly engage in or materially support the ICC's efforts to target the personnel of the United States and its allies without their consent. Those sanctions are a lawful exercise of the President's broad authority under the International Emergency Economic Powers Act ("IEEPA") to respond to foreign threats through economic measures—an authority that lies at the heart of the Executive's power over foreign affairs and national security.

Plaintiffs are U.S.-based advocates who wish to support the ICC's investigations and to collaborate with several foreign persons designated under Executive Order 14203. But Plaintiffs have not themselves been designated, sanctioned, or threatened with enforcement for interactions with designated foreign persons. Nor has the Government told them that any activity they wish to undertake is prohibited. To the contrary, Executive Order 14203, its implementing regulations, and

the Government's public guidance all make clear that the sanctions will be implemented in a manner consistent with applicable law, including IEEPA exemptions that protect the exchange of information and informational materials and personal communications, as well as activity protected by the First Amendment. Plaintiffs' claims rest not on any actions the Government has actually taken against them, but on predictions about how the sanctions might be enforced.

Plaintiffs cannot carry their heavy burden of showing a likelihood of success on any of their claims. First, their facial First Amendment challenge fails, as they cannot demonstrate that all impositions of sanctions would violate the First Amendment. Indeed, the Executive Order and designations pursuant to it do not violate the First Amendment. The Order is a content-neutral restriction on conduct—provision of funds, goods, and services to designated persons—and is do not impermissibly burden Plaintiffs' right to associate with persons and organizations of their choosing. The sanctions are justified by the Government's compelling interests in national security and foreign policy and are not targeted at the expression of any view. The sanctions do not, as the Government has repeatedly confirmed, reach constitutionally protected speech.[1]

Plaintiffs' statutory claims fare no better. Their claim under the Administrative Procedure Act ("APA") fails because there is no final agency action to review: the Government has taken no action against Plaintiffs—let alone actions that violate the IEEPA provisions they invoke—and has instead committed to honoring those same provisions. Their *ultra vires* claim is not cognizable

---

[1] The Government acknowledges that this Court previously ruled that Executive Order 14203 violated the First Amendment as applied to plaintiffs in a similar case. *See* *Rona v. Trump*, 797 F. Supp. 3d 278 (S.D.N.Y. 2025); *see also* *Smith v. Trump*, 791 F. Supp. 3d 90 (D. Me. July 18, 2025); *Open Soc'y Just. Initiative ("OSJI") v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021). While OSJI involved a different Executive Order issued in 2020, the Court in Rona stated that Executive Order 14203 is "the successor to the 2020 Order" and noted that "Section 3(a) of [Executive Order 14203] is identical to Section 3(a) of the 2020 Order." *Rona*, 797 F. Supp 3d 278 at 284–85.

because it simply repackages the APA claim, and it is unripe for the same reason there is no final agency action under the APA. And even if the Court could reach the merits, their claim that Executive Order 14203 violates the so-called Berman Amendment to IEEPA would fail because it rests on a misreading of the applicable IEEPA provisions.

Finally, the remaining preliminary-injunction factors confirm that relief is unwarranted. Plaintiffs' alleged irreparable harm depends on the success of their constitutional claim, while the injunction they seek would intrude on the President's judgments in the area of foreign affairs and disserve the public interest. The motion should be denied.

## BACKGROUND

### I. The International Emergency Economic Powers Act

For nearly its entire history, the United States has used economic sanctions as a tool of foreign policy and national security. *See* *Olenga v. Gacki*, 507 F. Supp. 3d 260, 265 (D.D.C. 2020) (discussing history of U.S. sanctions laws). Under IEEPA, the President may declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Upon declaring such an emergency, the President may, among other things, "investigate, block . . . regulate . . . [or] prohibit . . . any . . . transactions involving[] any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B).

IEEPA includes several exemptions to the President's authority, including that the President may not "regulate or prohibit, directly or indirectly . . . the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of

transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." 50 U.S.C. § 1702(b)(3). This exemption, which Congress added to IEEPA in 1988 and amended in 1994, is part of what is commonly known as the "Berman Amendment." *United States v. Amirnazmi*, 645 F.3d 564, 584–86 (3d Cir. 2011). Additionally, pursuant to a separate exemption, the President also may not "regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1).

Presidents have invoked IEEPA to block the property of designated persons under a variety of sanctions programs responding to declared national emergencies. *See, e.g.*, Exec. Order 13694, 80 Fed. Reg. 18,077 (Apr. 1, 2015) (blocking property of persons responsible for malicious cyber activities); Exec. Order 13382, 70 Fed. Reg. 38,567 (June 28, 2005) (blocking property of persons who contributed to the proliferation of weapons of mass destruction). In general, persons designated under an IEEPA-based sanctions program are added to the List of Specially Designated Nationals and Blocked Persons ("SDN List"), which is administered by the Department of Treasury's Office of Foreign Assets Control ("OFAC"). *See* OFAC, Specially Designated Nationals and Blocked Persons List. Persons on the SDN List generally have their property interests within U.S. jurisdiction "block[ed]" (i.e., frozen), 50 U.S.C. § 1702(a)(1)(B), and U.S. persons are generally prohibited from transacting with them absent authorization from OFAC, or unless exempt. *See* 50 U.S.C. § 1705(b) (civil penalties), *id.* § 1705(c) (criminal penalties).[2]

[2] When determining whether to issue a civil penalty, OFAC follows a set process outlined in the agency's regulations. *See generally* 31 C.F.R. part 501, App. A, Economic Sanctions Enforcement Guidelines. OFAC begins by reviewing the "facts and circumstances surrounding an apparent violation," then applies a set of General Factors to determine whether to initiate a civil penalty proceeding and, where applicable, to determine the appropriate amount of a civil monetary penalty.

