UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DEMOCRACY FOR THE ARAB WORLD NOW, INC. *d/b/a* DAWN et al.,<br><br>Plaintiffs,<br><br>-v-<br><br>PRESIDENT DONALD J. TRUMP, *in his official capacity as President of the United States*, et al.,<br><br>Defendants. | : | 26-CV-5957 (JMF)<br><br><u>OPINION AND ORDER</u> |

JESSE M. FURMAN, United States District Judge:

In 2020, during his first administration, President Donald J. Trump issued an Executive Order (the "2020 Order") imposing sanctions on certain persons associated with the International Criminal Court ("ICC") and subjecting people who provide services to those designated persons to civil and criminal penalties. A group of plaintiffs brought suit in this District arguing, among other things, that the 2020 Order violated the First Amendment. The Honorable Katherine Polk Failla concluded that the plaintiffs in that suit were likely to succeed on the merits of that claim and preliminarily enjoined the Government from enforcing the 2020 Order against the plaintiffs. *See Open Soc'y Justice Initiative v. Trump*, 510 F. Supp. 3d 198, 209-13, 217 (2021).

Upon his return to office in 2025, President Trump issued Executive Order 14,203 (the "2025 Order"), which is substantially similar to the Order that Judge Failla had enjoined. Last year, two law professors (including one who had been a plaintiff in the case before Judge Failla) brought a lawsuit challenging the 2025 Order. This Court held that the 2025 Order violated those plaintiffs' First Amendment rights because it constituted a content-based regulation of their speech-based activities and did not survive strict scrutiny. *See Rona v. Trump*, 797 F. Supp. 3d

278, 282, 287-93 (S.D.N.Y. 2025). It entered a permanent injunction barring the Government from enforcing the 2025 Order against the plaintiffs for the conduct specifically addressed in their complaint, which included the provision of education, training, analysis, and other services to the ICC. *See id.* at 285-86, 294.

This case involves a substantially similar challenge to the 2025 Order. Plaintiffs are Democracy for the Arab World Now, Inc. ("DAWN"), Taxpayer Alliance Against Genocide ("TAAG") — American advocacy organizations "devoted to promoting human rights abroad and ending U.S. economic, diplomatic, and military support for states that commit grave human rights abuses" — as well as TAAG members Tarik Kanaana and William Doares. ECF No. 29 ("Pls.' Mem."), at 1. They challenge the 2025 Order on both statutory and constitutional grounds, reupping many of the arguments made in the earlier cases before Judge Failla and the undersigned.[1]

Now pending is Plaintiffs' motion, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, for a preliminary injunction. *See* ECF No. 28. For the reasons that follow, which are substantially similar to the reasons set forth in Judge Failla's and this Court's prior Opinions, their motion is GRANTED in substantial part. Specifically, the Court concludes that the 2025 Order likely violates Plaintiffs' First Amendment rights because it constitutes a content-based regulation of their speech-based activities and cannot survive strict scrutiny. That said, the Court rejects Plaintiffs' request to declare the 2025 Order facially unconstitutional and declines their invitations to enjoin the President and to enter a "universal" injunction barring enforcement of the 2025 Order against anyone.

---

[1] The case is one of three challenges to the 2025 Order pending before the Court. *See also Prost v. Trump*, No. 26-CV-5305 (JMF) (S.D.N.Y filed June 24, 2026); *Am. Friends Serv. Comm. v. Trump*, No. 26-CV-6830 (S.D.N.Y filed Aug. 11, 2026).

## BACKGROUND

### A. The International Criminal Court

The ICC was established by the Rome Statute of the International Criminal Court (the "Rome Statute"), which entered into force in 2002. *See* ECF No. 1 ("Compl."), ¶ 27; Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90. The Rome Statute establishes the ICC's jurisdiction over the four core "atrocity crimes" of genocide, crimes against humanity, war crimes, and — following a 2010 amendment — crimes of aggression. *See* Compl. ¶ 27, 29; Rome Statute arts. 1, 5. In addition, it sets forth rules on when cases can be heard, what law applies, how the ICC is organized and run, and which legal procedures a country must follow to become an official "State Party" to the Statute. *See* Compl. ¶¶ 27-41; Rome Statute pts. 1-13. There are currently 125 States Parties to the Rome Statute. *See* Compl. ¶ 28. By ratifying or acceding to the treaty, a State Party consents to the investigation and prosecution of crimes within the Court's jurisdiction that are alleged to have occurred on its territory or to have been committed by its nationals. See Compl. ¶ 69; Rome Statute art. 12(2).

Neither the United States nor Israel is a State Party to the Rome Statute, and each has opposed the ICC's jurisdiction. *See* Compl. ¶ 28; Exec. Order No. 14,203, 90 Fed. Reg. 9369 (Feb. 12, 2025) ("Neither country has ever recognized the ICC's jurisdiction."). Although the United States was an early signatory under the Clinton Administration, it stopped short of ratification due to "concerns that the treaty could inhibit" some of its sovereign powers in the international sphere. *Kiobel v. Royal Dutch Petroleum Co*., 621 F.3d 111, 119 n.16 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013) (internal quotation marks omitted); *see also* American Servicemembers' Protection Act, 22 U.S.C. § 7421(5)-(6) (noting "fundamental concerns" that "United States armed forces operating overseas could be conceivably prosecuted by the

international court even if the United States has not agreed to be bound by the treaty," which "could inhibit the ability of the United States to use its military to meet alliance obligations and participate in multinational operations"). In light of those concerns and others, "[o]n May 6, 2002, the Bush Administration notified the United Nations that the United States did not intend to become a party, an act popularly referred to as 'unsign[ing].'" *Kiobel*, 621 F.3d at 119 n.16; *see* Compl. ¶ 28. That same year, Congress passed the American Servicemembers' Protection Act, which was designed to protect United States military personnel and others from the ICC's jurisdiction. 22 U.S.C. §§ 7421-7433; ECF No. 33 ("Defs.' Opp'n"), at 5. For its part, Israel signed the Rome Statute in 2000 but withdrew its signature in 2002. *See* Compl. ¶ 28.

