UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMOCRACY FOR THE ARAB WORLD NOW, INC. *d/b/a* DAWN et al., Plaintiffs, -v- PRESIDENT DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., Defendants. | 26-CV-5957 (JMF) <br> OPINION AND ORDER |

JESSE M. FURMAN, United States District Judge:

In this case, Plaintiffs — Democracy for the Arab World Now, Inc. ("DAWN"), Taxpayer Alliance Against Genocide ("TAAG"), Tarik Kanaana, and William Doares — challenge aspects of an Executive Order ("Executive Order 14,203" or the "2025 Order") issued by President Donald J. Trump that imposes sanctions on certain people associated with the International Criminal Court ("ICC") and subjects people who provide services to those sanctioned to civil and criminal penalties under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705. In an Opinion and Order entered on October 13, 2026, familiarity with which is presumed, the Court granted a preliminary injunction to Plaintiffs. *See Democracy for the Arab World Now, Inc. v. Trump*, No. 26-CV-5957 (JMF), 2026 WL 3061877 (S.D.N.Y. Oct. 13, 2026) (ECF No. 40) ("*DAWN I*"). In brief, relying on its earlier decision in *Rona v. Trump*, 797 F. Supp. 3d 278 (S.D.N.Y. 2025) (which relied, in turn, on Judge Failla's earlier decision in *Open Society Justice Initiative v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021)), the Court held that Plaintiffs were likely to succeed on the merits of their claim that the 2025 Order violates their rights under the First Amendment to the extent that it prohibits the

provision or receipt of "services by, to, or for the benefit of" any person designated for sanctions in connection with the work of the ICC. Exec. Order No. 14,203, § 3, 90 Fed. Reg. 9369, 9370 (Feb. 6, 2025). More specifically, the Court concluded that this prohibition — the "Services Prohibition" — is a content-based restriction on speech that fails strict scrutiny. *See DAWN I*, 2026 WL 3061877, at *7-9. The Court therefore enjoined Defendants (other than President Trump himself) from enforcing the civil or criminal penalty provisions of IEEPA against Plaintiffs for the speech-related activities addressed in their Complaint, including the submission of evidence to the ICC. *See id.* at *5-6, 12. At the same time, the Court declined to declare the 2025 Order facially unconstitutional or to enter a "universal" injunction. *Id.* at *10-12.

In granting Plaintiffs' request for a preliminary injunction, the Court observed that its reasoning "may be enough to resolve this case on the merits" and directed the parties to confer about next steps. *Id.* at *12. Thereafter, the parties filed a joint letter agreeing that there are no factual disputes pertaining to Plaintiffs' First Amendment claim and that the Court may consolidate the preliminary injunction hearing with trial on the merits of that claim under Rule 65(a)(2) of the Federal Rules of Civil Procedure. *See* ECF No. 41, at 1-2. Plaintiffs maintained, however, that the preliminary injunction was "unduly narrow," and they requested leave to file supplemental briefs and declarations on the scope of permanent relief, a request that the Court granted. *See id.* at 1; ECF No. 42. Before the Court now is Plaintiffs' motion for a permanent injunction that would bar enforcement of the Services Prohibition "against anyone for engaging in First Amendment-protected speech and association." ECF No. 43, at 1.

With the parties' consent, the Court resolves here the merits of Plaintiffs' First Amendment claim (and, thus, the case as a whole). First, the Court concludes that Plaintiffs are entitled to a permanent injunction, substantially for the reasons set forth in *DAWN I* and *Rona*.

In arguing otherwise, the Government effectively requests that the Court reconsider its earlier decisions, but there is no merit to that request. Put simply, Plaintiffs demonstrate that the Services Prohibition is a content-based restriction on speech and that it is not narrowly tailored to serve compelling state interests. Second, the Court concludes that Plaintiffs are entitled to broader relief than they were granted in *DAWN I*, in two respects. For one, Plaintiffs clarify that their facial challenge is not to the 2025 Order as a whole, but rather to the Services Prohibition as applied to speech and expression specifically. In light of that clarification, and Supreme Court precedent governing facial attacks on only a subset of a law's applications, the Court concludes that the 2025 Order is facially invalid to the extent that its Services Prohibition covers speech-based services. And two, the Court holds that Plaintiffs are entitled to an injunction that bars enforcement of the Services Prohibition against anyone who provides or receives speech-based services, thereby engaging in First Amendment-protected speech and association. That holding is based on the Court's conclusion that the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025) — which held that a federal court generally may grant injunctive relief only to the parties before it — does not necessarily overrule its earlier precedents approving of broader injunctions where, as here, a First Amendment facial overbreadth challenge succeeds.