OFAC's regulations provide administrative mechanisms for persons affected by a sanctions program. Specifically, OFAC's regulations permit any interested person to apply for a specific license authorizing an otherwise-prohibited transaction. *See* 31 C.F.R. § 501.801.

## II. International Criminal Court

The Rome Statute established the ICC in 2002. *See* Jennifer Elsea, Cong. Rsch. Serv., RL 31437, *ICC: Overview and Selected Legal Issues* 1 (2002) at CRS-1. The United States is not a party to the Rome Statute and has consistently declined to accept the ICC's jurisdiction over U.S. nationals. *See* *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 119 n.16 (2d Cir. 2010) (describing the U.S. decision to "'un sign[]'" the Rome Statute). Congress feared that the ICC would assert jurisdiction over American servicemembers and officials, even though "[t]he United States is not a party to the Rome Statute." 22 U.S.C. § 7421(5), (8), (9), (11). Thus, in 2002, the same year that the ICC was established, Congress passed the American Servicemembers' Protection Act ("ASPA"), Pub. L. No. 107-206, tit. II, 116 Stat. 820, 899–909 (2002), which restricted various forms of cooperation with the ICC. 22 U.S.C. §§ 7423–7425.

## III. Executive Order 13928

In 2020, President Trump issued Executive Order 13928, which declared a national emergency with respect to "any attempt by the ICC to investigate, arrest, detain, or prosecute" U.S.

---

*Id.* § 501, App. A(V). The General Factors OFAC considers include whether any apparent violation was willful or reckless, the subject person or entity's awareness of the conduct, involvement of senior management in the conduct, harm to the sanctions program objectives, and individual factors such as the commercial sophistication and size of the subject person or entity. *Id.* § 501, App. A(III). Depending on the facts and circumstances of particular cases, OFAC may determine after investigation, among other outcomes, that no response is warranted (because, for example, the conduct does not rise to a level warranting a response); that additional information is needed; that a cautionary letter should be issued; or that a violation occurred. *Id.* § 501, App. A(II).

personnel, or the personnel of certain allies, without their consent. *See* 85 Fed. Reg. 36,139 (June 11, 2020). Pursuant to that order, the then-serving Secretary of State designated the then-Prosecutor of the ICC and another senior ICC official. *OSJI*, 510 F. Supp. 3d,204–05. President Biden revoked the 2020 executive order in 2021.[3] *See* Exec. Order 14022, 86 Fed. Reg. 17,895 (Apr. 1, 2021).

## IV. Executive Order 14203

On February 6, 2025, President Trump issued Executive Order 14203, finding that the ICC has "engaged in illegitimate and baseless actions targeting America and our close ally Israel." 90 Fed. Reg. 9369, 9369 (Feb. 6, 2025). The order explains that—although the United States and Israel are not parties to the Rome Statute and have not accepted the ICC's jurisdiction—the ICC has "without a legitimate basis, asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel," and has "abused its power by issuing baseless arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant." *Id.*

The President found that these actions "set a dangerous precedent, directly endangering current and former United States personnel, including active service members of the Armed Forces, by exposing them to harassment, abuse, and possible arrest"; "threaten[] to infringe upon the sovereignty of the United States"; and "undermine[]" U.S. "national security and foreign policy." *Id.* On that basis, the President determined that "any effort by the ICC to investigate, arrest,

[3] Before the 2020 executive order was revoked, Judge Failla preliminarily enjoined the Government from enforcing IEEPA's civil and criminal penalties against plaintiffs in another case after finding that they were likely to succeed on the merits of their First Amendment claim. *OSJI*, 510 F. Supp. 3d at 217. The Government did not appeal, and the action was voluntarily dismissed after Executive Order 13928 was revoked. *See Rona*, 797 F. Supp. 3d at 281 (discussing procedural history of *OSJI*).

detain, or prosecute" protected persons—defined to include U.S. persons and citizens or lawful residents of a U.S. ally that has not consented to ICC jurisdiction—"constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States," and declared a national emergency to address that threat. *Id.* at 9369–71.

Executive Order 14203 blocks the property of, and prohibits certain transactions with, *inter alia*, any foreign person determined by the Secretary of State to have, *inter alia*, "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality" or "to have materially assisted, sponsored, or provided financial, material, or technological support for" such an effort.[4] Exec. Order § 1(a)(ii)(A)–(B), 90 Fed. Reg. at 9370.

The Order prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked," as well as "the receipt of any contribution or provision of funds, goods, or services from any such person." *Id.* § 3(a)–(b). Absent an applicable exemption or OFAC authorization, U.S. persons may not exchange funds, goods, or services with a designated person. *Id.* §§ 1(b), 3(a)–(b).

The order makes clear that it "shall be implemented consistent with applicable law." *Id.* § 12(b), 90 Fed. Reg. at 9372. Regulations implementing Executive Order 14203 expressly incorporate IEEPA's exemptions, including the exemptions for informational materials (50 U.S.C. § 1702(b)(3)) and personal communications (*id.* § 1702(b)(1)) discussed above. 31 C.F.R. § 528.205(a) ("The prohibitions contained in this part do not apply to any transactions that are

---

[4] Simultaneous with the issuance of the order, Karim Khan, then-Prosecutor of the ICC, was designated for sanctions. *Id.* at 9373.

exempt pursuant to section 203(b) of the International Emergency Economic Powers Act (50 U.S.C. 1702(b)).”). As recently as earlier this year, the Government has expressly and publicly stated that “OFAC does not sanction persons for their engagement in activities subject to U.S. constitutional protection, such as protected speech.” *See* *Treasury Exposes and Disrupts Hamas's Covert Support Network*, OFAC (Jan. 21, 2026) (citing OFAC, Frequently Asked Question (FAQ) No. 1190).