ICC proceedings are subject to various procedural requirements. For crimes falling within the ICC's jurisdiction, the tribunal's Office of the Prosecutor ("OTP") is the body tasked with conducting preliminary examinations, overseeing investigations, and bringing prosecutions. *See id.* ¶¶ 29-41; Pls.' Mem. 8. To assist with this process, any interested party may submit evidence and legal analysis to the OTP under Article 15 of the Rome Statute, and nonparties may also seek leave to file amicus briefs under Rule 103 of the ICC's Rules of Procedure and Evidence. *See* Compl. ¶¶ 40-41; Pls.' Mem. 6; Rome Statute art. 15. Nevertheless, the OTP is obliged to "act independently" and may not "seek or act on instructions from any external source." Rome Statute art. 42(1); *see* Compl. ¶ 31; Pls.' Mem. 6. As an additional check on the OTP, Article 16 of the Rome Statute allows any member of the U.N. Security Council to introduce a resolution that defers an ICC investigation or prosecution for a renewable twelve-month period, and such deferrals can be renewed indefinitely. Compl. ¶ 41. The United States has invoked Article 16 to defer an ICC investigation on two occasions. Compl. ¶ 42.

For cases that proceed from investigation to pre-trial and adjudication, the ICC consists of eighteen judges across three Judicial Divisions — a Pre-Trial Division, a Trial Division, and an Appeals Division. Compl. ¶ 30. ICC judges are nominated by a State Party and elected by the Rome Statute's Assembly of States Parties. Compl. ¶ 30; Rome Statute arts. 34-35. Once seated, judges must "be independent in the performance of their functions" and must also abide by a Code of Judicial Ethics. Compl. ¶ 30; Rome Statute art. 40. A three-judge panel within the Pre-Trial Division is also responsible for reviewing proposed arrest warrants filed by the OTP to determine whether "[t]here are reasonable grounds to believe that the person has committed a crime within the jurisdiction of the Court." Compl. ¶ 38; Rome Statute art. 58(1)(a).

**B. The International Emergency Economic Powers Act**

IEEPA authorizes the President to take a range of actions upon declaring a national emergency with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Upon such a declaration, the President may "investigate, block . . . regulate . . . [or] prohibit" transactions involving "any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B). Those powers "may only be exercised to deal with an unusual and extraordinary threat . . . and may not be exercised for any other purpose." *Id.* § 1701(b).

The President typically executes this authority by issuing an executive order that identifies the targeted conduct, establishes designation criteria, and delegates to agency officials the authority to "designate" persons and promulgate implementing regulations. *See* Compl. ¶ 38; *Open Soc'y Just. Initiative*, 510 F. Supp. 3d at 203 ("The President may exercise this authority

under IEEPA by issuing an executive order forbidding the dealing in property or interests in property of certain persons, and authorizing federal agencies to 'designate' those persons subject to such proscriptions."). Designated persons are added to a "Specially Designated Nationals and Blocked Persons List" ("SDN List") maintained by the Treasury Department's Office of Foreign Assets Control ("OFAC"). Compl. ¶ 57. According to Plaintiffs, a Specially Designated National ("SDN") "designation carries two operative consequences" relevant here: "(i) the person's property interests in the United States or in the possession or control of a U.S. person are blocked; and (ii) U.S. persons are prohibited from engaging in virtually any transaction or dealing with that person." *Id.*

IEEPA contains several "[e]xceptions to [this] grant of authority," 50 U.S.C. § 1702(b), two of which are relevant here. The first — the "Personal Communication Exception" — provides that the President may not "regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, *or other personal communication*, which does not involve a transfer of anything of value." *Id.* § 1702(b)(1) (emphasis added). The second — the "Informational Materials Exception" — provides that the President may not "regulate or prohibit, directly or indirectly," the import or export, "regardless of format or medium of transmission, of *any information or informational materials*, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." *Id.* § 1702(b)(3) (emphasis added).

Anyone who "violate[s], attempt[s] to violate, conspire[s] to violate, or cause[s] a violation of any license, order, regulation, or prohibition issued" under IEEPA faces civil penalties of up to the greater of $377,700 or twice the value of the underlying transaction. *Id.* § 1705(a)-(b); 90 Fed. Reg. 3687, 3688 (Jan. 15, 2025). Anyone who "willfully" commits,

attempts, conspires toward, or aids and abets these unlawful acts faces criminal penalties in the form of a fine of up to $1,000,000 and (for a natural person) up to twenty years' imprisonment. 50 U.S.C. § 1705(c); *see* 90 Fed. Reg. 3687-01 (Jan. 15, 2025); Compl. ¶ 58.

**C. Executive Order 13,928 (2020)**

In June 2020, President Trump issued Executive Order 13,928, titled "Blocking Property of Certain Persons Associated with the International Criminal Court." *See* Exec. Order No. 13,928, 85 Fed. Reg. 36,139 (June 11, 2020); Compl. ¶ 65; *Open Soc'y Just. Initiative*, 510 F. Supp. 3d at 201-02. The 2020 Order came in response to an investigation by then-ICC Prosecutor Fatou Bensouda into crimes allegedly committed in Afghanistan by the Taliban, Afghan security forces, and U.S. and allied personnel. *See Rona*, 796 F. Supp. 3d at 282. The Order declared a national emergency with respect to "any attempt by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States, or of personnel of countries that are United States allies and who are not parties to the Rome Statute or have not otherwise consented to ICC jurisdiction." 85 Fed. Reg. at 36,139. Accordingly, Section 1(a) imposed sanctions upon "any foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General," to have directly engaged in or materially supported such efforts by the ICC. *Id.* In addition, Section 3(a) prohibited "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any designated person. *Id.*

In September 2020, then-Secretary of State Michael R. Pompeo designated Bensouda and Phakiso Mochochoko, another official in the OTP, as persons subject to sanctions under the 2020 Order, which meant that anyone who provided "services" to them was potentially subject to IEEPA's civil and criminal penalties. *See Open Soc'y Just. Initiative*, 510 F. Supp. 3d at 204-05.

The following month, a lawsuit was filed in this District by "a public interest law center and four law professors who previously ha[d] worked with [the] two designated persons and other ICC personnel, and who desire[d] to continue doing so but for the Executive Order." *Id.* at 202. The plaintiffs alleged that the 2020 Order and its implementing regulations violated their rights under the First and Fifth Amendments to the U.S. Constitution and were *ultra vires* under IEEPA. *Id.* In particular, they claimed that several of their speech activities rendered them vulnerable to IEEPA penalties, including "participating in meetings with members of the [OTP], including Ms. Bensouda and Mr. Mochochoko . . . ; providing presentations, advice, and training to benefit members of the [OTP]; conducting and supervising research in support of the [OTP]; and submitting *amicus curiae* briefs supportive of the [OTP]." *Id.* at 210. They sought, among other things, a preliminary injunction barring the Government from enforcing IEEPA's civil and criminal penalties against them. *Id.* at 207.