**DISCUSSION**

The standard for a permanent injunction is essentially the same as for a preliminary injunction, the difference being that a plaintiff must demonstrate actual success on the merits rather than a mere likelihood of success on the merits. *See, e.g.*, *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987); *see also Rona*, 797 F. Supp. 3d at 287. But an injunction "does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). A plaintiff must also "demonstrate: (1) that it has

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Where, as here, "the [G]overnment is a party, . . . the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020); *see also, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The parties' supplemental briefing focuses in part on the merits of Plaintiffs' First Amendment claim and, more substantially, on the question of what relief the Court should grant if Plaintiffs demonstrate actual success on that claim. The Court will begin by addressing whether Plaintiffs are entitled to a permanent injunction. After concluding that they are, the Court will turn to the more challenging question of what relief Plaintiffs should be granted, which involves addressing whether or to what extent the Services Prohibition should be deemed facially invalid and whether the permanent injunction should extend beyond Plaintiffs.

**A. Plaintiffs Are Entitled to a Permanent Injunction**

The Government first contends that *DAWN I* was wrongly decided and that "Plaintiffs should not have received *any* relief on their First Amendment claims." ECF No. 46 ("Defs.' Supp. Mem."), at 1 (emphasis added) (cleaned up). It argues principally that the Services Prohibition is content neutral and thus subject only to intermediate scrutiny. *See id.* at 1-2. In the alternative, the Government maintains that the prohibition survives strict scrutiny because the 2025 Order "is narrowly tailored to compelling national security and foreign policy interests." *Id.* at 2. Finally, the Government asserts that Plaintiffs have not shown irreparable harm and that those interests weigh against any injunction. *See id.* at 4. These are, for the most part,

arguments that the Court considered and rejected in both *Rona*, 797 F. Supp. 3d at 287-94, and *DAWN I*, 2026 WL 3061877, at *7-9, and the Court sees no reason to change course. To the extent the Government offers new arguments in this round of briefing, they are unpersuasive.

First, the Government argues that this case is distinguishable from *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) — on which the Court relied in concluding that the Services Prohibition is content based, *see Rona*, 797 F. Supp. 3d at 288-89; *DAWN I*, 2026 WL 3061877, at *8 — because, in its view, the 2025 Order's "prohibitions are, on their face, based on the recipient, *i.e.*, the designated person, and not the content of any speech." Defs.' Supp. Mem. 1. But the same was true of the material-support statute considered by the Supreme Court in *Humanitarian Law Project*. That statute applied only to support for designated foreign terrorist organizations, yet the Supreme Court held it was content-based because, "as applied to plaintiffs[,] the conduct triggering coverage under the statute consist[ed] of communicating a message." *Humanitarian Law Project*, 561 U.S. at 28. So too here, where Plaintiffs may speak with designated persons but are subject to penalties if what they say has the "function or purpose" of benefitting those persons. *Rona*, 797 F. Supp. 3d at 289. The Government's first argument thus provides no basis to retreat from the conclusion in *DAWN I*.

Second, the Government contends that "record evidence in the form of congressional findings and statements by the executive branch" supports its asserted interest in protecting United States and allied personnel from the ICC. Defs.' Supp. Mem. 3-4 (citing 22 U.S.C. § 7421(5), (8), (9), (11) and 90 Fed. Reg. at 9369). In doing so, the Government takes a step beyond "implor[ing] the Court to take [it] at its word," as it did in *Rona* and *DAWN I*. *DAWN I*, 2026 WL 3061877, at *8 (quoting *Rona*, 797 F. Supp. 3d at 292). But it still "offer[s] no comparable record" to the one that the Supreme Court credited in *Humanitarian Law Project*.