Simultaneously with the issuance of Executive Order 14203, Karim Khan, then-Prosecutor of the ICC, was sanctioned. 90 Fed. Reg. at 9373. Between June and December 2025, the Secretary of State designated additional ICC officials—including several judges and two deputy prosecutors—based on their roles in authorizing or supporting the ICC's investigation of U.S. personnel in Afghanistan or its issuance of arrest warrants targeting senior Israeli officials. Compl. ¶ 74. On July 9, 2025, the Secretary of State designated Francesca Albanese, the U.N. Special Rapporteur, who recommended that the ICC issue arrest warrants targeting Israeli officials and pursue investigations and prosecutions of certain U.S. companies and their executives. *Id.* ¶ 92. And on September 4, 2025, the Secretary designated three foreign nongovernmental organizations—Al-Haq, Al Mezan, and the Palestinian Centre for Human Rights (collectively, “the Palestinian NGOs”)—for having “directly engag[ed] in efforts by the . . . [ICC] to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent.” *Id.* ¶¶ 75, 83.

**V. Plaintiffs' Lawsuit**

Plaintiff Democracy for the Arab World Now, Inc. (“DAWN”) is a U.S.-based nonprofit organization that, among other things, conducts research and has advocated for the ICC to investigate Israeli and U.S. officials, including by preparing submissions to the ICC's Office of the Prosecutor and by collaborating with certain designated ICC officials, the Palestinian NGOs, and

the U.N. Special Rapporteur. *Id.* ¶¶ 12–13, 94–102. Plaintiff Taxpayer Alliance Against Genocide ("TAAG") is an unincorporated association formed to prepare and submit communications to the ICC documenting alleged U.S. complicity in atrocity crimes abroad. *Id.* ¶ 14. Plaintiffs Tarik Kanaana and William Doares are, respectively, TAAG's president and treasurer. *Id.* ¶¶ 16–17.

Plaintiffs do not allege that they have been designated under Executive Order 14203. Before Executive Order 14203 was issued, however, DAWN allegedly made multiple Article 15 submissions[5] to the ICC, urging the ICC prosecutor to investigate Israeli or U.S. officials, but it halted this work after the order was issued. *Id.* ¶¶ 94, 103. Around October 2025, TAAG members started preparing its first Article 15 submission accusing U.S. officials and senior congressional leaders of aiding and abetting alleged Israeli war crimes, but it has refrained from completing and filing the submission. *Id.* ¶¶ 95, 103. Plaintiffs allege that, before the Palestinian NGOs and the U.N. Special Rapporteur were designated, DAWN exchanged information and legal analysis with them, coordinated advocacy, and platformed their work. *Id.* ¶¶ 4, 97–102. Plaintiffs allegedly fear that activities like these could be treated as prohibited "services," which would trigger IEEPA sanctions. *Id.* ¶ 106. According to Plaintiffs, if the Government were enjoined from enforcing Executive Order 14203 against them, they would immediately resume engaging in these activities. *Id.* ¶ 110.

Plaintiffs sought informal guidance from OFAC between February and May 2026 on whether certain activities were permitted, but they have not yet received answers to their questions. *Id.* ¶ 109. Plaintiffs do not allege that they applied for a specific license authorizing the activities they wish to undertake. *See* 31 C.F.R. § 501.801.

---

[5] Under Article 15 of the Rome Statute, any interested party may submit evidence to the ICC's Office of the Prosecutor to prompt an investigation. Compl. ¶ 40.

## LEGAL STANDARD

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

## ARGUMENT

### I. Plaintiffs Cannot Show a Likelihood of Success on Their First Amendment Claims

Plaintiffs attempt to bring a facial challenge on the grounds that Executive Order 14203 impermissibly restricts speech based on content and viewpoint and infringes on the freedom of association in violation of the First Amendment. But Plaintiffs cannot make the requisite showing to establish a viable facial challenge because they cannot demonstrate that there is no application of the Executive Order that comports with the First Amendment. Further, Plaintiffs cannot plausibly allege the First Amendment violations they claim because Executive Order 14203 is both content and viewpoint neutral and imposes no more than an incidental burden, if any, on the right of association.

### A. Plaintiffs' Facial Challenge Fails

Plaintiffs' facial challenge lacks merit. "Federal courts as a general rule allow litigants to assert only their own legal rights and interests, and not the legal rights and interests of third parties." *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006). Limiting litigants' ability to vindicate third party interests "ensur[es] that the issues before the court are concrete and sharply presented." *Thibodeau v. Portuondo*, 486 F.3d 61, 71 (2d Cir. 2007). As a result, "[f]acial challenges are generally disfavored" for a number of reasons. *Dickerson v. Napolitano*, 604 F.3d 732, 741–42 (2d Cir. 2010). First, facial challenges "often rest on speculation" and, consequently, "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450–51 (2008) (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004). Second, facial challenges run afoul of the "fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (internal quotation marks and citations omitted). Lastly, facial challenges "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id*.