Judge Katherine Polk Failla granted them a preliminary injunction on First Amendment grounds. *Id.* at 202, 209-13, 217. As relevant here, she held that the 2020 Order's services prohibition was an unconstitutional content-based restriction on the plaintiffs' speech because (1) their speech was "restricted if, and only if, it ha[d] the function or purpose of benefitting" a designated person, which triggered strict scrutiny, *id.* at 210-11, and (2) the Order "prohibit[ed] or chill[ed] significantly more speech than even [the Government] Defendants seem[ed] to believe [was] necessary to achieve their end," *id.* at 210-13. Judge Failla further found that, "[e]ven if the [c]ourt applied intermediate scrutiny rather than strict scrutiny, [the] [p]laintiffs still would likely prevail" because the 2020 Order and implementing regulations burdened substantially more speech than necessary. *Id.* at 212 n.7. The Government did not appeal the ruling. After President Joseph R. Biden assumed office, he issued an Executive Order titled

*Termination of Emergency with Respect to the International Criminal Court*, which rescinded the 2020 Order. *See* Exec. Order No. 14,022, 86 Fed. Reg. 17895 (April 1, 2021); *see* Compl. ¶ 66. Thereafter, OFAC removed Bensouda and Mochochoko from the SDN List and, in April 2021, the case before Judge Failla was voluntarily dismissed. *See* No. 20-CV-8121 (KPF), ECF No. 68.

**D. Executive Order 14,203 (2025)**

On February 6, 2025, shortly after his return to office, President Trump issued the 2025 Order, titled "Imposing Sanctions on the International Criminal Court." 90 Fed. Reg. at 9369; *see Rona*, 797 F. Supp. 3d at 281, 284. In all relevant respects, "[t]he 2025 Order is . . . the successor to the 2020 Order," and its provisions are "substantially similar" to that earlier edict. *Rona*, 797 F. Supp. 3d at 281, 284. Invoking the same authorities — IEEPA, the National Emergencies Act, the Immigration and Nationality Act of 1952, and 3 U.S.C. § 301 — the 2025 Order declares a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons." 90 Fed. Reg. at 9369-70. It defines "protected persons" as "any United States person, unless the United States provides formal consent to ICC jurisdiction over that person or becomes a state party to the Rome Statute" and "any foreign person that is a citizen or lawful resident of an ally of the United States that has not consented to ICC jurisdiction over that person or is not a state party to the Rome Statute." *Id.* at 9371, § 8(d).

The ICC proceedings that prompted the 2025 Order involve allegations of atrocity crimes committed by United States and Israeli nationals in two separate cases. First, in 2007, the OTP began examining possible crimes in Afghanistan, including allegations that U.S. armed forces and members of the Central Intelligence Agency had "committed acts of torture, cruel treatment, outrages upon personal dignity, rape and sexual violence against conflict-related detainees."

Compl. ¶¶ 45-46, 71(a) (quoting ICC-OTP, *Situation in Afghanistan, Summary of the Prosecutor's Request for Authorisation of an Investigation Pursuant to Article 15*, ¶¶ 25-26 (Nov. 20, 2017), https://perma.cc/KL2Z-WBXE). In 2021, however, then-ICC Prosecutor Karim Khan announced that the OTP would "deprioritise" the aspects of the investigation concerning U.S. personnel, and no applications for arrest warrants were ever announced for those personnel. *Id.* ¶¶ 47-48. Second, following Palestine's 2015 accession to the Rome Statute and a February 2021 jurisdictional ruling by the Pre-Trial Chamber, the OTP opened an investigation into alleged atrocity crimes in the "Occupied Palestinian Territory." *Id.* ¶¶ 49-51. A few years later, Khan filed arrest warrant applications for three Hamas leaders and for Israeli Prime Minister Benjamin Netanyahu and then-Defense Minister Yoav Gallant, citing atrocity crimes allegedly committed on and in the aftermath of October 7, 2023. *Id.* ¶ 53. Israel challenged the ICC's jurisdiction, and the United States was among the many amici that submitted views, but the Pre-Trial Chamber rejected Israel's challenge and issued the arrest warrants. *Id.* ¶¶ 54-55. In December 2025, the Appeals Chamber rejected Israel's appeal. Compl. ¶ 55.

Much like its predecessor, Section 1(a) of the 2025 Order blocks the property of "any foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General," to have (A) "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality"; (B) "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in subsection (a)(ii)(A) of this section or any person whose property or interests in property are blocked pursuant to this order"; or (C) been "owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property or interests in property are

blocked pursuant to this order." 90 Fed. Reg. at 9370, § 1(a)(ii); *see* Compl. ¶ 72. Section 3(a), for its part, is "identical" to its predecessor. 90 Fed. Reg. at 9370; *Rona*, 797 F. Supp. 3d at 285; *see also Rona*, 797 F. Supp. 3d at 281 (observing that the 2025 Order "includes the *exact* language that [Judge Failla] found likely unconstitutional" when enjoining the 2020 Order as-applied to the plaintiffs in the *Open Society Justice Initiative* case (emphasis in original)). It prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any blocked person and "the receipt of any contribution or provision of funds, goods, or services from any such person." 90 Fed. Reg. at 9370, § 3. The 2025 Order "does not define 'services to or in support of' [as used in Section 1] or 'services by, to, or for the benefit of' [as used in Section 3]." *Rona*, 797 F. Supp. 3d at 285. It provides, however, that "[t]his order shall be implemented consistent with applicable law." 90 Fed. Reg. at 9372, § 12(b).

In July 2025, OFAC promulgated regulations implementing the 2025 Order. *See id.* at 28,012-01 (July 1, 2025) (codified at 31 C.F.R. § 528) (the "Regulations"). The Regulations incorporate by reference "[a]ll transactions prohibited pursuant to [the 2025 Order]," including Section 3(a), *see* 31 C.F.R. § 528.201, but they provide that the prohibitions "do not apply to any transactions that are exempt pursuant to" Section 1702(b) of IEEPA, *see id.* § 528.205(a). That section of IEEPA contains the Personal Communication and Information Materials Exceptions. *See* 50 U.S.C. § 1702(b)(1), (b)(3). Otherwise, the Regulations do not define "services" or clarify the scope of Section 3 of the 2025 Order. *See* Compl. ¶ 106; Pls.' Mem. 10 n.4.