*Id.* (quoting *Rona*, 797 F. Supp. 3d at 292); *see Humanitarian Law Project*, 561 U.S. at 29-36. In *Humanitarian Law Project*, the Court attached "significant weight" to "the considered judgment of Congress and the Executive that providing material support to a designated foreign terrorist organization — even seemingly benign support — bolsters the terrorist activities of that organization." 561 U.S. at 36. And it concluded that the political branches had "adequately substantiated their determination that . . . it was *necessary* to prohibit providing material support in the form of training, expert advice, personnel, and services to foreign terrorist groups, even if the supporters meant to promote only the groups' nonviolent ends." *Id.* (emphasis added). By contrast, the materials cited by the Government here merely show that the political branches object to the ICC's assertion of jurisdiction over United States and allied personnel. *See* Defs.' Supp. Mem. 3-4; 22 U.S.C. § 7421(9), (11) (finding that the Rome Statute exposes members of the armed forces to "the risk of international criminal prosecution" and that "[t]he United States will not recognize the jurisdiction of the International Criminal Court over United States nationals"); 90 Fed. Reg. at 9369 (stating that the ICC's "recent actions against Israel and the United States set a dangerous precedent" and that its conduct "threatens to infringe upon the sovereignty of the United States"). But they do not establish why it is *necessary* to penalize every speech-based service provided to or received from every designated person, "even those in connection with ICC prosecutions that the United States purportedly supports." *DAWN I*, 2026 WL 3061877, at *8 (quoting *Rona*, 797 F. Supp. 3d at 291) (alteration omitted). Thus, the Government's second new argument falls short as well.

Finally, citing two press statements by former Secretary of State Antony J. Blinken, the Government argues that the 2025 Order "is narrowly tailored" because "alternative strategies . . . have not deterred the ICC." Defs.' Supp. Mem. 2-3 (citing Press Statement, Antony J. Blinken,

Sec'y of State, *The United States Opposes the ICC Investigation into the Palestinian Situation* (Mar. 3, 2021), https://2021-2025.state.gov/the-united-states-opposes-the-icc-investigation-into-the-palestinian-situation/ [https://perma.cc/4R9U-5MVK] and Press Statement, Antony J. Blinken, Sec'y of State, W*arrant Applications by the International Criminal Court* (May 20, 2024), https://2021-2025.state.gov/warrant-applications-by-the-international-criminal-court/ [https://perma.cc/2RAH-8ELC]). But the fact that two press statements failed to sway the ICC does not come close to establishing that less restrictive alternatives, such as the 2025 Order's own unchallenged restrictions on funds, goods, and non-expressive services, would be inadequate to the task. *See, e.g.*, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."). As Plaintiffs note, the United States could also invoke Article 16 of the Rome Statute and introduce a resolution "halting an ICC investigation," ECF No. 44 ("Pls.' Supp. Mem."), at 8, a step that it apparently has not taken and the Government here does not address. Thus, the Government's third new argument also fails to persuade.

In short, like the plaintiffs in *Rona*, Plaintiffs have shown actual success on the merits of their First Amendment claim. The remaining requirements for a permanent injunction are also met. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Moreover, the record here establishes that the threat of IEEPA penalties has in fact caused Plaintiffs to halt much of their advocacy. *See DAWN I*, 2026 WL 3061877, at *9. And because the injury is the loss of speech itself, "remedies available at law, such as monetary damages, are inadequate to compensate for" it. *eBay*, 547 U.S. at 391. In addition, the balance of hardships

and the public interest favor granting Plaintiffs relief, for two reasons. First, the Government "does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (internal quotation marks omitted). Second, as set forth below, the injunction that the Court grants today, like the one in *DAWN I*, is carefully "calibrated to preserve the elements of the 2025 Order that further the Government's legitimate interests." *DAWN I*, 2026 WL 3061877, at *10. Among other things, it does nothing to disturb the Government's authority to designate persons under Section 1 of the 2025 Order, "to penalize the provision or receipt of 'funds' or 'goods' to designated persons under Section 3," and "to enforce the Services Prohibition in ways that do not implicate the First Amendment — for example, by applying it to financial services rather than to speech-related advocacy services." *Id.* Accordingly, for the reasons discussed above (and in *DAWN I*), the Court concludes that Plaintiffs are entitled to a permanent injunction.