Simply put, "[f]acial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotation marks omitted). Consequently, in order for Plaintiffs to successfully bring a facial challenge, they "must establish that no set of circumstances exists under which the [Executive Order] would be valid." *Davidson v. Mann*, 129 F.3d 700, 701–02 (2d Cir. 1997). "[A] facial challenge must fail where the statute has a plainly legitimate sweep." *Grange*,

552 U.S. at 449. In evaluating whether a law is facially invalid courts are "careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id*. In sum, Plaintiffs only have a viable facial challenge if they can demonstrate that the First Amendment prohibits the Government from ever imposing the sanctions provided for in Executive Order 14203.

Plaintiffs cannot meet this "heavy burden." *Finley*, 524 U.S. 569, 580 (1998). First, Presidents have blocked persons under sanctions programs based on IEEPA in response to a range of declared national emergencies. *See, e.g.*, Exec. Order No. 13382, 70 Fed. Reg. 38567 (June 28, 2005) (blocking the property and interests in property of persons who, among other things, are determined to have engaged in transactions that have materially contributed to the proliferation of weapons of mass destruction); Exec. Order No. 13219, 66 Fed. Reg. 34777 (June 26, 2001) (listing individual persons as blocked). Further, like this Executive Order, prior Executive Orders sanctioning persons have also constrained the ability of non-blocked U.S. persons to provide or receive any goods, funds or services to or from blocked persons. *See, e.g.*, Exec. Order No. 14114, 88Fed. Reg. 89271 (Dec. 22, 2023). These types of sanctions are commonplace under IEEPA. Presidents declare "dozens of IEEPA national emergencies and authorized sanctions to address all manner of threats—ranging from narcotrafficking to political repression to malicious cyberactivity to corruption[,]" and "Courts regularly uphold these sanctions." *Rahmani v. Yellen*, No. Civ. 24-0285 (RC), 2024 WL 1701681, at *11 (D.D.C. Apr. 19, 2024); *see Morales v. United States Dep't of the Treasury*, No. Civ. 24-2519 (BAH), 2026 WL 2137999, at *6 (D.D.C. July 24, 2026) (noting that "[t]he Supreme Court has long maintained that IEEPA indicat[es] congressional acceptance of a broad scope for executive action and delegates broad authority to the President to act in times of national emergency with respect to property of a foreign country.") (internal quotation marks and

citations omitted). In light of the President's broad authority to impose sanctions exactly like the sanctions imposed by Executive Order 14203, Plaintiffs cannot plausibly allege that there is essentially no circumstance under which the Order would be valid.

### B. Plaintiffs Cannot Demonstrate that Executive Order 14203 Violates the First Amendment

#### 1. The Executive Order is Content and Viewpoint Neutral[6]

Even if the Court were to entertain Plaintiffs' facial challenge despite this defect, Plaintiffs cannot plausibly allege that the sanctions imposed by the Executive Order impermissibly burdens speech because they are content and viewpoint neutral. Plaintiffs assert that the Order is content and viewpoint based because "it only bars speech whose 'function or purpose' is to confer a benefit on a designated party." Pl. Br. at 20. Plaintiffs are incorrect in their description of how the sanctions function. Speech regulation is content-based when it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163. The challenged regulation must "on its face" draw[] distinctions based on the message a speaker conveys." *Id.* at 163-164 (internal quotation marks omitted). "Viewpoint discrimination is a subset or particular instance of the more general phenomenon of content discrimination. . ." *Consortium for Indep. Journalism, Inc. v. United States*, No. 23 Civ. 7088 (KPF), 2025 WL 919504, at *14 (S.D.N.Y. Mar. 26, 2025), *appeal dismissed* (July 21, 2025) (quotation marks and

---

[6] Defendants acknowledge that this Court previously rejected a similar argument and found that Executive Order 14203, as applied to Plaintiffs in that matter "is content based because, like Section 2339B, the Order 'regulate[s] speech based on its function or purpose.'" *Rona v. Trump*, 797 F. Supp. 3d 278, 288 (S.D.N.Y. 2025) (quoting *Tiktok Inc. v. Garland*, 604 U.S. 56, 145 S. Ct. 57, 67, 220 L.Ed.2d 319 (2025)).

citations omitted). A regulation is aimed at viewpoints when it "targets not subject matter, but particular views taken by speakers on a subject" such that "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

The restrictions imposed by Executive Order 14203 do not, on their face, implicate speech. The Executive Order prohibits Plaintiffs from providing or receiving "funds, goods, or services" to or from persons whose property or property interests are subject to sanction pursuant to the Executive Order. 90 Fed. Reg. 9369, 9370 (Feb. 6, 2025). "A regulation is content neutral when it is 'justified without reference to the content of the regulated speech.'" *Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48(1986)). These restrictions are content-neutral, as they do not distinguish among the funds, goods or services subject to them based on either message or content. Further, Plaintiffs cannot claim that these restrictions target any specific viewpoint. The restrictions imposed by the Executive Order do not target "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Univ. at Buffalo Young Americans for Freedom v. Univ. at Buffalo Student Ass'n Inc.*, No. 25-140 Civ., 2025 WL 3075633, at *3 (2d Cir. Nov. 3, 2025).