The Government has since "designated" several persons and entities under the 2025 Order. Former ICC Prosecutor Karim Khan was designated immediately. *See* 90 Fed. Reg. at 9370, 9373. Between June and August 2025, Secretary of State Marco Rubio designated six ICC judges and two Deputy Prosecutors for their roles in either the investigation of U.S. personnel in

Afghanistan or the ICC's actions against Israel, including the arrest warrants for Prime Minister Netanyahu and former Defense Minister Gallant. Compl. ¶ 74. On July 9, 2025, Secretary Rubio designated Francesca Albanese, the United Nations' "Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967" ("UNSR-oPt"), for "recommend[ing]" that the ICC issue the warrants against Netanyahu and Gallant and investigate certain American companies and executives. *Id.* ¶ 92 (internal quotation marks omitted). On September 4, 2025, the Secretary designated three Palestinian human rights organizations — Al-Haq, Al Mezan, and the Palestinian Centre for Human Rights (collectively, the "Palestinian NGOs") — for "directly engag[ing] in efforts by the . . . ICC to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent." *Id.* ¶ 83 (internal quotation marks omitted). Finally, on December 18, 2025, three days after the Appeals Chamber rejected Israel's appeal, Secretary Rubio designated two ICC judges who had voted with the majority; he did not designate the two judges who dissented from the ruling. *Id.* ¶ 74.

**E. This Lawsuit**

DAWN is a U.S.-based 501(c)(3) nonprofit organization whose mission is "to end U.S. technical, economic, military, and diplomatic support to repressive regimes in [the Middle East and Northern Africa], identify new pathways to hold perpetrators of grave human rights abuses accountable, and amplify the voices of human rights activists and dissidents from the region." ECF No. 29-1 ("Shakir Decl.") ¶ 3; *see* Compl. ¶ 12. Before the 2025 Order, DAWN made several Article 15 submissions to the ICC concerning alleged atrocity crimes by Israeli officials in the Occupied Palestinian Territory and "the role of U.S. officials in aiding and abetting those crimes." Shakir Decl. ¶ 7. The "aim in filing these submissions [was] not merely to encourage an ICC investigation" but also to "serve a broader expressive and public advocacy purpose,"

including by "build[ing] public pressure on state actors to obey the law." *Id.* ¶ 8. DAWN also worked closely with the Palestinian NGOs and U.N. Special Rapporteur Albanese. *See id.* ¶¶ 13-16, 18-23. For example, it exchanged evidence and legal analysis with them, shared and coordinated advocacy strategies with them, invited them to publish in its online journal or attend its events and trainings, included them on calls with congressional staff, signed joint statements with them, relied on them to identify victims and witnesses, and responded to Albanese's periodic "Calls for Input." *See id.* After the 2025 Order, DAWN halted its work with the ICC, the Palestinian NGOs, and Albanese "for fear that they would be construed as the provision or receipt of a 'service,' thereby exposing DAWN to IEEPA penalties." *Id.* ¶¶ 9, 15, 21.

TAAG is an unincorporated association of ten American taxpayers formed "(i) to gather and submit evidence to the [ICC] documenting how U.S. officials have aided and abetted atrocity crimes abroad . . . and (ii) to engage in related research, educational, and advocacy efforts in support of accountability for those abuses." ECF No. 29-2 ("Kanaana Decl.") ¶ 1; Compl. ¶ 14. Plaintiffs Tarik Kanaana and William Doares are its president and treasurer. Compl. ¶¶ 16-17. Beginning in October 2025, "several of the individuals that would eventually form TAAG began working with legal counsel to prepare an Article 15 submission to the ICC documenting the role of U.S. officials in aiding and abetting Israeli atrocity crimes in Gaza." Kanaana Decl. ¶ 5. TAAG has since "refrained from finalizing and transmitting the submission to the ICC Prosecutor out of fear that doing so would be construed as an unlawful 'service' and expose TAAG's members to civil and criminal penalties under [IEEPA]." *Id.* ¶ 9.

Plaintiffs have sought guidance from OFAC concerning the legality of their proposed activities. On February 17, 2026, the individuals who later formed TAAG asked OFAC to confirm that their proposed ICC submission "would not constitute a prohibited 'service' under

U.S. sanctions law" or, alternatively, to issue a specific license. *Id.* ¶ 6. OFAC has neither answered the request for guidance nor acted on the license request. *Id*. On March 31, 2026, DAWN similarly asked OFAC to confirm that it could continue making ICC submissions and engaging with the Palestinian NGOs and Albanese, but OFAC referred DAWN to its Licensing Division without answering the question. Shakir Decl. ¶ 24. Nor did OFAC offer a substantive response when DAWN "sent a second request to the Licensing Division requesting interpretive guidance as well as a public FAQ clarifying that DAWN's proposed activities are lawful." *Id.* Thus, although "Plaintiffs have not themselves been designated, sanctioned, or threatened with enforcement for interactions with designated foreign persons" under the 2025 Order, Defs.' Opp'n 1, Plaintiffs have also not received direct guidance on whether their activities will be treated as prohibited "services," 90 Fed. Reg. at 9370, § 3. Plaintiffs attest that they would resume the foregoing activities if Defendants were enjoined from enforcing the Services Prohibition against them. *See* Shakir Decl. ¶ 22; Kanaana Decl. ¶ 10.