**B. Plaintiffs' Facial Challenge**

That is not the end of the matter, though, because Plaintiffs argue that the permanent injunction should be broader than the preliminary injunction that the Court previously granted, in two respects. First, Plaintiffs argue that the Court should declare the Services Prohibition facially invalid insofar as it applies to speech-based services. Pls.' Supp. Mem. 1. As the Court explained in *DAWN I*, a facial challenge in the First Amendment context turns on "whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (cleaned up). That inquiry requires a court first to determine "the full range of activities the law[] cover[s]" and then to "measure the constitutional against the unconstitutional applications." *Id.* at 724-25; *see also id.* at 744 ("[E]ach court must evaluate the full scope of the law's

coverage. It must then decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other."). Applying that standard in *DAWN I*, the Court rejected Plaintiffs' facial challenge on the ground that, "[m]easured against the array of services that are within 'the 2025 Order's plainly legitimate sweep,' the more constitutionally suspect applications of the Services Prohibition — those that reach speech-related 'services' like amicus briefs, trainings, events, and publications — are relatively limited." *DAWN I*, 2026 WL 3061877, at *11 (quoting *Moody*, 603 U.S. at 723) (alteration omitted).

Plaintiffs now clarify that they do *not* challenge the 2025 Order in its entirety or "seek to disturb Defendants' ability to impose IEEPA penalties for the provision of non-expressive services." Pls.' Supp. Mem. 1. Instead, they bring a "narrow facial challenge" that "seeks only to bar the Government from enforcing" the Services Prohibition "against those who provide or receive expressive, speech-based services." *Id.* Plaintiffs acknowledge that a challenge to a law on its face ordinarily requires a court to measure the law's unconstitutional applications against the full range of activities that it covers. *See id.* at 5 (citing *Moody*, 603 U.S. at 717, 724-25, 744). Citing *Doe v. Reed*, 561 U.S. 186 (2010), however, they contend that where, as here, "a facial claim only challenges a subset of the law's applications," the analysis "is limited to the applications within the challenged subset." Pls.' Supp. Mem. 5. In *Reed*, the Supreme Court considered a challenge to Washington State's Public Records Act ("PRA"), pursuant to which the State treated referendum petitions, with the names and addresses of their signers, as records open to the public. *See* 561 U.S. at 190-93. Although the plaintiffs' complaint alleged that the PRA "violate[d] the First Amendment *as applied* to referendum petitions," the parties disagreed about whether the claim was "properly viewed as a facial or as-applied challenge." *Id.* at 194 (emphasis added) (internal quotation marks omitted). Writing for the Court, Chief Justice

Roberts observed that the claim "obviously ha[d] characteristics of both." *Id.* The challenge "[wa]s 'as applied' in the sense that it d[id] not seek to strike the PRA in all its applications, but only to the extent it cover[ed] referendum petitions," and it "[wa]s 'facial' in that it [wa]s not limited to plaintiffs' particular case, but challenge[d] application of the law more broadly to all referendum petitions." *Id.* But, the Court continued, "[t]he label is not what matters." *Id.* "The important point" was that the "claim and the relief that would follow" reached "beyond the particular circumstances of these plaintiffs," which meant that they had to "satisfy [the] standards for a facial challenge *to the extent of that reach*." *Id.* (emphasis added). The Court then examined "whether disclosure of referendum petitions" in particular violated the First Amendment, not whether the PRA was invalid in *all* of its applications. *Id.* at 191, 200.

The Court agrees that *Reed* provides the relevant framework for analysis of Plaintiffs' First Amendment challenge to the Services Prohibition. Like the challenge in *Reed*, Plaintiffs' claim in this case has characteristics of both an as-applied *and* a facial challenge. Their claim is as-applied insofar as they do not seek to strike the Services Prohibition (let alone the 2025 Order) "in all its applications," *id.* at 194; instead, they challenge the Services Prohibition only to the extent that it covers speech-based services, *see* Pls.' Supp. Mem. 1, 5. Yet their claim is facial insofar as it is not limited to Plaintiffs' "particular case," *Reed*, 561 U.S. at 194 — that is, it is not limited to their own legal submissions, research, trainings, and joint advocacy. Instead, Plaintiffs challenge the Services Prohibition's application to all such services. *See* Pls.' Supp. Mem. 1, 15. *Reed* governs analysis of this sort of "hybrid" claim, Pls.' Supp. Mem. 5, which means that Plaintiffs need only "satisfy [the] standards for a facial challenge *to the extent*" that the Services Prohibition covers speech-based services, *Reed*, 561 U.S. at 194 (emphasis added).