Plaintiffs speculate that the Executive Order would prevent them from engaging in conduct in support of causes they champion, such as "fil[ing] a brief *supporting* ICC jurisdiction, shar[ing] evidence *bolstering* Albanese's allegations, or speak[ing] with Palestinian NGOs to *align* their messaging" without facing penalties pursuant to the Executive Order while allowing them to engage in similar activities if they were critical of the ICC. Pl. Br. 20-21. Nothing in the text of Executive Order 14203 supports this proposition. Outside of the plain text of the Executive Order,

IEEPA itself limits the President's authority to regulate speech. The Berman Amendment to IEEPA prohibits the Government from using IEEPA "to regulate or prohibit, directly or indirectly . . . . the importation from any country, or the exportation to any country. . .of any information or informational materials." 50 U.S.C. § 1702(b)(3). In keeping with the Berman Amendment, the Government has confirmed that the restrictions implemented by the Executive Order do not restrict protected speech or any other constitutionally protected activities. *See* OFAC, Frequently Asked Question (FAQ) No. 1190. Plaintiffs' mere conjecture about how the Executive Order might impact them if they were to engage in these actions is not enough when weighed against the statutory language and the Government's clear statement that sanctions imposed under Executive Order 14203 will not reach protected speech.

Even if the Executive Order did impact speech, the effect is, at most, incidental, and the Executive Order can be "justified without reference to the content of the regulated speech." *Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986)). The Executive Order was not implemented for the purpose of disadvantaging a particular viewpoint or message. Rather, the Executive Order was implemented due to national security concerns. Specifically, the Executive Order aims to protect U.S. personnel and its allies from ICC efforts to investigate, arrest, detain, prosecute or otherwise target them without consent. The goal of the Executive Order is to regulate the aforementioned conduct. Courts in this Circuit have routinely recognized that "a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment." *Clementine Co., LLC v. Adams*, 74 F.4th 77, 87 (2d Cir. 2023) (citations and internal quotation marks omitted); *Real Est. Bd. of New York, Inc. v. City of New York*, 786 F. Supp. 3d 788, 804 (S.D.N.Y. 2025), *aff'd*, No. 25-1506, 2026 WL 2015138 (2d Cir.

July 13, 2026) (the First Amendment "does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech[.]")

**2. Executive Order 14203 Does not Burden the Right to Association**

Nor can Plaintiffs claim that the Executive Order infringes on their right to association. Plaintiffs contend that the Executive Order burdens their right to association by restricting their ability to "work jointly" with persons designated under the Executive Order. Pl. Br. at 22. Contrary to Plaintiffs' view, the Executive Order places no impermissible restrictions on their right to association. The right to free association "is implicated when governmental action interferes with an organization engaged in activities protected by the First Amendment, such as speech, assembly, redress of grievances, and the exercise of religion." *NYC C.L.A.S.H., Inc. v. City of New York*, 315 F. Supp. 2d 461, 472 (S.D.N.Y. 2004) (internal quotation marks and citations omitted). In evaluating whether government conduct violated an individual's First Amendment rights, courts consider "whether and to what extent defendants' actions burdened that right," and whether the conduct at issue passes muster under the appropriate level of scrutiny. *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 265 (E.D.N.Y. 2021). Courts have maintained that "[t]he right to associate for expressive purposes is not . . . absolute." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

The text of the Executive Order does not curtail associational activity. Rather, as explained *supra* Section B.1., it restricts Plaintiffs from transacting with those designated under the Executive Order. *See, e.g., Kadi v. Geithner*, 42 F. Supp. 3d 1, 35 (D.D.C. 2012) (concluding that blocking the property interests of an individual designated as a specially designated global terrorist under IEEPA "does not violate freedom of association because it does not prohibit associational activity; rather, it targets the financial support of terrorism."). Even if the Executive Order could be read to have some incidental impact on Plaintiffs' associational rights, "[m]ere incidental

burdens on the right to associate do not violate the First Amendment;" instead, "[t]o be cognizable, the interference with [plaintiffs'] associational rights must be "direct and substantial" or "significant." *Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007) (internal quotation marks and citations omitted). Plaintiffs here do not articulate direct or significant interference. They are, without running afoul of the Executive Order, still able to associate with persons sanctioned pursuant to the Executive Order outside of the discrete category of exchanging property as prohibited pursuant to the Order.

### 3. Any Incidental Burden on Speech Would Satisfy Strict Scrutiny

Intermediate scrutiny, not strict scrutiny, as Plaintiffs assert, properly applies to Plaintiffs' First Amendment freedom of speech claims because the Executive Order is a content and view-point neutral regulation that at worst only incidentally burdens expression protected by the First Amendment. *Butler v. City of New York*, 559 F. Supp. 3d 253, 267 (S.D.N.Y. 2021) ("when a regulation is content neutral, intermediate scrutiny applies."). A statute or regulation survives intermediate scrutiny when it "(1) advances important governmental interests unrelated to the suppression of free speech and (2) does not burden substantially more speech than necessary to further those interests[.]" *Brokamp v. James*, 66 F.4th 374, 391 (2d Cir. 2023) (internal quotation marks and citations omitted). It does not require that the Government utilize "the least speech-restrictive means of advancing the Government's interests." *Vincenty v. Bloomberg*, 476 F.3d 74, 84 (2d Cir. 2007).