Plaintiffs commenced this action on July 15, 2026. *See* Compl. 43. They raise five claims: (1) that the 2025 Order's Services Prohibition violates the First Amendment both as applied and on its face, *see id.* ¶¶ 111-15 (Claim I); (2) that the Services Prohibition violates the Due Process Clause of the Fifth Amendment because it is impermissibly vague as applied to a wide range of speech activities, *see id.* ¶¶ 116-20 (Claim II); (3) that the Services Prohibition is *ultra vires* because it exceeds the limits Congress placed on the President's IEEPA authority through the Personal Communications and Informational Materials Exceptions, *see id.* ¶¶ 121-23 (Claim III); (4) that OFAC's construction of those exemptions violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)-(C) (Claim IV), *see* Compl. ¶¶ 124-26; and (5) that "[a]ny exercise of authority pursuant to the Order is *ultra vires* because the Order is not

based on a qualifying 'national emergency,' as required by IEEPA" *see id.* ¶¶ 127-29 (Claim V). Plaintiffs seek "inter alia, (1) a declaration that the Sanctions' speech and association restrictions violate the First Amendment and exceed the President's authority under IEEPA, and (2) an order enjoining Defendants from implementing or enforcing the Sanctions' speech and association restrictions." *id.* ¶ 8. On July 23, 2026, Plaintiffs moved for a preliminary injunction based on Claims I (First Amendment), III (*ultra vires*), and IV (APA). *See* ECF No. 28.[2]

**DISCUSSION**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (describing a preliminary injunction as "one of the most drastic tools in the arsenal of judicial remedies"). "When 'a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'" *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (quoting *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016); *see also New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020) (noting that "[w]here, as here, the government is a party to the suit, the final two factors" in the traditional, four-part

---

2 In *Rona*, this Court "proposed, and the parties ultimately agreed to, consolidation of Plaintiffs' motion for a preliminary injunction with adjudication of the merits." *Rona*, 797 F. Supp. 3d at 281. Accordingly, the Court "exercise[d] its discretion to consolidate the preliminary injunction hearing with trial on the merits and, thus, treat[ed] Plaintiffs' request for a preliminary injunction as a request for a ruling on the merits and for a permanent injunction." *Id.* at 281-82. Neither the Court nor the parties proposed a similar course in this case. Thus, the Court will not consolidate the preliminary injunction hearing with trial on the merits.

*Winter* test — whether the balance of equities tip in the movant's favor, and whether an injunction is in the public interest — "merge" into one cohesive factor); *cf. Winter*, 555 U.S. at 20 (setting forth the traditional, four-part test). Ordinarily, "[a] showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "In cases alleging constitutional injury," however, "[l]ikelihood of success on the merits is . . . 'the dominant, if not the dispositive, factor'" because "a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (citation omitted); *see also Volokh v. James*, 148 F.4th 71, 82 (2d Cir. 2025) ("In a First Amendment challenge . . . , the likelihood of success on the merits is the dominant, if not the dispositive, factor . . . because irreparable harm and the impact on the public interest track closely with the constitutionality of the challenged statute." (internal quotation marks omitted)).

Applying these factors here, the Court concludes that Plaintiffs are entitled to a preliminary injunction, albeit not necessarily one granting all the relief they seek. The Court begins with the "dominant, if not the dispositive, factor" — namely, likelihood of success on the merits — before turning to the other factors and then the scope of relief.

**A. Likelihood of Success on the Merits**

First, Plaintiffs demonstrate a likelihood of success on the merits of their claim that the 2025 Order violates their First Amendment rights to speak.[3] "The First

[3] Under ordinary circumstances, the principle of constitutional avoidance would counsel in favor of considering Plaintiffs' *ultra vires* and APA arguments first. *See, e.g.*, *Bond v. United States*, 572 U.S. 844, 855 (2014) (remarking that "normally" a court "will not decide a

Amendment . . . prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const., Amdt. 1.). The Supreme Court's precedents "distinguish between two types of restrictions on protected speech: content-based laws and content-neutral laws." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025). "Content-based laws — those that target speech based on its communicative content — are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. Some content-based laws "are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* "Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163-64. By contrast, content-neutral laws "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642 (1994) (citation omitted). Under intermediate scrutiny, a restriction on speech will be upheld only "if it

---

constitutional question if there is some other ground upon which to dispose of the case" (internal quotation marks omitted)). The Court jumps straight to Plaintiffs' First Amendment arguments here, however, for two reasons. First, the principle of constitutional avoidance does not carry as much weight where, as here, the Court has in prior cases opined on these very constitutional issues. Second, courts have expressed doubts about the justiciability of statutory claims similar to those Plaintiffs press here. *See Smith v. Trump*, 791 F. Supp. 3d 90, 96 n.3 (D. Me. July 18, 2025) (expressing "concern[s] that the IEEPA claim is not ripe absent additional evidence that the Government intends to enforce the Executive Order in a manner that would amount to regulating 'information or informational materials' in violation of IEEPA" (cleaned up)); *Open Soc'y Just. Initiative*, 510 F. Supp. 3d at 216 (holding that the plaintiffs' IEEPA claim was not ripe where there was no more than "speculation that OFAC intend[ed] to violate" IEEPA's restriction on regulating 'informational materials' in its enforcement of the executive order). In these circumstances, judicial restraint calls for sticking to the more settled terrain of the First Amendment. *Cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 348 (2022) (Roberts, C.J., concurring in the judgment) ("If it is not necessary to decide more to dispose of a case, then it is necessary not to decide more.").

advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997).

As the Government concedes, this Court "previously ruled that [the 2025 Order] violated the First Amendment as applied to plaintiffs in a similar case," Defs.' Opp'n 2 n.1 (citing *Rona*, 797 F. Supp. 3d 278), and two other judges reached the same conclusion as to either the 2025 Order or the "identical" language in the 2020 Order, *id.* (citing *Smith v. Trump*, 791 F. Supp. 3d 90 (D. Me. July 18, 2025); *Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021)). In *Rona*, this Court considered the claims of two law professors who, "[p]rior to the issuance of the 2025 Order . . . had provided education, training, analysis, and other services to [ICC Prosecutor] Khan and others in the OTP." 797 F. Supp. 3d at 285. The professors "allege[d] that they ha[d] been injured, and continue[d] to be injured, by the threat of enforcement of IEEPA's civil and criminal penalties for providing services to or for the benefit of Mr. Khan, which ha[d] caus[ed] [them] to discontinue speech they were previously engaging in and caus[ed] them to abandon or reconsider speech they had planned to perform before the Executive Order was issued." *Id.* (internal quotation marks omitted). The *Rona* plaintiffs sought an injunction barring the Government from enforcing IEEPA's civil and criminal penalties against them as a result of the 2025 Order's Services Prohibition. *Id.* at 286.