The Government argues that Plaintiffs have merely "repackage[d] their already-rejected facial challenge," Defs.' Supp. Mem. 6, but that misses the point. The challenge that the Court rejected in *DAWN I* was to the 2025 Order as a whole, which is why the Court measured its speech-related applications against the full "array of services" that are within its sweep. *DAWN I*, 2026 WL 3061877, at *11. The challenge that Plaintiffs advance (or clarify) now is confined to speech-based services. Regardless of whether it is "repackage[d]" as facial, as-applied, or a hybrid of the two, Defs.' Supp. Mem. 6, *Reed* teaches that "[t]he label is not what matters," 561 U.S. at 194. The Government further argues that Plaintiffs, unlike the plaintiffs in *Reed*, identify no "discrete application" of the 2025 Order. Defs.' Supp. Mem. 5. But that argument fares no better. The range of applications that Plaintiffs challenge is defined by the same line between speech-based and non-expressive services that this Court has already drawn, *see DAWN I*, 2026 WL 3061877, at *11 (contrasting speech-related services with "a wide range of non-expressive services," such as "banking, brokerage, and insurance"); *Rona*, 797 F. Supp. 3d at 285, 292 (deeming the plaintiffs' "education, training, analysis, and other services" to be "protected expression"), and that other courts have used to frame injunctive relief in challenges to the 2025 Order (and a predecessor), *see, e.g.*, *Smith v. Trump*, 791 F. Supp. 3d 90, 100 (D. Me. 2025) (enjoining the Government from imposing penalties on the plaintiffs under the 2025 Order and IEEPA "based on the [p]laintiffs' provision of speech-based services to the ICC"); *Open Soc'y Just. Initiative*, 510 F. Supp. 3d at 210, 217 (enjoining enforcement of an identical services prohibition in an earlier Executive Order as to the "speech activities" addressed in that opinion).

Thus, in assessing Plaintiffs' facial challenge, the relevant question is "whether," *within the category of speech-based services*, "a substantial number of the [Services Prohibition's] applications are unconstitutional, judged in relation to the [Services Prohibition's] plainly

legitimate sweep." *Moody*, 603 U.S. at 723; *see Reed*, 561 U.S. at 194. The answer to that question is plainly yes. *Every* application of the Services Prohibition to a speech-based service turns on the function or purpose of the speech and, thus, triggers strict scrutiny. And every such application suffers from the same lack of narrow tailoring. In other words, the constitutional defect is "categorical," in that it is "present in every case." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021). Notably, the Government does not identify even one application of the Services Prohibition to speech-based services that would survive strict scrutiny. On the flip side, *all* of the Services Prohibition's "constitutional applications" to which the Government points are applications to non-expressive services — which Plaintiffs do not challenge. *See* Defs.' Supp. Mem. 6 (citing *DAWN I*, 2026 WL 3061877, at *11). The Court therefore concludes that the Services Prohibition is facially invalid to the extent it applies to speech-based services, while its other applications are unaffected. *See Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006) (explaining that a law may be "declared invalid to the extent that it reaches too far, but otherwise left intact" (internal quotation marks omitted)).

**C. The Scope of the Injunction**

Second, Plaintiffs ask the Court to enter what has come to be known as a "universal" injunction — that is, to enjoin enforcement of the Services Prohibition against "anyone" who provides or receives speech-based services, not just against Plaintiffs themselves. Pls.' Supp. Mem. 14-15. They contend that, under First Amendment overbreadth doctrine, facial invalidation "entail[s] injunctive relief barring the enforcement of the speech and associational restrictions against anyone with First Amendment rights." *Id.* at 1 n.1; *see also* ECF No. 49 ("Pls.' Supp. Reply"), at 3 ("It is well-settled that an injured plaintiff may bring a First Amendment overbreadth challenge to vindicate nonparties' rights, and that an order suspending

all enforcement of a facially overbroad law is warranted to protect an uninhibited marketplace of ideas and to reduce the social costs caused by the withholding of protected speech by regulated parties not before the court." (cleaned up)). In any event, they argue, only an injunction barring enforcement of the Services Prohibition against anyone would fully remedy their own injuries because they "cannot effectively undertake" their protected activities "without extensive assistance from and participation by nonparties to this litigation." Pls.' Supp. Mem. 10-11. The Government counters that the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), forecloses any relief beyond Plaintiffs themselves and that an order protecting Plaintiffs alone "would eliminate their alleged fears." Defs.' Supp. Mem. 6-9.[1]