Plaintiffs' freedom of association claims should be subject to rational basis review. Strict scrutiny, which Plaintiffs contend applies here, is appropriate for freedom of association claims "only when a challenged regulation imposes "severe burdens" on associational rights." *Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Departments, App. Div. of*

*the Supreme Ct. of New York*, 852 F.3d 178, 191 (2d Cir. 2017). However, if a regulation only affects associational rights in incidental or limited manner, "the restriction should be reviewed only for a rational basis." *Kraham v. Lippman*, 478 F.3d 502, 506 (2d Cir. 2007); *Jacoby & Meyers*, LLP, 852 F.3d 191 (2d Cir. 2017) ("in the context of claims asserting First Amendment associational rights" courts in the Circuit apply rational basis review when the challenged regulation does not impose any severe burden on associational rights). Under rational basis review, "the restriction need only be rationally related to a legitimate government interest." *Kraham*, 478 F.3d 506 (2d Cir. 2007). In this instance, rational basis review would properly apply because, as explained above, the Executive Order has no more than an incidental impact on Plaintiffs' associational rights.

Even if the Court were to agree with Plaintiffs' assessment that strict scrutiny applies, the Order satisfies that more demanding standard.[7] A regulation survives strict scrutiny if it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. The Executive Order serves a compelling government interest—it protects U.S. personnel and its allies from investigation, prosecution, detention and arrest by the ICC where the U.S. and its allies have not consented to the ICC's jurisdiction. These constitute the kind of "sensitive and weighty interests of national security and foreign affairs" that involve highly important governmental interests for the purposes of the First Amendment analysis. *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 20, 145 S. Ct. 2090, 2107, 222 L. Ed. 2d 296 (2025) (quoting

---

[7] This Court has previously held that strict scrutiny properly applied to its consideration of Executive Order 14203 because it is content-based. In those cases, the Court has concluded that, as applied to those Plaintiffs, the Executive Order could not survive strict scrutiny. *See Rona v. Trump*, 797 F. Supp. 3d 278 (S.D.N.Y. 2025); *see also Smith v. Trump*, 791 F. Supp. 3d 90 (D. Me. July 18, 2025); *Open Soc'y Just. Initiative ("OSJI") v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021).

*Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010), *aff'd*, 604 U.S. 56, 145 S. Ct. 57, 220 L. Ed. 2d 319 (2025); *TikTok Inc. v. Garland*, 122 F.4th 930, 953 (D.C. Cir.), *aff'd*, 604 U.S. 56, 145 S. Ct. 57, 220 L. Ed. 2d 319 (2025) (in determining whether a speech restriction served a compelling government interest where "sensitive interests in national security and foreign affairs at stake," the Court determined that the Government's judgment was "entitled to significant weight.").

The Executive Order is also narrowly tailored. Sanctions authorities allow the President to address threats by preventing transactions with specific persons or organizations or in specific areas. Plaintiffs claim that the Government has "numerous less restrictive means" of achieving its interest. Pl. Br. at 27. At base, Plaintiffs suggest that the less restrictive means available would involve the Government engaging in more speech, such as filing its own amici or Article 15 submissions, or by attempting to persuade State Parties not to cooperate with the ICC. *Id.* at 27–28. While the Government can engage in more speech espousing its views on ICC jurisdiction over U.S. personnel and allies if it so chooses, Plaintiffs do not articulate how these purported alternatives achieve the Government's goals of protecting its citizens and allies from prosecution, investigation or arrest.

Plaintiffs further contend that the Executive Order is both over and underinclusive. According to Plaintiffs, it is overinclusive in that it "bar[s] Plaintiffs from providing or receiving services that have no nexus to the parties' efforts to persuade the ICC to investigate U.S. or Israeli nationals." Pl. Br. at 29. Additionally, Plaintiffs claim it also is underinclusive because the Government has "only designated four advocates for urging the ICC to investigate U.S. and Israeli nationals." *Id.* at 30. Neither of these assertions has merit. "The First Amendment requires that [the provision] be narrowly tailored, not that it be 'perfectly tailored.'" *Mejia v. Time Warner Cable Inc.*,

No. 15 Civ. 6445 (JPO), 2017 WL 3278926, at *17 (S.D.N.Y. Aug. 1, 2017) (internal quotation marks and citations omitted). Further, with respect to underinclusiveness, "[t]he first Amendment "imposes no freestanding underinclusiveness limitation[,]" and Courts have "upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449, 135 S. Ct. 1656, 1668, 191 L. Ed. 2d 570 (2015).The Executive Order aims to target specific ICC-related activities that are deemed to threaten U.S. interests. In order to do so, the Executive Order permits the President to designate additional individuals or organizations if additional information indicates that such designation would be appropriate. The Executive Order achieves its aims without anything more than a minimal, if any, impact on First Amendment rights, as the only prohibition it places on individuals and organizations with First Amendment rights is restrictions on transacting with, or for the benefit of, or dealing in the property or property interests of, the designated or blocked individual. As such, the Executive Order is neither over nor underinclusive and survives strict scrutiny.

## II. Plaintiffs are Unlikely to Succeed on Their *Ultra Vires* or APA Claims

Plaintiffs' *ultra vires* and APA claims both rest on the theory that imposing penalties on them would exceed the President's authority under IEEPA's "personal communications" and "informational materials" exemptions. 50 U.S.C. § 1702(b)(1), (b)(3). These duplicative claims fail for multiple, independent reasons. To begin, there is no final agency action for the Court to review under the APA. The *ultra vires* claim is not cognizable because it simply repackages the APA claim, and the claim is also unripe because the Government has taken no action against Plaintiffs and has committed to honoring IEEPA's exemptions. And even absent these threshold

problems, Plaintiffs' claim under the "informational materials" exception would fail for an additional reason—it rests on an erroneous interpretation of the exemption.