Finding that the *Rona* plaintiffs had shown "actual success on the merits," the Court granted them a permanent injunction. *Id.* at 293-94. The Court held, first, that the 2025 Order's services prohibition is a content-based restriction on speech subject to strict scrutiny because it "regulates speech based on its function or purpose." *Id.* at 288-89 (cleaned up). That conclusion, the Court explained, was "compelled" by the Supreme Court's decision in *Holder v.*

*Humanitarian Law Project*, 61 U.S. 1 (2010), which involved a First Amendment challenge to a statute that prohibited "knowingly provid[ing] material support or resources to a foreign terrorist organization," *id.* at 8 (citing 18 U.S.C. § 2339B(a)); *see also City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74, ("[A] regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result."). Although the *Holder* Court ultimately rejected the plaintiffs' challenge, it found that the "material-support statute" was content-based and, thus, subject to strict scrutiny because the plaintiffs "want[ed] to speak to [the designated terrorist groups], and whether they [could] do so under § 2339B depend[ed] on what they sa[id]" — in particular, on whether the plaintiffs' speech to those groups imparted a "specific skill" or communicated advice derived from "specialized knowledge," like training on the use of international law or advice on petitioning the United Nations. *Rona*, 797 F. Supp. 3d at 288 (citing *Holder*, 61 U.S. at 27, 38-39). So, too, in *Rona*, where the "[p]laintiffs [we]re free to speak if their speech d[id] not have the function or purpose of benefitting [ICC Prosecutor] Khan; but they [we]re subject to civil and criminal penalties if it d[id] have that function or purpose." *Id.* "The 2025 Order [was] thus content based," meaning that it was "presumptively unconstitutional and [could] be justified only if the government" satisfied strict scrutiny. *Id.* at 289-90 (internal quotation marks omitted).

Next, the Court held in *Rona* that the 2025 Order failed strict scrutiny because the Services Prohibition was not narrowly tailored to serve a compelling governmental interest. *Id.* at 290-92. The Court accepted that "[p]rotection of the foreign policy of the United States is a governmental interest of great importance," but it emphasized that "concerns of national security and foreign relations do not warrant abdication of the judicial role" and that courts "do not defer

to the Government's reading of the First Amendment, even when such interests are at stake." *Id.* at 291 (quoting *Holder*, 561 U.S. at 34). "After all, national-security concerns must not become a talisman used to ward off inconvenient claims — a label used to cover a multitude of sins." *Id.* (internal quotation marks omitted). That being established, the Court found that "the Government's national security argument does not withstand strict scrutiny because [the 2025 Order] is overinclusive." *Id.* That is, because the Order prohibits "*any* contribution or provision of . . . services by, to, or for the benefit of any" designated person, 90 Fed. Reg. at 9370, § 3 (emphasis added), it bars a wider array of speech-related services than necessary to achieve its interest, "even [those] in connection with ICC prosecutions that the United States purportedly supports," *Rona*, 797 F. Supp. 3d at 291. And, unlike in *Holder*, where the Supreme Court heavily credited the Government's foreign policy interests because they were based on congressional findings, an Executive Branch affidavit, and other record evidence, the Government in *Rona* "offer[ed] no comparable record." *Id.* at 292. Instead, it "implore[d] the Court to take the Government at its word and endorse a foreign policy rationale with seemingly no limiting principle and no tailoring." *Id*. Because "[s]trict scrutiny demands more," the Court found that the plaintiffs "demonstrate[ed] actual success on the merits of their as-applied First Amendment claim." *Id.* at 292-93; *see also Smith*, 791 F. Supp. 3d at 97-98 (holding that Section 3(a) of the 2025 Order likely "fails even intermediate scrutiny" because it "appears to burden substantially more speech than necessary"); *Open Soc'v Just. Initiative*, 510 F. Supp. 3d at 210-213 (holding that the identical services prohibition in the 2020 Order was a content-based restriction on speech and was "not narrowly tailored").

This case is on all fours with *Rona* (not to mention *Open Society*). Plaintiffs are challenging the *exact* provision that the Court enjoined on an as-applied basis there, and the

"*exact* language that [Judge Failla] found likely unconstitutional" when enjoining the 2020 Order as-applied to the plaintiffs in the *Open Society Justice Initiative* case. *Id.* at 281. Additionally, Plaintiffs are similarly situated to the law professors in *Rona*; although they have not themselves been designated, sanctioned, or threatened with enforcement for interactions with designated foreign persons, they have halted much of their speech-related advocacy work "for fear that they would be construed as the provision or receipt of a 'service,' thereby exposing [them] to IEEPA penalties." Shakir Decl. ¶ 15; *cf. Rona*, 797 F. Supp. 3d at 285 (recounting that the Services Prohibition "caus[ed] [the plaintiffs] to discontinue speech they were previously engaging in and caus[ed] them to abandon or reconsider speech they had planned to perform before the Executive Order was issued" (internal quotation marks omitted)). And Plaintiffs seek to engage in the same or a similar set of advocacy activities with the ICC and designated persons that the Court deemed "protected expression" in *Rona*, including "education, training, analysis, and other services." *Rona*, 797 F. Supp. 3d at 285, 289; *cf.* Shakir Decl. ¶¶ 7-8, 13-16, 18-23; Kanaana Decl. ¶ 5, 8; Compl. ¶¶ 12-17.

Conspicuously, although the Government acknowledges (albeit in footnotes) that the Court "previously ruled" against it on similar grounds, Defs.' Opp'n 2 n.1, 13 n.6, 18 n.7, it makes no effort even to argue that *Rona* got it wrong. Nor does the Government cite any intervening authority. Nor does it identify any material difference between *Rona* and the present case. Instead, the Government rehashes the three arguments that it offered in *Rona*. There, the Government's position rested on three theories: (1) that the Services Prohibition does not regulate protected speech; (2) that, even if the Services Prohibition does regulate protected speech, it is content neutral and thus subject to intermediate rather than strict scrutiny; (3) that, even if strict scrutiny applies, the regulation is narrowly tailored to serve a compelling interest.

*See* 797 F. Supp. 3d at 287-93; *see also* No. 25-CV-3114 (JMF), ECF No. 56, at 11-17. Here too, the Government argues that (1) "[t]he sanctions do not, as the Government has repeatedly confirmed, reach constitutionally protected speech," Defs.' Opp'n 2; (2) even if the sanctions regulate protected speech, "[i]ntermediate scrutiny, not strict scrutiny, . . . properly applies to Plaintiffs' First Amendment freedom of speech claims because the Executive Order is a content and viewpoint neutral regulation that at worst only incidentally burdens expression protected by the First Amendment," *id.* at 17; and (3) "[e]ven if the Court were to agree with Plaintiffs' assessment that strict scrutiny applies, the Order satisfies that more demanding standard" because it is narrowly tailored to "serve[] a compelling government interest — it protects U.S. personnel and its allies from investigation, prosecution, detention and arrest by the ICC where the U.S. and its allies have not consented to the ICC's jurisdiction," *id.* at 18-19. The Court rejected those arguments before, and it does so again now.