*CASA* aside, Plaintiffs' argument that a finding of facial overbreadth under the First Amendment warrants injunctive relief that extends beyond the plaintiffs who brought the case is well founded. Indeed, the Supreme Court has long instructed that a showing of substantial overbreadth in violation of the First Amendment "suffices to invalidate *all* enforcement" of the challenged law. *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citing cases); *accord, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 336 (2010) (invoking precedents under which "a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated"); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503-04 (1985) (explaining that a substantially overbroad law "may not be enforced against anyone, including the party before the court, until it is narrowed to reach only unprotected activity"); *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973) (observing that "any enforcement of a statute" found to be facially overbroad under the

---

[1] In *DAWN I*, the Court declined to consider Plaintiffs' request for a "universal" injunction because they had failed to make the request until their reply, thereby depriving the Government of an opportunity to address the "significant questions" that the request raised following *CASA*. *DAWN I*, 2026 WL 3061877, at *12. The issue is now fully joined.

First Amendment "is totally forbidden"); *Thornhill v. Alabama*, 310 U.S. 88, 101-06 (1940) (holding an anti-picketing statute "invalid on its face" due to its "sweeping proscription of freedom of discussion"); *see also, e.g.*, *Reed*, 561 U.S. at 194 (describing the relief "that would follow" from a successful facial challenge as "an injunction" that would "reach beyond the particular circumstances of these plaintiffs"). The Court has justified this "expansive remedy" — that is, "the 'strong medicine' of overbreadth invalidation" — on the ground that "the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech." *Hicks*, 539 U.S. at 119 (quoting *Broadrick*, 413 U.S. at 613); *see id.* ("Overbreadth adjudication, by suspending *all* enforcement of an overinclusive law, reduces the[] social costs caused by the withholding of protected speech."); *accord United States v. Hansen*, 599 U.S. 762, 769-70 (2023) ("[T]he overbreadth doctrine allows a litigant . . . to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak."). "In such cases, it has been the judgment of th[e Supreme] Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes." *Broadrick*, 413 U.S. at 612.

Even before *CASA*, this rationale — indeed, the First Amendment facial overbreadth doctrine as a whole — was questioned by some members of the Court. *See, e.g.*, *Moody*, 603 U.S. at 752-66 (Thomas, J., concurring in the judgment); *United States v. Sineneng-Smith*, 590 U.S. 371, 382-90 (2020) (Thomas, J., concurring). But even the doctrine's most prominent critic acknowledged that "the Court [had] invoked this rationale to facially invalidate a wide range of laws." *Sineneng-Smith*, 590 U.S. at 383-84 (Thomas, J., concurring) (citing cases, including *United States v. Stevens*, 559 U.S. 460, 482 (2010), in which the Supreme Court, in an opinion

by Chief Justice Roberts, held a federal statute "substantially overbroad, and therefore invalid under the First Amendment"). The same is true for the Second Circuit. *See, e.g.*, *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 153 (2d Cir. 2000) (holding a New York statute imposing witness residence requirements for ballot access designating petitions "invalid on its face under the overbreadth doctrine"); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 108-09, 112 (2d Cir. 2017) (affirming a permanent injunction against enforcement of an ordinance "because it is an overbroad commercial speech prohibition"); *Nat'l Advert. Co. v. Town of Babylon*, 900 F.2d 551, 557 (2d Cir. 1990) (holding that, because "the overbreadth challenge was successful," the challenged ordinances were "invalid in all their applications").

Whether this longstanding precedent remains good law in the wake of *CASA* appears to be an issue of first impression in this Circuit.[2] At issue in *CASA* was the scope of a federal court's authority to enter universal injunctions — those that "prohibit enforcement of a law or policy against *anyone*," not just the named plaintiffs. 606 U.S. at 837. Writing for the Court, Justice Barrett held that federal courts are authorized by the Judiciary Act of 1789 to grant "only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception," a category that, she concluded, did not include "the universal injunction" or "any analogous form of relief." *Id.* at 841-47 (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). It follows that federal courts are generally limited to "administer[ing] complete relief *between the parties*." *Id.* at 851 (citation omitted).