**A. Legal Standards**

The APA authorizes judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Agency action is final only if it both "mark[s] the 'consummation' of the agency's decisionmaking process" and determines "'rights or obligations'" or produces "'legal consequences.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The "core question" is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2d Cir. 2008) (quotation marks omitted). And because "the President is not an agency within the meaning of the [APA]," a presidential directive, such as an executive order, is not itself reviewable under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796, 802–03 (1992) ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'"); *see also Serv. Emps. Int'l Union Loc. 200 United v. Trump*, 420 F. Supp. 3d 65, 75 (W.D.N.Y. 2019) ("while a president's actions may be reviewable on other bases, such as constitutionality, they are not subject to the requirements of the APA").

*Ultra vires review* is available only where "an agency has taken an action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (emphasis in original) (quoting *Railway Clerks v. Association for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)). It "derives from the inherent equitable powers of courts." *Am. Fed. of Gov. Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 692 (S.D.N.Y. 2025). "Courts must be exceedingly cautious of exercising *ultra vires*

review because it 'seeks the intervention of an equity court where Congress has not authorized statutory judicial review.'" *Masroor v. Noem*, No. Civ. 25-256 (JDB), 2025 WL 2439176, at *3 (D.D.C. Aug. 25, 2025) (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022)). *Ultra vires* review is not an alternative route for obtaining judicial review when the APA's requirements have not been met. *Nuclear Regul. Comm'n*, 605 U.S. at 681 (explaining that, because *ultra vires* review could "become an easy end-run around" limits on "judicial-review statutes," the doctrine has been "strictly limited"); *see also* *New York v. Admin. for Child. & Fams.*, No. 26 Civ.172 (VSB), 2026 WL 673848, at *21 n.9 (S.D.N.Y. Mar. 10, 2026) ("An *ultra vires* claim is 'essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds.'").

**B. There is No Final Agency Action Under the APA**

Plaintiffs' APA claim fails here because the Government has not taken any final agency action with respect to Plaintiffs—let alone one that violates IEEPA's exemptions for "personal communication[s]" or "informational materials." *See* 50 U.S.C. §§ 1702(b)(1), (b)(3). Specifically, OFAC has not taken action that "mark[s] the 'consummation' of [its] decisionmaking process" and no "'rights or obligations have been determined,'" and no "'legal consequences'" have flowed to Plaintiffs. *Bennett*, 520 U.S. at 178. While Plaintiffs purportedly fear they will be subject to penalties in violation of IEEPA exemptions, Executive Order 14203 specifically provides that it "shall be implemented consistent with applicable law." *Id.* § 12(b), 90 Fed. Reg. at 9372. Furthermore, the regulations implementing Executive Order 14203 expressly incorporate these exemptions. *See* 31 C.F.R. § 528.205(a); 50 U.S.C. § 1702(b)(1), (b)(3). Plaintiffs argue that the Government has interpreted these exemptions in ways with which they disagree, but these interpretations are not tantamount to challengeable final agency action. Indeed, "courts 'lack authority to review claims under the APA where an agency merely expresses its view of what the

law requires of a party, even if that view is adverse to the party.'" *Ellingson Drainage, Inc. v. United States Fish & Wildlife Serv.*, No. Civ. 25-541 (JDB), 2025 WL 2926381, at *4 (D.D.C. Oct. 15, 2025) (some quotation marks omitted) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808 (D.C. Cir. 2006)). It is premature to review Plaintiffs' APA claims—premised on the alleged violation of § 1702(b) exemptions—when the Government has taken no final action against Plaintiffs, while giving assurances that it will abide by these exemptions. Indeed, two district courts, when analyzing analogous *ultra vires* claims, found that the claims were not likely to succeed because they were not ripe. *OSJI*, 510 F. Supp. 3d at 214–16 (concluding IEEPA *ultra vires* claim was "not ripe" because while imposing "IEEPA penalties for conduct covered by the 'informational materials' exception plainly would be *ultra vires*," it is "no more than speculation that OFAC intends to violate that provision"); *Smith*, 791 F. Supp. 3d at 96 n.3 (declining to reach the merits of an *ultra vires* IEEPA claim out of "concern[] that the IEEPA claim is not ripe" given insufficient "evidence that the Government intends to enforce the Executive Order in a manner that would amount to regulating 'information or informational materials' in violation of IEEPA"). The absence of final agency action here compels the same result for Plaintiffs' APA claim.

### C. The *Ultra Vires* Claim Is Not Cognizable or Ripe

Plaintiffs' *ultra vires* claim fails because it simply repackages the APA claim. For an *ultra vires* claim to be viable, there must be "no alternative procedure for review of the statutory claim." *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 27 (2d Cir. 2022) (quotation marks omitted). Here, the APA authorizes review of agency action "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), which is the same theory underlying Plaintiffs' *ultra vires* claims. Compl. ¶ 123 (arguing that sanctions would "exceed the authority IEEPA grants").

Plaintiffs cannot assert an *ultra vires* claim as an "end-run around the limitations" imposed by the APA, including the final-agency-action requirement. *See Nuclear Regul. Comm'n*, 605 U.S. at 681; *see also LabMD, Inc. v. F.T.C.*, 776 F.3d 1275, 1277 (11th Cir. 2015) (*ultra vires* claim that was "intertwined with . . . APA claim" could only be heard after there is "a 'final agency action'").