In short, substantially for the reasons set forth in *Rona*, the Court concludes that Plaintiffs are likely to succeed on the merits of their First Amendment free-speech claim.[4] In light of that conclusion, the Court need not and does not reach Plaintiffs' statutory arguments or their arguments that the 2025 Order violates the First Amendment in other ways.

**B. The Other Preliminary Injunction Factors**

The Court need not dwell long on the other preliminary injunction factors. First, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In addition, "[w]here," as here,

---

[4] In *Rona*, the Court noted that, "because the Court ultimately finds that the 2025 Order cannot survive strict scrutiny[,] the Court need not and does not reach Plaintiffs' argument that the 2025 Order discriminates on the basis of viewpoint (and is, thus, even more constitutionally suspect)." 797 F. Supp. 3d at 289 n.3. So too, here.

"a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003). Not surprisingly, therefore, the Government devotes only a sentence to irreparable harm. *See* Defs.'s Opp'n 26-27. What is more, that one sentence merely directs the Court to consider the Government's earlier arguments concerning Plaintiffs' likelihood of success on the merits. *See id.* ("Plaintiffs' argument that they have demonstrated irreparable harm depends entirely on their demonstrating a clear likelihood of success on the merits of their First Amendment claim which, for the reasons discussed above, they cannot do."). Because the Court has already rejected the Government's arguments on the merits, it follows that the Government's irreparable-harm argument fails as well. In any event, even if this were a case where "irreparable harm must still be shown — rather than simply presumed — by establishing an actual chilling effect," *Bronx Household of Faith*, 331 F.3d at 349, Plaintiffs have shown it. As noted, Plaintiffs have halted a substantial portion of their speech-related advocacy and associational activity for fear that their work may be treated as prohibited "services" under the 2025 Order. Shakir Decl. ¶¶ 9, 15-16, 21; Kanaana Decl. ¶ 9. That is "an actual chilling effect," *Bronx Household of Faith*, 331 F.3d at 349, and it properly establishes the presence of "irreparable harm absent injunctive relief," *Agudath Israel of Am*, 983 F.3d at 631.

The final two factors — whether the balance of equities tip in the movant's favor and whether an injunction is in the public interest — "merge" when the Government is a party. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 58–59. Together, they favor Plaintiffs in this case because "[t]he Government does not have an interest in the enforcement of an unconstitutional law" and "securing First Amendment rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quoting *Am. Civil Liberties*

*Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)). In arguing otherwise, the Government insists that "at stake here are significant national-security and foreign-policy interests that weigh strongly against an injunction." Defs.' Opp'n 27. Maybe so, but, again, "national-security concerns must not become a talisman used to ward off inconvenient claims" or "a label used to cover a multitude of sins." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) (internal quotation marks omitted); *see also Rona*, 797 F. Supp. at 291. Furthermore, "[i]t is hard to square . . . the Government's assertion that an injunction would impede national security and foreign policy interests" with the fact that "the Government has at least implied that injunctive relief is unnecessary because it does not intend to enforce the Executive Order against the Plaintiffs at all." *Smith*, 791 F. Supp. 3d at 99 (referencing the Government's assertions that [1] "it has expressly and publicly stated that U.S. persons do not violate OFAC sanctions for engaging in activities subject to U.S. constitutional protection, such as protected speech," and [2] "the EO expressly provides that it 'shall be implemented consistent with applicable law,' which includes IEEPA" (citations omitted)).

In any event, as discussed below, the injunction entered today is calibrated to preserve the elements of the 2025 Order that further the Government's legitimate interests. It does not disturb the Government's authority to designate persons for sanctions under Section 1 of the Order. It also leaves undisturbed the Government's authority to penalize the provision or receipt of "funds" or "goods" to designated persons under Section 3. It even allows the Government to enforce the Services Prohibition in ways that do not implicate the First Amendment — for example, by applying it to financial services rather than to speech-related advocacy services. In other words, the injunction still leaves plenty of room for the Government to protect its foreign-policy interests. As a result, "the proffered national security justification for seeking to prevent

and potentially punish Plaintiffs' speech is inadequate to overcome Plaintiffs' and the public's interest in the protection of First Amendment rights." *Open Society*, 510 F. Supp. 3d at 217.

**C. Scope of Relief**

That leaves only the question of relief. In *Rona*, the Court granted a permanent injunction against "all Defendants with the exception of President Trump" that prohibited those defendants "from enforcing IEEPA's civil or criminal penalty provisions against Plaintiffs for the conduct specifically addressed in Plaintiff[s'] Complaint and in this Opinion and Order, to the extent that such conduct is alleged to have been committed in violation of the 2025 Order." 797 F. Supp. 3d at 294. Plaintiffs here ask the Court to go beyond the as-applied, plaintiff-specific injunction that the Court entered in *Rona*. First, they ask the Court (at least implicitly) to enjoin the President. Compl. ¶ 18; *id.* at 43, ¶ F. And second, arguing that the 2025 Order is facially unconstitutional, they seek universal relief. *See* ECF No. 37 ("Pls.' Reply"), at 7-10. The Court addresses — and rejects — those requests in turn.

**1. Enjoining the President**

Plaintiffs' Complaint names the President as a Defendant and asks the Court to "[e]njoin Defendants," without making any exception as to the President. Compl. 43, ¶ F. The Government, in passing, quotes the Supreme Court's decision in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), for the proposition that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." Defs.' Opp'n 21. In *Open Society*, Judge Failla observed that it is "unnecessary" to address whether the President might be subject to judicial injunction because "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Open Soc'y Just. Initiative*, 510 F. Supp. 3d at 214 (quoting *Franklin*, 505 U.S. at 815 (Scalia, J.,

concurring in part and concurring in the judgment)). Judge Failla further noted that "the operative decisions that pose a threat to Plaintiffs, *i.e.*, the decision to designate persons under [the relevant section of] the Executive Order and the decision to impose penalties under IEEPA for non-compliance, are delegated to agents of the President — namely, the other individual Defendants — against whom injunctive and declaratory relief is available." *Id.* at 214-15. For these reasons, Judge Failla excluded the President from the scope of the injunction in that case. *Id.* at 217. The Court does the same here. *Cf. Rona*, 797 F. Supp. 3d at 294 n.7 (excluding the President from the scope of the injunction because the plaintiffs conceded that they did not seek injunctive relief against the President); *Smith*, 791 F. Supp. 3d at 95 n.2 (same).