---

[2] The Second Circuit has expressly reserved judgment on the issue. *See Volokh v. James*, 148 F.4th 71, 98 & n.12 (2d Cir. 2025) (declining to decide whether an injunction barring "*any* application" of a state law found facially invalid under the First Amendment was "impermissibly 'universal' under" *CASA* and "leav[ing] the question" to "the district court in the first instance").

Significantly, in so holding, the Court did not suggest that a federal court's remedial authority could vary based on the nature of the substantive claim at issue; instead, the Court's analysis turned on the equitable remedies generally available under the Judiciary Act of 1789. More to the point, the Court did not suggest, let alone hold, that First Amendment overbreadth challenges might be treated differently — a silence that is especially noteworthy because the Court did take pains to note that its decision did not "resolve[] the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at 847 n.10. Perhaps tellingly, the Court even cited with approval a prior decision in which it had upheld an injunction of an overbroad municipal ordinance limited "to the particular federal plaintiffs." *Id.* at 844 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)). Thus, there is no question that *CASA* casts some doubt on traditional First Amendment overbreadth doctrine.

Time and time again, however, the Supreme Court has instructed that, when one of its precedents "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," a lower court "should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). A lower court is bound by that rule "even if the lower court thinks the precedent is in tension with some other line of decisions" or that "intervening decisions from [the Supreme] Court ha[ve] implicitly overruled" the precedent. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (internal quotation marks omitted); *see Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."); *see also Comey v. U.S. Dep't of Just.*, — F. Supp. 3d —, No. 25-CV-7625 (JMF), 2026 WL 3203254, at *16 (S.D.N.Y. Oct. 26, 2026). Along similar lines, the Second Circuit has

stressed that lower courts are bound by its prior decisions "until such time as [the decisions] are overruled either by an *en banc* panel of our Court or by the Supreme Court." *Defending Educ. v. Croton-Harmon Union Free Sch. Dist.*, 190 F.4th 53, 57 (2d Cir. 2025); *accord, e.g.*, *United States v. Wong*, 40 F.3d 1347, 1373 (2d Cir. 1994) (observing that, "until the Supreme Court rules otherwise," a district court is "obliged to follow [the Second Circuit's] precedent, even if that precedent might be overturned in the near future").

Thus, "the precise question for this Court is not whether, by its own analysis," *CASA* supports the Government's argument that relief here should be limited to Plaintiffs alone, but rather whether *CASA* "so conclusively supports that finding that the Second Circuit or the Supreme Court is all but certain to overrule" the case law approving universal injunctions in the First Amendment overbreadth context. *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015) (cleaned up), *aff'd*, 854 F.3d 197 (2d Cir. 2017). The Court cannot conclude that it does. First, although *CASA* did not suggest, let alone hold, that First Amendment overbreadth cases were exempt from its holding, it did not suggest, let alone hold, the opposite either. That is, the Court gave no indication that it was overruling its overbreadth precedents, and it "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). Second, in a concurrence joined by Justice Thomas, Justice Alito expressed concern about an "issue[] . . . left unresolved" by the Court's opinion that could "potentially threaten" its "practical significance," namely "the availability of third-party standing." *CASA*, 606 U.S. at 866 (Alito, J., concurring). First Amendment overbreadth doctrine is founded on the concept of third-party standing. *See, e.g.*, *Hansen*, 599 U.S. at 769-70; *Broadrick*, 413 U.S. at 612-13. And finally, two other Justices — *including Justice Barrett*, the author of *CASA*, herself — have observed that First Amendment

overbreadth challenges may be distinguishable from other kinds of cases when it comes to the authority of a federal court to issue a universal injunction. *See Griffin v. HM Fla.-ORL, LLC*, — U.S. —, 144 S. Ct. 1, 2 (2023) (statement of Kavanaugh, J., joined in relevant part by Barrett, J., respecting the denial of the application for stay) (observing that First Amendment overbreadth challenges "present[]" their "own doctrinal complexities about the scope of relief" in explaining why a case was not an appropriate vehicle to decide the question of whether a district court can enter a universal injunction). In light of these data points, the Court cannot say that "the Supreme Court is all but certain to overrule" its case law approving universal injunctions in the First Amendment overbreadth context. *Diaz*, 122 F. Supp. 3d at 179 (cleaned up).