Even if Plaintiffs could simultaneously assert duplicative *ultra vires* and APA claims, the *ultra vires* claims are not ripe for review for the same reason that there is no final agency action under the APA—that is, the Government has taken no action against Plaintiffs and has given assurances that it will implement Executive Order 14203 in a manner consistent with IEEPA's exemptions, making any threatened violation speculative. *See OSJI*, 510 F. Supp. 3d at 213–16 (finding that *ultra vires* claim is not ripe); *Smith*, 791 F. Supp. 3d at 96 n.3 (same); *see also Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) ("A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"). Accordingly, while Plaintiffs argue that certain of their activities fall within Section 1702(b)(1)'s personal communications exception or Section 1702(b)(3)'s information and informational materials exception, IEEPA's language is clear and Executive Order 14203 clearly states that it will be implemented in accordance with its restrictions. It is therefore "no more than speculation that OFAC intends to violate" Section 1702(b)(1) or (b)(3) "in its enforcement of the Executive Order." *OSJI*, 510 F. Supp. 3d at 215-16 (S.D.N.Y. 2021). "Accordingly, the question of the legal validity of . . . any . . . potential interpretation" of those provisions, or "its applicability to the conduct in which Plaintiffs wish to engage, is not now properly before the Court." *Id.* at 216.

### D. Any Cognizable *Ultra Vires* or APA Claim Concerning Section 1702(b)(3) Would Fail on the Merits

Even if Plaintiffs could bring *ultra vires* or APA claims, their claim under 1702(b)(3) would fail for the additional reason that it is premised on an incorrect interpretation of that IEEPA

exemption. Plaintiffs' § 1702(b)(3) theory rests on a reading of the informational-materials exemption that is inconsistent with the interpretation that OFAC has long adopted and which courts have upheld. As noted above, the so-called Berman Amendment exempts from IEEPA sanctions the "importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." 50 U.S.C. § 1702(b)(3).

OFAC has long interpreted § 1702(b)(3) not to extend to "information or informational materials not fully created and in existence at the date of the transactions, or to the substantive or artistic alteration or enhancement of informational materials, or to the provision of marketing and business consulting services." *See, e.g.*, 31 C.F.R. § 560.210(c)(2) (Iranian Transactions and Sanctions Regulations). This interpretation—which distinguishes between "informational materials that are widely circulated in a standardized format and those that are bespoke"—is the best reading of the statute's text and history, and courts have upheld it. *Amirnazmi*, 645 F.3d at 587–88 ("[T]here is ample evidence to suggest Congress has accepted OFAC's decision to permit the circulation of informational materials already in existence while concomitantly regulating transactions that contemplate the creation of new materials."); *accord* *Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1011–13 (S.D.N.Y. 1990).

The statutory text confirms the point. OFAC's interpretation is consistent with the list of examples of "informational materials" in § 1702(b)(3)—"publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feed"—all embodiments of information in fixed form. It is also consistent with the

legislative purpose of the Berman Amendment. *Amirnazmi*, 645 F.3d at 587 ("OFAC has made a reasoned determination that Congress's paramount concern [was] for facilitating transactions and activities incident to the flow of informational materials in-being"); *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003) (explaining that Congress added the Berman Amendment in reaction to seizures of "shipments of magazines and books from embargoed countries").

The Court should reject Plaintiffs' invitation to override OFAC's longstanding interpretation of § 1702(b)(3), which courts have upheld. *See* *Loper Bright Ent. v. Raimondo*, 603 U.S. 369, 386 (2024) (recognizing that "the longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is" (alterations and quotation marks omitted)); *West Virginia v. EPA*, 597 U.S. 697, 747 (2022) (Gorsuch, J., concurring) ("A 'contemporaneous' and long-held Executive Branch interpretation of a statute is entitled to some weight.").

Plaintiffs' challenge thus fails to the extent § 1702(b)(3) does not apply to many of their described activities. The coordinated advocacy campaigns, fellowships, interactive and dynamic training or education, and bespoke analysis they propose to provide to or receive from designated persons (Compl. ¶¶ 4, 14, 104–05) are a far cry from the fixed, standardized forms of information already in existence that the exemption protects. *See* *Amirnazmi*, 645 F.3d at 587.

## III. Plaintiffs Do Not Meet the Remaining Requirements to Establish Entitlement to Injunctive Relief

Plaintiffs also have not made a "clear showing," *Winter*, 555 U.S. at 22, that they meet the remaining requirements for injunctive relief. Plaintiffs' argument that they have demonstrated irreparable harm depends entirely on their demonstrating a clear likelihood of success on the merits of their First Amendment claim which, for the reasons discussed above, they cannot do. *See N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("Consideration of the

merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor.").

Additionally, the balance of the equities and the public interest favor the Government. Because Plaintiffs cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guarantee Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). Because Defendants are government officials sued in their official capacities and federal agencies, the balance of equities and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). At stake here are significant national-security and foreign-policy interests that weigh strongly against an injunction. *See* *Winter*, 555 U.S. at 24; *cf.* *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002). The injunction Plaintiffs seek would frustrate and displace the President's determination of how best to address threats to national security. *Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 854 (E.D. La. 1992) (holding that injunction "unblocking the plaintiffs' vessels and bank accounts . . . would risk impermissible interference with Executive and Congressional decisions").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: New York, New York
August 13, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By: /s/Kamika S. Shaw
DANIELLE J. MARRYSHOW
MARK OSMOND
KAMIKA S. SHAW
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2689/2713/2768

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certifies that this memorandum complies with the Court's July 22, 2026 Order, Dkt. No. 27, granting the parties leave to exceed Local Rule 7.1(c)'s word-count limitation. As measured by the word processing system used to prepare it, this memorandum contains 8,579 words.

*/s/Kamika S. Shaw*
Assistant United States Attorney