**2. Universal Relief**

Second, the Court declines to enjoin enforcement of the 2025 Order beyond Plaintiffs themselves. Granted, Plaintiffs did not forfeit their facial attack on the 2025 Order, as the plaintiffs did in *Rona*. *See* 797 F. Supp. 3d at 287; Pls.' Reply 8 (arguing that, whereas "*Rona* held that the facial claim was forfeited because it was raised for the first time in reply," "[h]ere, Plaintiffs' Complaint and preliminary-injunction motion expressly seek full invalidation of the speech and associational restrictions"). Nevertheless, their request for broader relief is still unwarranted, for reasons discussed in *Rona* and mandated by Supreme Court precedent.

As noted in *Rona*, "[f]acial challenges are disfavored" because "[c]laims of facial invalidity often rest on speculation" and "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." 797 F. Supp. 3d at 287 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008)). "For that reason,

the normal rule is that partial, rather than facial, invalidation is the required course, such that a statute may be declared invalid to the extent that it reaches too far, but otherwise left intact." *Id.* (cleaned up); *see Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006). In other words, a litigant's "cho[ice] to litigate the[ir] cases as facial challenges comes at a cost" because "[t]he [Supreme] Court has . . . made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

Although facial challenges are "hard to win," *id.*, the Government is wrong in arguing that "Plaintiffs only have a viable facial challenge if they can demonstrate that the First Amendment prohibits the Government from ever imposing the sanctions provided for in Executive Order 14203." Defs.' Opp'n 12. That argument holds as its premise the "[n]ormal" rule that "a plaintiff bringing a facial challenge must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (cleaned up); *see* Defs.' Opp'n 12 ("In order for Plaintiffs to successfully bring a facial challenge, they must establish that no set of circumstances exists under which the Executive Order would be valid." (cleaned up)). But in First Amendment cases, the Supreme Court "has lowered that very high bar," and held that "[t]he question is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (cleaned up). That inquiry requires a court first to determine "the full range of activities the law[] cover[s]" and then to "measure the constitutional against the unconstitutional applications." *Id.* at 724-25; *see also id.* at 744 ("[E]ach court must evaluate the full scope of the law's coverage. It must then decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other.").

Plaintiffs, however, do not meet even that lower burden. For starters, the Services Prohibition has at least a partially legitimate sweep. Indeed, as noted earlier, its ban on the provision or receipt of "*any* . . . services by, to, or for the benefit of" any designated person, 90 Fed. Reg. at 9370, § 3 (emphasis added), reaches not only First Amendment protected speech and association but also a wide range of non-expressive services. That includes financial services — such as banking, brokerage, and insurance — as well as shipping, logistics, and travel services, all of which seemingly allow the Government to achieve its interests in penalizing "transactions" with designated persons, Defs.' Opp'n 16, 19-20, without running afoul of the First Amendment. Measured against the array of services that are within "the [2025 Order's] plainly legitimate sweep," the more constitutionally suspect applications of the Services Prohibition — those that reach speech-related "services" like amicus briefs, trainings, events, and publications — are relatively limited. *Moody*, 603 U.S. at 723 (internal quotation marks omitted); *see United States v. Hansen*, 599 U.S. 762, 770 (2023) (providing that unconstitutional applications must be "substantially disproportionate to the statute's lawful sweep" to support a facial challenge). The "normal rule" of partial invalidation therefore applies. *Ayotte*, 546 U.S. at 329 (internal quotation marks omitted).

In any event, Plaintiffs' request for a universal injunction does appear for the first time in their reply, *see* Pls.' Reply 9-10, and "[i]t is well established that arguments raised for the first time on reply are forfeited," *Rona*, 797 F. Supp. 3d at 287. That principle of judicial restraint is especially warranted here, where the Government did not address the issue at all in its opposition, and the Supreme Court has counseled against issuing "such a sweeping remedy" even when fully briefed by the parties. *Trump v. CASA, Inc.*, 606 U.S. 831, 843 (2025); *see also id.* at 837 (asserting that "universal injunctions likely exceed the equitable authority that

Congress has granted to federal courts" (cleaned up)). Under *CASA*, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." 606 U.S. at 852 (emphasis in original). Plaintiffs argue that their "speech and associational activities necessarily depend on the participation of persons and entities not before this Court" because (1) "[e]njoining the Sanctions' enforcement against Plaintiffs would not stop Defendants from targeting Plaintiffs' collaborators, counsel, associates, and invitees for 'violat[ing], attempt[ing] to violate, conspir[ing] to violate, or caus[ing] a violation' of the services prohibition," Pls.' Reply 10 (quoting 50 U.S.C. § 1705(a)), and because (2) it would not be "feasible for Plaintiffs to predict everyone with whom they might wish to collaborate in activities that could be construed as providing or receiving prohibited services, much less to identify those who were deterred by the threat of sanctions from even considering such collaboration," *id.* Those arguments are not necessarily without force, but they raise significant questions that the Government should have at least been given an opportunity to brief. Accordingly, the Court declines Plaintiffs' invitation to enter a "universal" injunction and grants the same relief that it granted in *Rona*.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is GRANTED in substantial part. But Plaintiffs' requests for an injunction against the President, for an order declaring the 2025 Order facially unconstitutional, and for a "universal" injunction are denied. All Defendants except President Trump are hereby preliminarily enjoined from enforcing IEEPA's civil or criminal penalty provisions against Plaintiffs for the conduct specifically

addressed in Plaintiffs' Complaint and in this Opinion and Order, to the extent that such conduct is alleged to have been committed in violation of the 2025 Order's Services Prohibition.

Although the Court did not consolidate the preliminary injunction hearing with trial on the merits as it did in *Rona*, *see* 797 F. Supp. 3d at 281; *see also supra* note 2, the Court's reasoning above (and in *Rona*) may be enough to resolve this case on the merits. Accordingly, the parties shall confer and, no later than **October 20, 2026**, submit a joint letter addressing next steps in this litigation — including whether anything remains to be litigated with respect to Plaintiffs' First Amendment claims and, if not, whether the Court should enter a permanent injunction and final judgment consistent with this Opinion and Order.

The Clerk of Court is directed to terminate ECF No. 28.

SO ORDERED.

Dated: October 13, 2026
New York, New York

JESSE M. FURMAN
United States District Judge