Notably, that conclusion is consistent with a decision of the Sixth Circuit, one of the few courts of appeals to address the issue since *CASA*. *See Welty v. Dunaway*, 192 F.4th 607, 643 (6th Cir. 2026). It is further supported by an opinion joined by five judges sitting en banc on the Eleventh Circuit. *See HM Fla.-ORL, LLC v. Governor of Fla.*, 186 F.4th 776, 805 (11th Cir. 2026) (en banc) (Rosenbaum, J., dissenting). To be sure, these opinions have not gone unchallenged. The Sixth Circuit case was decided over a dissent from then-Chief Judge Sutton, who would have held that, even in an overbreadth case, "the remedy still must be party specific." *Welty*, 192 F.4th at 663 (Sutton, C.J., dissenting) (emphasis omitted). Similarly, six judges on the Eleventh Circuit concluded that *CASA* "did *not* carve out an exception for First Amendment overbreadth challenges." *HM Fla.-ORL, LLC*, 186 F.4th at 785 (Brasher, J.) (emphasis added). The point is not to say that one side or the other of this debate is right about whether, following *CASA*, the Supreme Court will ultimately overrule its prior overbreadth case law; it is enough to say that it is debatable. It follows that a lower court may not go its own way; put differently, "while the Supreme Court may be free to overrule its prior cases . . . , this Court is not." *Comey*,

2026 WL 3203254, at *16. Accordingly, the Court rejects the Government's contention that *CASA* limits relief to Plaintiffs themselves in the context of this First Amendment overbreadth challenge.

**CONCLUSION**

For the foregoing reasons, the Court concludes that Plaintiffs are entitled to a permanent injunction barring "*all* enforcement" of the Services Prohibition with respect to speech-based services. *Hicks*, 539 U.S. at 119. That is to say, to the extent that the Services Prohibition purports to regulate speech-based services, it "may not be enforced against anyone." *Brockett*, 472 U.S. at 503.[3] For the reasons discussed in *DAWN I*, however, President Trump himself is excluded from the scope of the injunction. *See* 2026 WL 3061877, at *10.

In light of these conclusions, the Court need not and does not reach Plaintiffs' alternative argument that the 2025 Order discriminates on the basis of viewpoint. *See* Pls.' Supp. Mem. 9-10. Nor must it reach their claim under the Administrative Procedure Act. *See id.* at 14-15.

Rule 58 of the Federal Rules of Civil Procedure provides that "[e]very judgment . . . must be set out in a separate document." Additionally, Rule 65(d)(1)(C) requires that, in any order granting an injunction, a district court "describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required." In light of these

---

[3] The Court reserves judgment on what the proper scope of injunctive relief would be here in the event that *CASA* does apply. That said, there is a strong argument for protecting at least some nonparties — such as those who, at Plaintiffs' request or in coordination with Plaintiffs, participate in Plaintiffs' activities protected by the First Amendment — in order to "offer complete relief to the plaintiffs." *CASA*, 606 U.S. at 852 (emphasis omitted); *see, e.g.*, Pls.' Supp. Mem. 10-12 (arguing that Plaintiffs' work "is inherently collaborative" and that, "because of their modest size, DAWN and TAAG rely heavily on outside assistance to complete their ICC submissions"); *see also* ECF No. 44-2 ("Stenberg Decl."), ¶¶ 4-5 (describing potential collaborators who "withdrew their offers of assistance" to Plaintiffs for fear of IEEPA liability); ECF No. 44-1 ("Shakir Supp. Decl."), ¶¶ 2-5 (same).

requirements, Plaintiffs shall promptly draft and produce to the Government a proposed judgment consistent with this Opinion and Order. No later than **December 1, 2026**, the parties shall file (1) an agreed-upon proposed judgment or (2) competing proposed judgments with a redline showing the differences and supporting letter briefs not to exceed four pages.

The Clerk of Court is directed to terminate ECF No. 43.

SO ORDERED.

Dated: November 23, 2026
New York, New York

JESSE M. FURMAN
United States District Judge